*Harper*

*v.*

*Starbucks Corporation*

---

Mark G. Luker

July 30, 2024

---

**AB Litigation**
SERVICES

216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-03295-GPG-KAS

_____

REMOTE VIDEO DEPOSITION OF MARK G. LUKER, MD

July 30, 2024

_____

DONALD HARPER,

Plaintiff,

vs.

STARBUCKS CORPORATION,

Defendant.

_____

**Page 2**

1   APPEARANCES:
2       DORMER HARPRING, LLC
            By Sean M. Dormer, Esq.
3           3457 Ringsby Court
            Suite 110
4           Denver, CO  80216
            smd@denvertrial.com
5               Appearing remotely on behalf of
                Plaintiff.
6
7       GARNETT POWELL MAXIMON BARLOW & FARBES
            By Andrew Garnett, Esq.
8           Robert L. Barlow, Esq.
            1512 Larimer Street
9           Suite 950
            Denver, CO  80202
10          andrew.garnett@garnettlegalgroup.com
            rob.barlow@garnettlegalgroup.com
11              Appearing remotely on behalf of
                Defendant.
12  Also Present:
            Taylor Pace, Legal Video Specialist
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1           Pursuant to Notice and the Federal Rules
2   of Civil Procedure, the remote video deposition of
3   MARK G. LUKER, MD, called by Garnett Powell Maximon
4   Barlow & Farbes, was taken on Tuesday, July 30,
5   2024, commencing at 2:02 p.m. before
6   Rosemary Novario, Registered Merit Reporter, and
7   Notary Public within and for the State of Wyoming.
8
                    I N D E X
9
    REMOTE VIDEO DEPOSITION OF MARK G. LUKER, MD
10
    EXAMINATION BY:                          PAGE
11
        Mr. Garnett                          4, 83
12      Mr. Dormer                           45
13
    EXHIBITS                        INITIAL REFERENCE
14
    No. 11...01/30/2024 Follow-Up in Rocky
15      Mountain Orthopedics Clinic ........... 87
16
17
18
19
20
21
22
23
24
25

EXAMINATION BY:                          PAGE
    Mr. Garnett                          4, 83
    Mr. Dormer                           45
EXHIBITS                        INITIAL REFERENCE
No. 11...01/30/2024 Follow-Up in Rocky
    Mountain Orthopedics Clinic ........... 87

**Page 4**

1           P R O C E E D I N G S
2           THE VIDEOGRAPHER:  We are on the record at
3   2:02 p.m.  Today is July 30th, 2024.  This begins the
4   video-recorded deposition of Dr. Mark Luker taken by
5   the defendant in the matter of Donald Harper versus
6   Starbucks Corporation.  This video deposition is
7   being recorded via video conference.  The court
8   reporter today is Rosemary Novario.  The videographer
9   is Taylor Pace.
10          Counsel, please introduce yourselves and the
11  parties you represent beginning with plaintiff's
12  counsel first.
13          MR. DORMER:  Hello.  This is Sean Dormer,
14  and I'm here with Amy Rogers, and we represent
15  Donald Harper.
16          MR. GARNETT:  I'm Andrew Garnett with
17  Rob Barlow on behalf of Starbucks Corporation.
18          THE VIDEOGRAPHER:  Will our court reporter
19  please swear in the deponent?
20              MARK G. LUKER, MD,
21      being first duly sworn in the above cause, was
22      examined and testified as follows:
23              EXAMINATION
24  BY MR. GARNETT:
25      Q   So Dr. Luker, first and foremost, thanks so

1  much for making time. My name's Andrew Garnett.
2  Rob Barlow and I represent the defendant, Starbucks
3  Corporation, in some ongoing litigation that brings
4  you here to talk a little bit about your treatment at
5  different points of Donald Harper; does that make
6  sense
7      A   Yes.
8      Q   Have you ever been deposed before?
9      A   I have.
10     Q   Have you ever been an expert witness
11  before?
12     A   No, I have not served as an expert
13  witness.
14     Q   When you were deposed before, do you know
15  what the context was; were you a witness, were you a
16  part to a case; what was that for?
17     A   Generally, a treating-physician witness.
18  I've never been --
19         THE REPORTER:  I'm sorry.  Can you repeat
20  that, Doctor?
21         THE WITNESS:  I said it's always been as a
22  witness or a treating physician.
23  BY MR. GARNETT:
24     Q   Have you ever been hired as an expert
25  witness to provide an opinion in litigation?

1      A   No.
2      Q   So a couple ground rules, and Rosemary will
3  do a good job of interjecting when she needs to.
4  Obviously, this is on Zoom.  We could cut in, cut
5  out.  Raise your hand, let me know if you can't hear
6  me for any reason, okay?
7      A   Okay.
8      Q   You need to give audible answers, yes, no,
9  not shaking or nodding your head so that Rosemary can
10  get the record clear, typed answers.  So let's just
11  make sure that we're giving audible answers and
12  trying not to talk over one another so she doesn't
13  have to try to split two speaking people at any given
14  time, okay?
15     A   Understood.
16     Q   We're going to fail at that, and I'm going
17  to ask some stupid questions that don't make any
18  sense.  If that happens, just let me know.  The most
19  important thing is I want to make sure you understand
20  my questions, and I want to make sure I understand
21  your answers so we can get a clear record and make
22  sure we're understanding one another, okay?
23     A   Yes.
24     Q   Do you know anything about this
25  litigation?

1      A   I understand that -- yes, I know a little
2  bit about it, I suppose.
3      Q   And how did you learn about it?
4      A   I don't recall.  It may have been Mr.
5  Harper telling me about it.  I've had some
6  communication with some attorney s in the past but I
7  cannot recall what that's been, honestly.
8      Q   Okay.  Do you recall speaking with
9  Mr. Dormer or somebody from Mr. Dormer's office who
10  represents Mr. Harper?
11     A   I think that's likely.  Again, I have some
12  notes I'll have to pull up to be sure, but it seems
13  like this is taking a long time.
14     Q   It is an old case, yes.
15     A   The answer is yes, I have a recollection of
16  some phone call with an attorney.
17     Q   Was that attorney named Eric Moyer or
18  Sean Dormer?
19     A   I don't recall, but my notes may indicate
20  that.
21     Q   And do you know when that was?
22     A   Certainly not off the top of my head.
23     Q   Was it within the last few months, or was it
24  a long time ago?
25     A   I don't know.  I'd have to look, honestly.

1      Q   Sure.  Do you have that information
2  available to you?
3      A   I am searching for it now.
4      Q   Okay.  Take your time.
5          (Pause.)
6      A   Well, I don't see a note, so I'm going to
7  have to say I don't recall, don't have the details in
8  front of me, at least not successful.
9      Q   No problem.  And I also meant to mention
10  this earlier, if you don't recall or you don't know,
11  those are perfectly acceptable and fine answers.  So
12  I want to go back just a second.  Well, first of all,
13  you have your chart up you said?
14     A   I do.
15     Q   And is that your chart for treatment of
16  Mr. Harper?
17     A   Yes.
18     Q   And is it your visits with Mr. Harper?
19     A   This is the record from what was SCL Health
20  and then Intermountain Health, my employer record,
21  and there may be some other things that were scanned
22  into it, but it's our medical record.
23     Q   And so does that have records from other
24  treating physicians of Mr. Harper; not just your
25  notes but other doctors at your hospital?

**Page 9**

1    A    It would.

2    Q    And so do you know or can you tell what you

3    would consider to be the dates that you saw

4    Mr. Harper after August 23rd, 2019?

5    A    I have numerous dates of -- numerous

6    encounters with him after -- what was the date,

7    August?

8    Q    23rd, 2019.

9    A    2019.  Since that time, I've seen him in

10   July 2020, July 2023, August 2023, October 2023,

11   January 2024.  That's the sum of it.

12   Q    So those are back with what would have been

13   or that is my expectation or was my understanding,

14   and so five appointments or five visits with

15   Mr. Harper in the last four years, correct?

16   A    Yes.

17   Q    And I want to talk a little bit about your

18   involvement with Mr. Harper since the incident

19   that -- well, first of all, do you know what happened

20   at Starbucks on August 23rd, 2019?

21   A    I have a record of it in my chart.  I

22   understand something about it, yes.

23   Q    What is your understanding?

24   A    He was struck by an umbrella while sitting

25   on the patio at Starbucks, struck him on the left

**Page 10**

1    side of his neck and upper thorax, chest, scapula,

2    clavicle, something in that area.  That's what I

3    understand it to be.

4    Q    And so you did not see Mr. Harper for almost

5    a year after that incident, correct?

6    A    That is correct.

7    Q    And were you aware whether he saw a

8    neurologist, Dr. Hehmann?

9    A    Would you repeat the doctor's name?

10   Q    I believe it's Hehmann, H-E-H-M-A-N-N?

11   A    I don't recall that interaction.

12   Q    When you first saw him in July of 2020, was

13   he referred to you?

14   A    I don't know.

15   Q    Were you evaluating him for a particular

16   injury at that time or a particular location of an

17   injury at that time?

18   A    Left-upper extremity, pain, and numbness.

19   Q    And so when you saw Mr. Harper --

20        THE REPORTER:  Excuse me.  Mr. Garnett,

21   all's I got was, "when you saw Mr. Harper," and then

22   I couldn't hear what you said.

23        MR. DORMER:  A problem for us.  I think

24   probably a mike issue potentially or maybe moving

25   away from the mike, Andrew.

**Page 11**

1        MR. GARNETT:  Sorry.  Is this any better?

2        MR. DORMER:  Yeah.  It's kind of better when

3    you're kind of closer and facing towards the

4    camera.

5        MR. GARNETT:  No problem.  Let me know.

6    Sorry about that.  I'll try to speak up louder and

7    clearer.

8    BY MR. GARNETT:

9    Q    So Dr. Luker, when you saw Mr. Harper in

10   July of 2020, what was he complaining about?

11   A    Left-upper extremity pain and numbness.

12   Q    And I want to break out a couple of

13   different portions of the left extremity, okay?

14   A    Okay.

15   Q    So one I'm going to call the shoulder and

16   then the elbow and then the hand, okay?

17   A    Yes.

18   Q    So when you saw Mr. Harper on July 21st,

19   2020, you referred him to a hand specialist to assess

20   his nerve symptoms and assess his ulnar nerve,

21   correct?

22   A    Yes.

23   Q    So is it safe to say that based on

24   Mr. Harper's complaints, you sent him to a specialist

25   to look at his elbow and to evaluate his nerve-based

**Page 12**

1    complaints in a little more specificity?

2    A    Yes.

3    Q    Was that person that you referred Mr. Harper

4    to Dr. Treadwell?

5    A    Yes.

6    Q    And so was it your understanding that

7    Dr. Treadwell would look into any complaints related

8    to the ulnar nerve or Mr. Harper's left elbow?

9    A    Yes.

10   Q    And you did not specifically formally

11   diagnose Mr. Harper with any related to his left

12   elbow; you referred him to a specialist for that

13   purpose, correct?

14        MR. DORMER:  Object to form.

15   A    Yes.

16   BY MR. GARNETT:

17   Q    And so would you defer to Dr. Treadwell's

18   evaluation and diagnosis of Mr. Harper's nerve

19   complaints and left-elbow complaints?

20        MR. DORMER:  Same objection.

21   A    As long as it made sense.

22   BY MR. GARNETT:

23   Q    Do you have any reason to disagree with what

24   Dr. Treadwell diagnosed as Mr. Harper's injuries or

25   problems with his left elbow or his nerve issues?

**Page 13**

1    A    Only that he didn't get better with
2    treatment.
3        Q    So describe that in a little more detail.
4        A    My understanding is that Mr. Harper did not
5    recover after having had surgery with Dr. Treadwell,
6    and it's possible that Dr. Treadwell's analysis was
7    not correct.
8        Q    And so you're basing that off of Mr. Harper
9    coming and seeing you three years later and
10   continuing to complain about elbow issues?
11       MR. DORMER:  Object to form; foundation, as
12   well.
13       A    Yes.
14   BY MR. GARNETT:
15       Q    You don't have any opinions as to injuries
16   that Mr. Harper had to his elbow?
17       A    Let me clarify that previous question.  It's
18   not really just elbow issues.  It's ulnar nerve
19   problems that he had.  So he was treated for an elbow
20   problem, but it may not be purely an elbow problem is
21   my point.
22       Q    Sure, sure.  So let's unpack that a little
23   bit.  So did you diagnose Mr. Harper with cubital
24   tunnel syndrome?
25       A    I did not diagnose him with cubital tunnel

**Page 14**

1    syndrome if that's what you mean.
2        Q    Yeah.
3        A    I suspected that he may have cubital tunnel
4    syndrome or double-crush syndrome or some other ulnar
5    nerve problem.
6        Q    And that suspicion caused you to refer
7    Mr. Harper to Dr. Treadwell for further evaluation
8    and treatment related to those complaints, correct?
9        A    Yes.
10       Q    Mr. Harper -- and Dr. Treadwell performed
11   those evaluations and made those diagnoses with
12   Mr. Harper, correct?
13       MR. DORMER:  Object to foundation.
14       A    Yes.
15   BY MR. GARNETT:
16       Q    And other than Mr. Harper's surgery did not
17   resolve some of his complaints or injury complaints,
18   do you have any reason to disagree with the diagnoses
19   that Dr. Treadwell made regarding Mr. Harper's elbow
20   and ulnar nerve issues?
21       A    I haven't looked into it, so only the fact
22   that the outcome didn't solve -- the procedure didn't
23   solve the problem.
24       Q    Right.  Okay.  Because you weren't asked to
25   give an expert opinion in this case when you were

**Page 15**

1    treating Mr. Harper, correct?
2        MR. DORMER:  I'm going to object to
3    foundation; form, as well.
4        A    I don't remember being asked to give an
5    expert opinion, no.
6    BY MR. GARNETT:
7        Q    Right.  You were just referred a patient who
8    was complaining of issues to his left-upper
9    extremity, and you were tasked with evaluating and
10   treating, correct?
11       A    Yes.
12       Q    In that first meeting in July of 2020
13   resulting in you referring him to a specialist for
14   nerve issues and an ulnar nerve complaint, and that
15   person that you referred him to for treatment for
16   those issues was Dr. Treadwell?
17       A    Once again, yes.
18       Q    And you weren't asked to determine the cause
19   of any of his elbow issues or elbow complaints,
20   correct?
21       MR. DORMER:  Object to foundation and form,
22   yeah.
23       A    Yes.
24   BY MR. GARNETT:
25       Q    So you don't have any opinion as to what may

**Page 16**

1    have been the cause of Mr. Harper's ulnar nerve
2    complaints, correct?
3        MR. DORMER:  Same objection.
4        A    I have an opinion because I referred him to
5    Dr. Treadwell thinking that he may have suffered an
6    injury to his ulnar nerve of some sort.  I mean,
7    yeah, I have an opinion.
8    BY MR. GARNETT:
9        Q    Well, right.  Let's unpack that a little
10   bit.  You have an opinion that he may have had an
11   ulnar nerve injury, correct?
12       A    Right.
13       Q    But you didn't do anything to determine the
14   potential cause of any ulnar nerve issue that he may
15   have had?
16       A    I did not.
17       MR. DORMER:  Object to form and foundation
18   again.
19       A    Correct.
20   BY MR. GARNETT:
21       Q    So just to clarify, you do not have an
22   opinion as to the cause of any ulnar nerve issue or
23   complaints of Mr. Harper because you weren't asked to
24   do that, and you didn't, correct?
25       MR. DORMER:  Sorry, Andrew.  Is your

1  question finished?
2       MR. GARNETT:  Yeah.
3       MR. DORMER:  Same objection.
4    A   I'm not sure I even understand the question.
5  I have an opinion as to the cause based on history,
6  but I don't -- didn't do any tests as you suggested
7  previously, yeah, no.  Trying to be as accurate as I
8  can be here.  It's hard to split these hairs.
9  BY MR. GARNETT:
10   Q   Well, it's really not splitting hairs.  I'm
11 just trying to understand what you are or are not
12 providing an expert opinion on because I've read your
13 medical records, and nowhere in your medical records
14 is there any notes as to the cause or the causation
15 event of any of Mr. Harper's injuries, okay.  So
16 that's the important background dynamic, but we're
17 not to any of those issues with the shoulder yet.
18 We're just talking about the elbow, okay?
19   A   Okay.
20      MR. DORMER:  I object to form on the
21 diatribe.  You could ask the question if you want,
22 but I didn't hear one.  I think also, Andrew, that it
23 may be misleading to suggest that this wasn't
24 disclosed to you in some way because it's in our
25 expert disclosure from our talk with Dr. Luker.  I

1  don't know if you saw that, but . . .
2       MR. GARNETT:  What are you talking about?
3       MR. DORMER:  Yeah.  Just to kind of give you
4  an idea of where my objection's coming from.  It
5  sounds like you're trying to imply to Dr. Luker that
6  he's somehow hasn't been open about his opinion or
7  hasn't written it down anywhere, hasn't told anyone.
8  I mean, we had a phone call with him and put his
9  opinion in our expert disclosures, and he's told you
10 a couple times that he's -- he has an opinion on it,
11 and your opinion about what might or might not be in
12 the records is really not an appropriate deposition
13 topic.  If you want to ask the witness questions, you
14 can ask the witness questions, but that's basically
15 where my form objection is coming from
16 It's -- hopefully that explains it.
17      MR. GARNETT:  Yeah, that's fine.  I'm going
18 to keep going with my examination of Dr. Luker.
19      MR. DORMER:  Sounds good.
20 BY MR. GARNETT:
21   Q   Dr. Luker, you do not have an opinion as to
22 what event caused any ulnar nerve injury for
23 Mr. Harper, correct?
24      MR. DORMER:  Object to the form and
25 foundation.

1    A   I still think that I do have an opinion.  I
2  mean, I think he suffered an injury.  By his history,
3  I developed an opinion about what may have happened
4  to him.  I didn't do any additional diagnostic workup
5  as you're pointing out, but I have an opinion.
6  BY MR. GARNETT:
7    Q   Okay.  So you have an opinion as to what may
8  have happened, but I'm asking for your opinion to a
9  reasonable degree of medical probability, and so if
10 you have an opinion to a reasonable degree of medical
11 probability as to what event caused Mr. Harper's
12 ulnar nerve injury, please tell me what that is.
13   A   I think it's likely that he suffered a --
14 some injury to his brachial plexus in his Starbucks
15 injury event that he described.  I don't have any
16 other good explanation for it.
17   Q   Okay.  So I want to stop there for a second.
18 That's an opinion as to his brachial plexus nerve.
19 I'm talking about his ulnar nerve.
20   A   So the ulnar nerve comes from the brachial
21 plexus, right.
22   Q   Correct.
23   A   Yeah.
24   Q   So what injury did he have to his ulnar
25 nerve that you diagnosed?

1    A   Ulnar nerve dysfunction somewhere from the
2  brain to the motor units and sensory receptors of the
3  ulnar nerve.  Somewhere from the beginning to the
4  end, the ulnar nerve became dysfunctional.  It's
5  connected, right?
6    Q   Right.
7    A   So the ulnar nerve can be dysfunctional
8  because there's a problem in the neck.
9    Q   So do you disagree with Dr. Treadwell's
10 diagnosis of the cause -- let me ask that -- strike
11 that.  When Mr. -- when Dr. Treadwell says that based
12 on his evaluation and diagnosis of Mr. Harper, his
13 cubital tunnel ulnar nerve issues were not caused by
14 the blunt force trauma of the umbrella hitting his
15 clavicle, do you disagree with that opinion?
16      MR. DORMER:  I'm going to object to
17 foundation as to what Treadwell said or may have
18 said.
19   A   I haven't read Treadwell's records, and I
20 would say I'm not confident in Treadwell's
21 diagnosis.
22 BY MR. GARNETT:
23   Q   His diagnosis of the ulnar nerve issue or
24 his --
25   A   Right.

Page 21

1    Q    -- or his opinion -- okay.  So you don't
2 think he had an ulnar nerve issue?
3    A    That's not what I said.
4    Q    Okay.  So tell me what you're trying to say.
5    A    I think he has an ulnar nerve issue, but he
6 may also have something more, and what Dr. Treadwell
7 did to solve the apparent ulnar nerve issue didn't
8 solve the ulnar nerve issue as best I could tell.  So
9 I'm not confident that he had the right diagnosis.
10    Q    Okay.  And so in July of 2020, right, your
11 first time seeing Mr. Harper, did you review any
12 diagnostic tests that he had done?
13    A    I don't recall.  I don't recall.
14    Q    Okay.  Do you have Page 4 that says, "I do
15 not have access to MRI scans apparently done recently
16 at the VA"?
17    A    Yes, I see that now.
18    Q    And so have you ever seen MRIs of
19 Mr. Harper's brachial plexus?
20    A    I don't recall.  It's been four years.  I
21 don't think so, but I don't remember.
22    Q    And so would you be surprised to see an MRI
23 from January 13th, 2020 of his left brachial plexus
24 that shows no evidence of injury to the brachial
25 plexus?

Page 22

1    A    I'm not especially surprised.  Is that the
2 one that was done at the VA that I'm referring to?
3    Q    I don't know what you were referring to.
4 That one was done at the VA in January of 2020.
5 There was also one done in September of 2020 at St.
6 Mary's Pavilion that also shows normal left brachial
7 plexus?
8    A    Yeah.
9    Q    Do you rely on diagnostic tests in your
10 practice, Dr. Luker?
11    A    Yes.
12    Q    What kind of diagnostic tests do you rely
13 on?
14    A    It's a broad category of diagnostic tests.
15    Q    Do you rely on MRIs?
16    A    I do.
17    Q    Would you consider an MRI to be a diagnostic
18 test?
19    A    Yes.
20    Q    Do you rely on EMG nerve conduction
21 studies?
22    A    I do.
23    Q    Would you consider an EMG to be a diagnostic
24 test?
25    A    Yes.

Page 23

1    Q    And what do diagnostic tests do for you in
2 your practice?
3    A    They provide information to help make a
4 diagnosis.
5    Q    And can that corroborate or refute the
6 subjective complaint from a patient?
7    A    Yes.
8    Q    Is it important to perform and review those
9 diagnostic tests in your course and practice?
10    A    Yes.
11    Q    Have you seen the EMG studies performed on
12 Mr. Harper?
13    A    I don't recall.  I suspect I have, but I
14 don't recall.
15    Q    And so if Mr. Harper had an EMG done in
16 October of 2019, a few months after the umbrella
17 incident in about nine months before you saw him, and
18 it demonstrated no ulnar nerve issues, would that be
19 important to you?
20    A    Repeat that for me again.  A few months
21 after the umbrella incident?
22    Q    Yeah.
23    A    And --
24    Q    So it's October of 2019.  So the incident
25 was August.

Page 24

1    A    Right.
2    Q    And you saw him in July 2020, so would it be
3 important for you in formulating your opinions to
4 have an EMG study from two months after the
5 incident?
6    A    That would be important.
7    Q    And if that EMG study showed no ulnar nerve
8 issues, would that potentially impact your opinion as
9 to whether or not Mr. Harper had an ulnar nerve issue
10 that was caused by the umbrella's blunt force trauma
11 to his clavicle?
12    A    It would.
13    Q    So is it safe to say that you don't have all
14 of the information in this case?
15    A    Yes, of course.
16    Q    So if you don't have MRIs of him, of his
17 brachial plexus, or EMG studies, what are you relying
18 on to make your opinions in this case?
19    A    Well, I discount the MRI studies heavily,
20 just to be clear.  The MRI of the brachial plexus is
21 not a very helpful or accurate test unless it's done
22 immediately, evidence of acute traumatic injury, but
23 the EMG studies -- well-done EMG studies that are
24 negative are helpful, so . . .
25    Q    And so what are you basing your opinions on

1  in this case?
2      A   His history, largely.
3      Q   Okay.  Do you know --
4      A   Physical exam and presentation.
5      Q   So physical exam and his history, would you
6  argue the history you have is subjectively provided
7  to you by Mr. Harper?
8      A   I'm sorry.  Repeat the -- "subjectively," is
9  that what you said?
10     Q   Yeah, sorry.  So you're saying you're
11 relating it based on physical examination, right?
12     A   Yes.
13     Q   Seeing Mr. Harper and seeing his upper-left
14 extremity, correct?
15     A   Yes, correct.
16     Q   And then his history, right?
17     A   Yes.
18     Q   But I don't have his medical records,
19 correct; you just have his subjective history that he
20 is telling to you?
21     A   That's correct.
22     Q   Because you don't have the MRIs of his
23 brachial plexus?
24     A   And I don't care about that, just to be
25 clear.  MRIs -- the MRIs of his brachial plexus, if

1  they were positive, would be meaningful.  If they're
2  negative, they're not meaningful, in my opinion.
3      Q   Okay.  We can get to that in a minute, but
4  you didn't have those, right?
5      A   Right.
6      Q   Even though you said a minute ago that those
7  diagnostic tests are important for your practice,
8  right?
9      A   Right.
10     Q   And did you not have his EMG study --
11     A   Correct.
12     Q   -- for two months after the incident,
13 correct?
14     A   Correct.
15     Q   You also -- did you have access to his
16 medical records predating the incident?
17     A   I don't recall.  I don't know.  I don't
18 think --
19     Q   Yeah.  You wouldn't think so because all
20 you're basing this off of is his subjective
21 complaints.  So are you aware of when he tore his
22 left rotator cuff?
23         MR. DORMER:  Object to form and -- form.
24     A   Am I aware now?  No.  I would have to look
25 that up to see if I had any records of that.

1  BY MR. GARNETT:
2      Q   And so you repaired his right rotator cuff,
3  correct?
4      A   You'll have to forgive -- I did, 2019,
5  yes.
6      Q   And when you did that, his left rotator cuff
7  was torn, correct?
8      A   I believe that's right.
9      Q   And he was diagnosed with a torn rotator
10 cuff in -- not ordered, but it was recommended that
11 he have surgery to repair his torn left rotator cuff
12 years before the umbrella incident, correct?
13     A   I would have to look at that.  Honestly, I
14 don't -- my chart does not have that information, but
15 that sounds correct to me.  You probably have more in
16 front of you than I do.  I'm sure you're more
17 familiar with it than I am.
18     Q   And were you aware that Mr. Harper fell off
19 of a roof in 2012?
20     A   Yes.
21     Q   And were you aware that he had a cervical
22 procedure to his spine as a result of that fall?
23     A   That rings a bell.
24     Q   And so all of these pieces of information
25 are important, right, to give you a full picture of

1  what's going on with a patient that comes in with
2  complex pain complaints, correct?
3      A   Correct.
4      Q   And it's important to do diagnostic studies
5  because it can corroborate the pain complaints that a
6  patient is subjectively communicating to you,
7  correct?
8      A   Correct.
9      Q   You're not just going to operate on a
10 person's shoulder because they say, "My shoulder
11 hurts," correct?
12     A   Correct.
13     Q   You're going to do an MRI to demonstrate
14 it's a tear to the rotator, right?
15     A   Correct.
16     Q   And you're not going to provide an opinion
17 as to somebody's complex history and injury history
18 in the causation of those potential injuries without
19 referring either to the diagnostic tests or to their
20 full set of medical records, are you?
21         MR. DORMER:  Object to form.
22     A   Yeah.  That's generally correct.
23 BY MR. GARNETT:
24     Q   Okay.  Is it different in this case than it
25 is generally?

1    A    No.  I'm just saying his medical records
2  have a bearing on it, yes.
3    Q    Because I'm not talking about the
4  diagnostic -- about the diagnosis of an injury.
5  There are two different things at play here, right:
6  One is the diagnosis of an injury that you are doing
7  when you are physically examining him, and he is
8  subjectively complaining about his symptoms and his
9  injuries, and then there's a causation opinion as to
10  what is causing that potential injury that you are
11  diagnosing, correct?
12    A    Yeah.
13    Q    Okay.  I want to make that clear; understand
14  that?
15        MR. DORMER:  Object to form.
16    A    Understood.
17  BY MR. GARNETT:
18    Q    So I -- let me summarize what I think you're
19  saying.  You have an opinion that Mr. Harper has an
20  ulnar nerve injury and that he has a brachial plexus
21  injury, correct?
22        MR. DORMER:  Object to form and foundation.
23    A    That's likely, yes.
24  BY MR. GARNETT:
25    Q    Even though the EMG studies show no ulnar

1  nerve injury?
2        MR. DORMER:  Object to foundation.
3    A    Is that a question?
4  BY MR. GARNETT:
5    Q    Yes.
6    A    So I didn't really have a -- I didn't bite
7  off the whole diagnosis of the ulnar nerve.  I think
8  Treadwell was responsible for figuring that out,
9  right?
10    Q    Right.  So let's stop there for a -- well,
11  go ahead.  You can finish, but then I want to go back
12  to that because I want to unpack that.
13    A    I did make a diagnosis.  I made a diagnosis
14  there was something wrong with his ulnar nerve, and
15  that may have come from anywhere along the chain.
16    Q    Are you done?
17    A    Yeah.
18    Q    Is -- the timeline is crucial here, right?
19  You only saw Mr. Harper one time between August of
20  2019 and August of 2023 --
21        MR. DORMER:  Object to form.
22  BY MR. GARNETT:
23    Q    -- correct?
24    A    That sounds right to me.
25    Q    And when you saw him in July of 2020, you

1  didn't bite off the ulnar nerve issue.  You referred
2  that subjective complaint that he had made to
3  Dr. Treadwell for evaluation, diagnosis, and
4  treatment --
5    A    Right.
6    Q    -- correct?
7    A    Correct.
8    Q    And then when you saw Mr. Harper in 2023
9  after Dr. Treadwell had diagnosed him and treated him
10  for his ulnar nerve injury, you have an opinion that
11  he is still having ulnar nerve problems after having
12  a cubital tunnel release, correct?
13    A    Correct.
14    Q    So going back to July of 2020, you cannot
15  opine that Mr. Harper even had an ulnar -- you
16  cannot, to a reasonable degree of medical
17  probability, based off of one evaluation of him
18  physically and his subjective complaints, having not
19  reviewed any of the diagnostic tests or his whole
20  history of medical records opine conclusively to a
21  degree of medical probability that he had an ulnar
22  nerve injury at that time, can you?
23        MR. DORMER:  Hold on.  Objection to --
24  there's a form objection there.
25        MR. GARNETT:  Sean, just say, "form."

1        MR. DORMER:  Hold on a second.  Yeah,
2  there's a foundation one, too.  So form and
3  foundation.
4    A    I -- correct.
5  BY MR. GARNETT:
6    Q    You thought he might, but you referred him
7  to Dr. Treadwell for that simple purpose?
8    A    Correct.
9    Q    So you cannot say then that before August of
10  2023 when you saw him after the unsuccessful surgery,
11  that Mr. Harper had an ulnar nerve injury caused by
12  the umbrella incident because you can't even opine to
13  a degree of medical probability that he had an ulnar
14  nerve injury?
15        MR. DORMER:  Same objections.
16    A    Correct.
17  BY MR. GARNETT:
18    Q    Because I want to -- okay.  Which means you
19  were there for the shoulder.  You were not there for
20  the elbow; fair to say?
21    A    Yes.
22    Q    And so you do not have any opinions
23  regarding his ulnar nerve injury or lack thereof
24  before Dr. Treadwell's surgery?
25        MR. DORMER:  Same objections.

Page 33

```
 1      A    Correct.
 2
 3   BY MR. GARNETT:
 4      Q    Because -- well, let's take a three-minute
 5   break.
 6           THE VIDEOGRAPHER:  All right.  We're off the
 7   record at 2:43 p.m.
 8           (Break from 2:43 p.m. to 2:48 p.m.)
 9           THE VIDEOGRAPHER:  We're back on the record
10   at 2:48 p.m.
11   BY MR. GARNETT:
12      Q    So Dr. Luker, we talked a lot about the
13   elbow.  Now I want to talk about the shoulder a
14   little bit, okay?  Agreed?
15      A    Yes.
16      Q    And so going back to your surgery on
17   Mr. Harper's right shoulder, was that for a torn
18   rotator cuff?
19      A    Yes.
20      Q    And that was successful, correct?
21      A    I believe so.
22      Q    You have not seen Mr. Harper for any
23   complaints related to his right shoulder, correct?
24      A    That's correct.
25      Q    Excuse me -- since the surgery?
```

Page 34

```
 1      A    That's correct.
 2      Q    And so have you seen -- and we talked a
 3   little bit about this earlier -- any of Mr. Harper's
 4   brachial plexus MRIs?
 5      A    I don't recall.
 6      Q    Have you seen other shoulder MRIs for
 7   Mr. Harper's left shoulder?
 8      A    I believe I have, but again, I don't know
 9   for a fact.  I mean, I don't -- I'd have to look at
10   my records.
11      Q    And we can certainly do that.
12      A    If you know, why don't you just tell me
13   where they are?
14      Q    Well, I'll look for that now.
15           Let me ask you this:  Did you diagnose
16   Mr. Harper with a torn rotator cuff in his left
17   shoulder?
18      A    Yes.
19      Q    And would you have relied on an MRI to make
20   that formal diagnosis?
21      A    Not necessarily, but often I do.
22      Q    Okay.  Do you have the August 15th, 2023
23   dated record?
24      A    Yes.
25      Q    I have Page 4.
```

Page 35

```
 1      A    I don't think -- I'm on a computer, so I
 2   don't really have paging.
 3      Q    Why don't I show it to you or, I mean,
 4   it's --
 5      A    I see MRI scan results reviewed.
 6      Q    Yes, and the MRI demonstrated a tear -- a
 7   full tear to his left rotator?
 8      A    Yes.
 9      Q    And did you recommend Mr. Harper have
10   surgery to his left rotator cuff?  I think it would
11   be on the next page.
12      A    Yeah.  I think the answer's, "no," but I'm
13   -- August 2023, yeah, okay.  Yeah, no, I did.  I did
14   recommend -- yes, I see it.
15      Q    And do you see the ongoing in that record,
16   "We again discussed a major rotator cuff disease,"
17   and then it concludes, "In the end, we made a
18   decision to pursue surgical treatment"?
19      A    Yes, I do see that.  That's what I'm looking
20   at.
21      Q    And so that diagnosis of a torn rotator
22   cuff, decide to go forward with surgery, but you did
23   not perform the surgery to his left rotator cuff,
24   correct?
25      A    That is correct.
```

Page 36

```
 1      Q    And this is in August of 2023, correct?
 2      A    That's correct.
 3      Q    And so what happened after August 2023 that
 4   prohibited Mr. Harper from receiving surgery to his
 5   left rotator cuff, if you know?
 6      A    My notes in October indicate that he
 7   returned for another visit frustrated by pain and
 8   weakness in his shoulder.  His pain extended down his
 9   arm.  The -- he was also having back pain that was a
10   major limiter for him.  So I think we made a decision
11   that the back pain was the biggest issue at the time,
12   and he turned his focus to his back problem.
13      Q    Do you have any idea what caused
14   Mr. Harper's back problem or back pain?
15      A    I do not.
16      Q    Nothing to indicate that the back problem
17   was related to the umbrella incident at Starbucks,
18   correct?
19      A    Correct.
20      Q    Dr. Luker, have you ever performed a
21   brachial plexus surgery?
22      A    In training only; nothing since then in
23   practice.
24      Q    When you say, "in training," when you
25   weren't -- what does that mean?
```

Page 37

1    A    In the residency training, I had
2 experience -- limited experience working on the
3 brachial plexus.
4    Q    How long ago was your residency?
5    A    1990s -- middle 1990s.
6    Q    And were you performing the surgery or were
7 you assisting in the performance of the surgery?
8    A    I would have been assisting in the
9 performance of the surgery.
10   Q    So you've never been the lead surgeon in a
11 brachial plexus surgery, correct?
12   A    Correct.
13   Q    Would you consider yourself an expert in the
14 brachial plexus?
15   A    No.
16   Q    And so since residency, no other physician
17 or anyone else has referred a patient to you for
18 brachial plexus surgery?
19   A    Correct.
20   Q    Do you see patients or you refer patients
21 with brachial plexus injuries?
22   A    Occasionally.
23   Q    And if -- would you refer that patient to a
24 brachial plexus specialist if they needed surgical
25 intervention or additional diagnosis beyond your

Page 38

1 expertise?
2    A    Yes.
3    Q    Who would you refer a person to; do you have
4 any names?
5    A    No.
6    Q    So I want to talk -- so now I'm going to go
7 back to that kind of opinion/causation dynamic,
8 okay?
9    A    Okay.
10   Q    So I want to talk about your opinion as it
11 relates to Mr. Harper's brachial plexus, okay?
12   A    Okay.
13   Q    Do you have an opinion as to Mr. Harper's
14 brachial plexus and whether or not he has a brachial
15 plexus injury?
16   A    Yes.
17   Q    Okay.  What is that opinion?
18   A    I think he may have a -- he's likely to have
19 some brachial plexus injury of some sort.
20   Q    So if I were to ask you what is your opinion
21 to a reasonable degree of medical probability as to
22 any injuries Mr. Harper has to his brachial plexus,
23 what would your medical, expert opinion be?
24        MR. DORMER:  Objection as to form.
25   A    Yeah.  I mean, I don't -- I haven't done the

Page 39

1 work to give you a solid opinion on that.  I'm
2 just --
3 BY MR. GARNETT:
4    Q    Right.
5    A    -- giving you my opinion as his treating
6 physician that it looks to me like he may have a
7 brachial plexus injury that would be a reasonable
8 explanation for some of his problem.  I'm not
9 prepared to tell you with a reasonable degree of
10 medical certainty that I've looked at everything and
11 given it --
12   Q    And Dr. Luker, that's exactly what I'm
13 trying to talk about.
14   A    Right.
15   Q    Because you weren't asked to do that?
16   A    Right.
17   Q    And you weren't given all of the information
18 to do that.  You were not provided with all of the
19 information, and you weren't given sort of carte
20 blanche access to his medical records and the ability
21 to do additional things to provide that expert
22 opinion to a reasonable degree of medical
23 probability --
24   A    Yes.
25   Q    -- and that's what we're dealing with in

Page 40

1 court.  So let me summarize that a little --
2        MR. DORMER:  Same objections on form and
3 foundation; legal opinions.  Go ahead.
4 BY MR. GARNETT:
5    Q    So you have suspicions and you have thoughts
6 based on your treatment of Mr. Harper, but you don't
7 have any opinions to a reasonable degree of medical
8 probability to provide in this case?
9    A    That's correct.  I can live with that.
10   Q    One moment.
11        (Pause.)
12   Q    Sorry, Dr. Luker.  Just a couple of
13 additional follow-up questions.  So you do not have
14 any expert opinion to a reasonable degree of medical
15 probability regarding Mr. Harper's brachial plexus,
16 correct?
17   A    Correct.
18   Q    And you do not have any expert opinion to a
19 reasonable degree of medical probability regarding
20 Mr. Harper's ulnar nerve, correct?
21        MR. DORMER:  With this wording in general,
22 same objections as to form and foundation --
23 actually, just foundation.
24   A    Yes.
25 BY MR. GARNETT:

Page 41

1    Q    You also don't have any medical expert
2 opinions to a reasonable degree of medical
3 probability that Mr. Harper has a hand injury,
4 correct?
5    A    Correct.
6    Q    You also don't have any expert opinions to a
7 reasonable degree of medical probability as to the
8 causation of any possible injury to Mr. Harper's
9 brachial plexus, correct?
10    A    Yes.
11        MR. DORMER:  Same objections on his wording
12 throughout.
13    A    Correct.
14 BY MR. GARNETT:
15    Q    You also don't have an expert opinion to a
16 reasonable degree of medical probability as to the
17 causation of any potential injury to Mr. Harper's
18 ulnar nerve, correct?
19        MR. DORMER:  Same objection.
20    A    Correct.
21 BY MR. GARNETT:
22    Q    You also don't have an expert opinion to a
23 reasonable degree of medical probability as to the
24 causation of any potential injury to Mr. Harper's
25 hand, correct?

Page 42

1        MR. DORMER:  Same objection.
2    A    Correct.
3 BY MR. GARNETT:
4    Q    And so Dr. Luker, have you ever seen a
5 summary of opinions -- of expert opinions prepared by
6 Mr. Dormer's office in this case?
7    A    I don't recall.  I don't -- I'm -- I don't
8 know.
9    Q    If there was anything purporting to
10 represent that you did have an expert opinion to a
11 reasonable degree of medical probability in this
12 case, that would be inaccurate, correct?
13        MR. DORMER:  Same objection; foundation.
14    A    Correct.
15 BY MR. GARNETT:
16    Q    Let's take another five-minute break,
17 please.
18        THE VIDEOGRAPHER:  Going off the record at
19 3:03 p.m.
20        (Break from 3:03 p.m. to 3:07 p.m.)
21        THE VIDEOGRAPHER:  We are back on the record
22 at 3:07 p.m.
23 BY MR. GARNETT:
24    Q    All right, Dr. Luker.  So almost done, just
25 want to wrap up.  I'm going to show you a document --

Page 43

1 I don't know if you've seen it before -- want to talk
2 to you a little bit about it.
3        MR. GARNETT:  Mr. Dormer, it was in
4 Dr. Treadwell's depo.  It's just the expert
5 disclosures, so I'm happy to do it as Exhibit 1 for
6 Dr. Luker.  I can't remember which number it was.
7        So for the record, I'm happy to just keep
8 using the original designation.  I defer to you.
9        MR. DORMER:  Yeah, why don't we just keep
10 using the original.  It's easier, right?  Sorry,
11 Mark.
12        MR. GARNETT:  We'll figure that out outside
13 of the presence of the doctor.
14 BY MR. GARNETT:
15    Q    Dr. Luker, can you see my screen?
16    A    Yes.
17    Q    Great.  So it says, "In The United States
18 District Court For The District Of Colorado"?
19    A    Yes.
20    Q    Okay.  So I'll go -- is it big enough or is
21 it zoomed in enough; can you read it?
22    A    I can.
23    Q    Have you ever seen this before?
24    A    No.
25    Q    So this is Mr. Harper's initial expert

Page 44

1 disclosures -- I'll just represent to you --
2 submitted by his counsel in this case, and so this
3 includes a section about you.  So No. 5 is Dr. G --
4 or excuse -- Mark G. Luker, MD; do you see that?
5    A    Yes.
6    Q    It's about two pages.  Can you read that
7 paragraph, and then when you're done, I can scroll
8 down.  I want you to read the section as it relates
9 to you, but take your time.
10    A    (Witness complying.)
11        Okay.  I've read up to Section A there.
12        (Pause.)
13        Okay.  I'm ready to move on there.
14        Ready to move to Section D.
15    Q    That's the last section.
16        (Pause.)
17    A    Completed.
18    Q    So I've stopped sharing the screen.  And so
19 Dr. Luker, if in that disclosure there's an
20 insinuation that you are providing any medical expert
21 opinions to a reasonable degree of medical
22 probability, that is inaccurate, correct?
23    A    Apparently.
24        MR. DORMER:  Object to foundation again on
25 that.

Page 45

1    A    Yes.
2  BY MR. GARNETT:
3    Q    And just to clarify, Dr. Luker, your answer
4  to my previous question is "yes"?
5    A    Yes.
6    Q    So you do not have any expert opinions to a
7  reasonable degree of medical probability to provide
8  in this case at all?
9        MR. DORMER:  Same objection.
10    A    Yes.
11  BY MR. GARNETT:
12    Q    I don't have any additional questions for
13  Dr. Luker.
14                EXAMINATION
15  BY MR. DORMER:
16    Q    All right.  So Doctor, do you know the legal
17  definition of "reasonable degree of medical
18  certainty"?
19    A    Why don't you refresh my memory?
20    Q    So when you hear the word, "certainty," what
21  do you think, how do you understand that?
22    A    Yeah.  Let's cut to the chase.  It's more
23  than 50 percent likely, right?
24    Q    Yeah, right.  So earlier in this deposition
25  when you were talking about things being probable,

Page 46

1  likely, you meant they're more likely than not,
2  right?
3    A    Most often that's probably right.  That's
4  correct, yes.
5    Q    So this last series of questions where you
6  heard Mr. Garnett asking you, "Well, that's not to a
7  reasonable degree of certainty," did you think that
8  "certainty" meant some higher standard, something
9  requiring like, you know, a hundred percent certainty
10  beyond a reasonable doubt, something like that?
11        MR. GARNETT:  Objection.
12    A    No.  No, I didn't, I didn't.  I think I
13  understand his point, and I'm not -- I didn't think
14  he meant a hundred percent certainty.
15  BY MR. DORMER:
16    Q    So if I told you that "reasonable degree of
17  medical certainty" just requires more likely than
18  not, would that be new information to you?
19    A    No.
20    Q    Do you know the legal definition of
21  "cause"?
22    A    No.
23    Q    So let's -- we'll go through it, okay.  So
24  first of all, I want to ask you about biological
25  plausibility.  It's something that the cases talk

Page 47

1  about.  So when I say "biological plausibility," I
2  just mean could something have happened based on your
3  knowledge of anatomy; does that make sense?
4    A    Yes.
5    Q    And then we're going to talk about
6  temporality, which means that based on the patient's
7  history, does the timing match up with the diagnosis,
8  fair?
9    A    Yes.
10    Q    And then the third piece is differential
11  diagnosis.  It's looking at more likely.  Are there
12  any more likely alternative explanations.  You're
13  familiar with that process because that's taught in
14  medicine, right?
15    A    Right.
16        MR. GARNETT:  Objection; form.
17  BY MR. DORMER:
18    Q    And then did you know that when we talk
19  about cause, legally we only mean something has to be
20  a cause, not the only cause; were you familiar with
21  that?
22        MR. GARNETT:  Objection; form.
23    A    No.
24  BY MR. DORMER:
25    Q    And in medicine, oftentimes there are

Page 48

1  multiple causes of a condition or a disease or an
2  injury, right?
3        MR. GARNETT:  Objection; form.
4    A    Can be.
5  BY MR. DORMER:
6    Q    So let's just talk about -- let's start with
7  temporality.  You saw Mr. Harper before this umbrella
8  incident, right?
9    A    Yes.
10    Q    And actually, I want to back up even further
11  back to your medical training.  So you remember the
12  question, "Are you an expert in the brachial plexus?"
13  You remember saying, "no"?
14    A    Yes.
15    Q    Are you an expert in the brachial plexus
16  relative to me?
17        MR. GARNETT:  Objection; form.
18    A    Likely, yes.  I suspect.  I don't know what
19  you know, but . . .
20  BY MR. DORMER:
21    Q    Is it fair to say you probably know more
22  than most physicians outside orthopedics about the
23  brachial plexus, right?
24        MR. GARNETT:  Objection to form.
25    A    That's true.

Page 49

BY MR. DORMER:

1    Q   Do you know more than most laypeople about
the brachial plexus?

4    A   Yes.

5    Q   You don't operate on the brachial plexus now
you told us, right?

7    A   Correct.

8    Q   Why do you need to have some understanding
of it through, you know, residency training and your
medical training?

11   A   Because it is -- it's an important structure
that contributes to the function of the whole
left-upper extremity.  It's -- yeah.

14   Q   Your sub specialization is in shoulders,
right?

16   A   Correct.

17   Q   You're also boarded in orthopedics
generally?

19   A   Right.

20   Q   And if you want to avoid working on
someone's shoulder when they actually have a brachial
plexus problem, you got to know something about
brachial plexus anatomy and symptomology, right?

24   A   Correct.

25   Q   You do this job full time --

Page 50

1    A   Yes.

2    Q   More than full time.  If I know orthopedics,
it's probably more than full time, right?

4    A   Right.

5    Q   And it's your job to not just diagnose
rotator cuff injuries, but also be able to say this
is something different, right?

8    A   Correct.

9    Q   So when you -- when you see Dr. -- or when
you see Mr. Harper before he has his umbrella injury,
you diagnosed him with a rotator cuff problem,
right?

13   A   Yes.

14   Q   And that was done partly with imaging
studies, but not only, fair?

16   A   Yes.

17   Q   There's kind of this insinuation we hear
sometimes of, you know, subjective evidence, you
know, as if it shouldn't be considered.  Is it good
medicine to discount subjective evidence in treating
patients?

22       MR. GARNETT:  Objection; form.

23   A   No.  The patient's history is always
subjective, so you have to listen to the patient's
history.

Page 51

BY MR. DORMER:

2    Q   And by carefully taking that history,
interviewing -- taking a history, just -- it's
medical jargon for interviewing the patient, right?

5    A   Yes.

6    Q   And it's not just an interview; it's a
targeted careful interview that you spend a lot of
time learning?

9    A   Correct.

10   Q   You also do a physical exam, right?

11   A   Yes.

12   Q   And there was this -- there was this
statement, well, you only saw Dr. -- or you only saw
Mr. Harper once in X period of time; you remember
that question?

16   A   I do.

17   Q   Are you aware that Mr. Garnett's expert that
he hired, he didn't even ask him to see Dr. -- or
Mr. Harper a single time?

20       MR. GARNETT:  Objection; form.

21   A   I'm not aware.

22   BY MR. DORMER:

23   Q   Would you diagnose someone without doing a
physician exam?

25   A   I would prefer not to.

Page 52

1    Q   So that brings us to temporality.  You saw
Mr. Harper before he got hit by the umbrella,
right?

4    A   I did.

5    Q   Were his symptoms the same or different
after he got hit by the umbrella?

7        MR. GARNETT:  Objection; form.

8    A   I -- it's different.  Again, I have to look
through my records, but I presume different.

10   BY MR. DORMER:

11   Q   Yeah.  And you know, you document that they
were different?

13   A   He had a different complaint when I saw
him.

15   Q   Yeah.  You interviewed him about those
symptoms, too, right; you asked him specific
questions about them?

18       MR. GARNETT:  Objection; form.

19   A   I did.

20   BY MR. DORMER:

21   Q   And you asked him where they were, right?

22   A   I did.

23   Q   And you asked him how they felt?

24   A   I did.

25   Q   And you also put him through various

**Page 53**

1  maneuvers to check what might be going on with him?
2  A    Right.
3  Q    So can you tell us based on that first
4  visit -- well, you came up with a diagnosis, right?
5       MR. GARNETT:  Objection; form.
6  A    I did.
7  BY MR. DORMER:
8  Q    What was your diagnosis?
9       MR. GARNETT:  Objection; form.
10 A    Traumatic tear left rotator cuff, rotator
11 cuff impingement syndrome left shoulder, lesion of
12 left ulnar nerve, and pain of left clavicle.
13 BY MR. DORMER:
14 Q    So that lesion of ulnar nerve, is -- that
15 was your diagnosis that day, right?
16 A    Yeah, it was.
17 Q    And did you believe that that was
18 probable?
19      MR. GARNETT:  Objection; form.
20 A    So you'd have to select a diagnosis code.
21 This was as close as I could get to something's
22 happening that's causing dysfunction in his ulnar
23 nerve.
24 BY MR. DORMER:
25 Q    Yeah, and to be fair, you didn't know enough

**Page 54**

1  yet to go further and say where exactly that lesion
2  might be, right?
3  A    Right.
4       MR. GARNETT:  Object to form.
5  BY MR. DORMER:
6  Q    You couldn't say, you know, with certainty
7  he should have X, Y, Z surgery to fix it, right --
8  A    Correct.
9  Q    -- or maybe some other treatment, right?
10 A    Right.
11 Q    But your diagnosis, at least the general
12 diagnosis, you were confident you could narrow it
13 down to the ulnar nerve?
14      MR. GARNETT:  Objection; form.
15 A    I mean, it was a long time ago.  I -- that's
16 what I was thinking.
17 BY MR. DORMER:
18 Q    Well -- and you know, here's something like,
19 you don't need to second guess yourself just because
20 lawyers ask aggressively-toned questions.
21 A    No.  I'm just -- honestly, I was just trying
22 to remember what I was thinking, right, four years
23 ago.
24 Q    Right.  And so as you're looking at your --
25 as you're looking at your documentation, can you see

**Page 55**

1  factors that led to that diagnosis?
2  A    Right.
3  Q    Can you?
4  A    Yes.
5  Q    And did you -- knowing everything you know
6  about the rotator cuff, are these symptoms that are
7  probably coming from his rotator cuff?
8       MR. GARNETT:  Objection; form.
9  A    No.
10 BY MR. DORMER:
11 Q    Go ahead, Doctor.
12 A    No.
13 Q    Why?  Explain that to us.
14 A    Because the clinical picture did not -- was
15 not consistent with a rotator cuff problem.
16 Q    If someone gets hit -- and I'm just -- for
17 the written record, I'm gesturing just above my
18 clavicle on the left side, right?  Is that what it
19 looks like to you, can you see my picture?
20 A    Yes.
21 Q    If someone gets hit here by an umbrella, one
22 of those big kind of industrial umbrellas, and they
23 get hit hard enough to bend the metal, is it
24 plausible that that would cause them to stretch their
25 ulnar nerve?

**Page 56**

1       MR. GARNETT:  Objection; form.
2  A    Strictly speaking, it's not the ulnar nerve
3  there, but it could -- it's plausible that it could
4  cause a nerve-stretch injury that would affect the
5  ulnar nerve, yes.
6  BY MR. DORMER:
7  Q    Okay.  Explain that to me.
8  A    The ulnar nerve comes off of the roots,
9  trunks, divisions of the brachial plexus.  So
10 it's -- there could be maybe not quite the ulnar
11 nerve yet where that was, you know, that nerve --
12 those nerve fibers might have been stretched,
13 right.
14 Q    So it's the same nerve fibers were kind
15 of --
16 A    Yes, the same, exactly, yeah.
17 Q    If I bend my head to the right especially
18 suddenly and especially under traction from a big
19 piece of metal, what does that do to the lower
20 brachial plexus?
21      MR. GARNETT:  Objection.
22 A    It stretches it.
23 BY MR. DORMER:
24 Q    As I lift and bend my arm, what does that do
25 to the ulnar nerve?

Page 57

1    MR. GARNETT: Objection; form.
2    A    It can stretch the ulnar nerve, the flexion
3    of the elbow, particularly.
4    BY MR. DORMER:
5    Q    And how do you know that? Sounds like a
6    stupid question, but when'd you learn that kind of
7    thing?
8    A    Medical school.
9    Q    It's pretty basic anatomic knowledge?
10   A    Yes.
11   Q    Throughout your medical training, have you
12   learned what that type of stretching mechanism can
13   cause in terms of symptoms?
14   A    Yes.
15   Q    What are those?
16   MR. GARNETT: Objection; form.
17   A    Numbness, tingling, weakness,
18   electrical-shock type pain.
19   BY MR. DORMER:
20   Q    You also -- you documented Mr. Harper's
21   numbness, tingling, electrical-shock type pain in a
22   very particular part of his body, right, or part of
23   the arm?
24   A    I'd have to look.
25   MR. GARNETT: Objection; form.

Page 58

1    BY MR. DORMER:
2    Q    Take your time if you want to take a look
3    real quick.
4    Q    Why don't you point me to where I did that?
5    Is it in the history?
6    Q    I believe so. What I have noted is that you
7    documented it was more on the pinky side, small
8    finger. Let's check just to make sure.
9    A    Present illness, fourth or fifth line,
10   portion pain runs down the entire arm, but localized
11   and most intense from the elbow to the fingertips on
12   the ulnar half of his hand.
13   Q    How does that -- does that specific history
14   report factor into your diagnosis?
15   A    Yes.
16   Q    Now, you were asked if there was an MRI at
17   this point or whether you consider an MRI in
18   diagnosing a brachial plexus -- possible brachial
19   plexus, but I'll call it an ulnar nerve lesion?
20   A    Right.
21   MR. GARNETT: Objection; form.
22   BY MR. DORMER:
23   Q    Do you remember that questioning?
24   A    I do.
25   Q    Do you know approximately how long MRIs have

Page 59

1    even been available?
2    MR. GARNETT: Objection; form.
3    A    I don't know. 30 years or more.
4    BY MR. DORMER:
5    Q    Yeah. So right around kind of the length of
6    time you've been practicing, but not all that much
7    longer?
8    A    Right.
9    Q    And orthopedics as a practice existed long
10   before that, right?
11   A    Yes.
12   MR. GARNETT: Objection; form.
13   BY MR. DORMER:
14   Q    And if you're going to operate on someone,
15   fair to say you want the most information you could
16   possibly get, right?
17   A    Yes.
18   Q    And that's because the risks are always
19   there no matter how much you do to try to minimize
20   them?
21   A    Yes.
22   Q    Before MRIs or without MRIs, are orthopedic
23   surgeons still able to come to opinions more likely
24   than not?
25   MR. GARNETT: Objection; form.

Page 60

1    A    Yes.
2    BY MR. DORMER:
3    Q    And EMG, so you consider EMG findings you
4    mentioned are --
5    THE REPORTER: I'm sorry. I'm sorry. Can
6    you repeat that question?
7    BY MR. DORMER:
8    Q    Yeah. I'll try to repeat it. You rely --
9    you mentioned on direct questioning that you rely at
10   times on EMG findings?
11   A    Yes.
12   Q    EMGs like MRIs have a false negative rate,
13   right?
14   MR. GARNETT: Objection; form.
15   A    Yes.
16   BY MR. DORMER:
17   Q    How common is it that someone has symptoms
18   like Mr. Harper and doesn't have any EMG findings?
19   MR. GARNETT: Objection; form.
20   A    I don't know, but it happens. It's not
21   rare.
22   BY MR. DORMER:
23   Q    Yeah. And when you say you don't know, you
24   don't know the specific number, but qualitatively,
25   you do know it's not rare, right?

1    A    Yes.
2    Q    When do EMG findings tend to be positive and
3 what causes an EMG to be positive?
4    A    I don't know.
5        MR. GARNET:  Objection; form.
6    A    That's a difficult question for me to
7 answer.
8 BY MR. DORMER:
9    Q    Yeah.  I mean, if you had to explain to a
10 layperson what an EMG looks for -- maybe that's a
11 better way of saying it -- how would you explain it
12 to the patient?
13    A    Looks for some form of dysfunction of the
14 nerve.  Some -- it's a sign that the nerve's not
15 sending appropriate signal to the muscle.
16    Q    Nerve dysfunction may not appear immediately
17 when there's nerve irritation, fair?
18        MR. GARNETT:  Objection; form.
19    A    Correct.
20 BY MR. DORMER:
21    Q    When a nerve is compressed, that can cause
22 nerve dysfunction over time even if it doesn't show
23 up immediately?
24    A    Correct.
25        MR. GARNETT:  Objection.

1 BY MR. DORMER:
2    Q    When a nerve is irritated or inflamed,
3 there's kind of an inflammatory cycle that can also
4 cause nerve problems or nerve functional problems
5 over time, right?
6        MR. GARNETT:  Objection; form.
7    A    Right.
8 BY MR. DORMER:
9    Q    And those may not happen been right off the
10 bat, right?
11        MR. GARNETT:  Objection.
12    A    Correct.
13 BY MR. DORMER:
14    Q    If the nerve is not having functional
15 problems yet, an EMG would be negative?
16        MR. GARNETT:  Objection; form.
17    A    Correct.
18 BY MR. DORMER:
19    Q    So do you believe that, as I've defined it,
20 more probable than not, you believe it's more
21 probable than not that Mr. Harper had a biologically
22 plausible cause of an ulnar nerve injury from the
23 umbrella impact?
24        MR. GARNETT:  Objection; form.
25    A    Could you repeat the question?

1 BY MR. DORMER:
2    Q    Yeah.  Was the umbrella -- I asked in a poor
3 way.  So was the umbrella impact a biologically
4 plausible cause of his ulnar nerve problems?
5        MR. GARNETT:  Objection; form.
6    A    Yes.
7 BY MR. DORMER:
8    Q    More probably than not, did he have the
9 ulnar nerve problems -- do you see any evidence he
10 had the ulnar nerve problems before the umbrella
11 incident?
12        MR. GARNETT:  Objection; form.
13    A    I do not.
14 BY MR. DORMER:
15    Q    And you didn't see anything like that when
16 you saw him before when you were working him up for
17 left rotator cuff problems, right?
18        MR. GARNETT:  Objection; form.
19    A    Correct.
20 BY MR. DORMER:
21    Q    When you -- now, let's look at differential
22 diagnosis.  So how would you explain the concept of
23 differential diagnosis to a layperson, to a patient?
24    A    Differential diagnosis is the process of
25 determining what the possible and probable causes of

1 whatever condition you're trying to explain might
2 be.
3    Q    And so it starts with kind of creating a
4 list of all of the possibilities, right?
5    A    Yes.
6    Q    And then you narrow it down, right?
7    A    Yes.
8        MR. GARNETT:  Objection; form.
9 BY MR. DORMER:
10    Q    And you can narrow it down not just with
11 MRIs and EMGs, but with the older scientific tools of
12 medicine like history and physical, right?
13        MR. GARNETT:  Objection; form.
14    A    Yes.
15 BY MR. DORMER:
16    Q    And so is there a more plausible -- is there
17 anything in your differential for Mr. Harper other
18 than the umbrella impact that's a more plausible
19 cause of his ulnar nerve problems?
20        MR. GARNETT:  Objection; form.
21    A    I don't know of one.
22 BY MR. DORMER:
23    Q    You sent him to Dr. Treadwell, right?
24    A    I did.
25    Q    Dr. Treadwell had a different theory of what

1  was going on, right?
2          MR. GARNETT:  Objection; form.
3      A   I don't really know Treadwell thought was
4  going on.  I didn't -- hadn't read his records.
5  BY MR. DORMER:
6      Q   Okay.  Do you have access to his records in
7  the --
8      A   I should.
9      Q   I thought you did.  I thought we talked
10 about that, but it's been a while.  First of all,
11 just for the record, we haven't met for a few months
12 at least, right?
13     A   Yeah, quite some time I'm pretty sure.
14     Q   So you referred Mr. Harper to Dr. Treadwell,
15 right?
16     A   I did.
17     Q   And you understand Dr. Treadwell did an
18 ulnar nerve surgery, right?
19     A   I do.
20     Q   And he specifically did that surgery at the
21 elbow, right?
22     A   Yes.
23         MR. GARNETT:  Objection; form.
24         THE REPORTER:  Excuse me.  Mr. Garnett, you
25 were muffled.  Can you -- all's I got was, "objection

1  to form."
2          MR. GARNETT:  Sure, sure, sure.  So
3  objection to form, but real quick, Mr. Dormer, to
4  clarify for the record and for me, did you provide
5  Mr. -- or Dr. Luker with Dr. Treadwell's records
6  before?  Did he review them before the deposition
7  today?
8          MR. DORMER:  Hold on.
9  BY MR. DORMER:
10     Q   So Dr. Luker, Dr. Treadwell at the time that
11 Mr. Harper saw him was in your same practice, right?
12     A   That's correct.
13     Q   And you all have an EMR, an electronic
14 medical record system?
15     A   Yes.
16     Q   And as a treating physician, you're able to
17 read and review anyone's medical records as needed,
18 right?
19     A   Yes.
20     Q   And you may -- you may do that in certain
21 cases; you may not do that in other cases, right?
22     A   Yes.
23     Q   At the very least, you had a chance to
24 interview and examine Mr. Harper after he saw
25 Dr. Treadwell, right?

1      A   Yes.
2      Q   So going back to the questions I was asking,
3  from your general -- from your orthopedics knowledge,
4  what was the surgery Dr. Treadwell did intended to
5  fix?
6      A   Compression of the ulnar nerve around the
7  elbow through the cubital tunnel.
8      Q   And you talked on direct about -- I'll say
9  you were not confident in Treadwell's diagnosis based
10 on the results of that surgery.  Explain what the
11 results of that surgery were and how they led to that
12 lack of confidence.
13         MR. GARNETT:  Objection to form.
14     A   As far as I know, the patient's numbness and
15 weakness were not resolved with treatment of his
16 ulnar nerve at the elbow.
17 BY MR. DORMER:
18     Q   Now, you know, let me ask a question that's
19 a little bit different.
20         Turning to this kind of double-crush
21 concept, what is "double crush" as you understand it
22 and as you've described it in your records?
23     A   "Double crush" simply means that there's two
24 levels of injury or compression or damage to a
25 nerve.

1      Q   And how does that factor into symptoms like
2  the ones that Mr. Harper was experiencing, why did
3  you consider that for him?
4          MR. GARNETT:  Objection; form.
5      A   I -- because of his history of having had a
6  brachial plexus stretch mechanism form of injury that
7  would -- that led me to consider an injury to his
8  brachial plexus as a component of whatever symptoms
9  he may be having.
10 BY MR. DORMER:
11     Q   And in a double-crush syndrome, how is it
12 that -- so this double-crush syndrome is something
13 that's described in literature to describe a certain
14 set of symptoms that are almost kind of feeding into
15 each other, right?
16     A   It's not a very clear question.  I don't
17 understand what you're --
18     Q   Yeah.  Can you explain to us what double
19 crush does to symptoms, how does it affect someone's
20 symptoms, does it make them worse than they would be
21 with either -- is it kind of something that's greater
22 than the sum of its parts; am I making sense there?
23     A   Yeah.  I don't know that you can describe it
24 that way.  I don't think that's necessarily true.
25     Q   So let me try to ask it a different way.  So

Page 69

1   is there -- can a double crush be in the setting
2   of -- can it occur in the setting of preexisting
3   conditions?
4           MR. GARNETT:  Objection; form.
5      A    Can it occur in the setting of preexisting
6   conditions.
7   BY MR. DORMER:
8      Q    Today?
9      A    Yeah.  I think the answer to that is yes.
10     Q    And specifically, for example, if someone's
11  cubital tunnel, like the part where their ulnar nerve
12  goes through the elbow, is already a little narrowed,
13  but asymptomatic, can a stretch at the brachial
14  plexus cause it to become symptomatic?
15          MR. GARNETT:  Objection; form.
16     A    Yes.
17  BY MR. DORMER:
18     Q    And is that -- am I getting closer to
19  explaining how double crush works --
20     A    Yes.
21     Q    -- by pointing out that concept?  And
22  why -- what is the theory, kind of the working
23  hypothesis -- and I'll call it the best explanation
24  in the literature -- as to why that happens knowing
25  everything we know about nerve anatomy?

Page 70

1           MR. GARNETT:  Objection; form.
2      A    I'm not sure how to answer that question.
3   What is the best theory in the literature.  You know,
4   there's a certain level at which a low level of
5   injury at one location and a low level of injury at
6   another location can combine to, you know, cause
7   nerve signal transmission to become faulty.  Either
8   level by itself might not cause that to become
9   faulty.
10  BY MR. DORMER:
11     Q    Perfect.  That helps.  So when you
12  have -- when we talk about causation in the law, we
13  also mean what's called a "but-for cause," so I am
14  going to ask you some questions about but for.  But
15  for or without the umbrella impact, do you think that
16  Don Harper would probably have had the symptoms he's
17  had running down his arm, the tingling, shooting,
18  those nerve symptoms?
19          MR. GARNETT:  Objection; form.
20     A    I don't know.
21  BY MR. DORMER:
22     Q    And if you don't know, what do you think in
23  terms is -- what's more probable?
24          MR. GARNETT:  Objection; form.
25     A    All I have to go by is his history, which

Page 71

1   suggests that he had a substantial change in his
2   symptoms after his injury, so . . .
3   BY MR. DORMER:
4      Q    Specifically, if he hadn't gotten hit by the
5   umbrella, do you think it's more probable than not
6   that he would have come in to tell you about numbness
7   and tingling in his ulnar distribution when I did?
8           MR. GARNETT:  Objection; form.
9      A    Again, I don't know.  It was -- he came to
10  see me for his left shoulder pain because he had had
11  an injury, and so that was the way he presented.  So
12  I assume that had all of his symptoms -- not all of
13  his symptoms, but his symptom complex is largely
14  related to his injury.  That's how he described it to
15  me.
16  BY MR. DORMER:
17     Q    Would it be speculative to say that if he
18  hadn't gotten hit by the umbrella, he would have
19  ended up having ulnar nerve problems anyway?
20          MR. GARNETT:  Objection; form.
21     A    I don't know.
22  BY MR. DORMER:
23     Q    Is there any way -- is there any evidence to
24  say that he probably would have had ulnar nerve
25  problems if he hadn't gotten hit by the umbrella?

Page 72

1           MR. GARNETT:  Objection; form.
2      A    No.
3   BY MR. DORMER:
4      Q    Is there evidence to suggest on the other
5   side that weighs in favor of saying the umbrella's
6   what caused him to come to see you for the nerve
7   problems?
8           MR. GARNETT:  Objection; form.
9      A    There is evidence, yes.
10  BY MR. DORMER:
11     Q    Absent the umbrella, is there any evidence
12  he would have seen Dr. Treadwell?
13          MR. GARNETT:  Objection; form.
14     A    No.
15  BY MR. DORMER:
16     Q    Is it more probable than not that the
17  umbrella caused him to be referred to
18  Dr. Treadwell?
19          MR. GARNETT:  Objection; form.
20     A    Yes.
21  BY MR. DORMER:
22     Q    Do you believe it was reasonable for
23  Mr. Harper to follow Dr. Treadwell's advice?
24          MR. GARNETT:  Objection; form.
25     A    Yes.

*AB Litigation Services*

Page 73

1   BY MR. DORMER:
2      Q    Have you seen Mr. Harper recently -- as
3   recently as earlier this year, right?
4      A    January 2024.
5      Q    Had his nerve symptoms gotten any better --
6   his ulnar nerve problems?
7      A    No.
8      Q    Now, as we're sitting here today, I want to
9   be clear about this.  Do we know at this point what
10  specifically -- what particular place on his ulnar
11  nerve is causing him problems or what surgery may or
12  may not fix it?
13     A    No.
14     Q    Can we be any more specific than -- sorry.
15  Go ahead.
16     A    No.
17     Q    So just to be clear, you really don't have
18  an opinion about the -- what specific treatment he
19  might need or might help his ulnar nerve problems,
20  right?
21     A    Correct.
22          MR. GARNETT:  Objection.
23  BY MR. DORMER:
24     Q    Is there any indication that this far out
25  that problems are going to spontaneously get better?

Page 74

1          MR. GARNETT:  Objection; form.
2      A    No indication.
3   BY MR. DORMER:
4      Q    Are you aware of -- as we're sitting here
5   today -- of any treatment that you think would fix
6   it?
7      A    No.
8          MR. GARNETT:  Objection.
9   BY MR. DORMER:
10     Q    Did you do your rotator cuff surgery based
11  on your expertise in shoulders, is that going to fix
12  his ulnar nerve problems?
13     A    No.
14     Q    You told him that, right?
15     A    Yes.
16     Q    Still reasonable to do the rotator cuff,
17  right?
18     A    I told him I thought it would potentially
19  make him worse because it's not his fundamental
20  problem.  It's not worth putting him through that
21  process right now.
22     Q    So I want to kind of ask you, I guess, two
23  questions:  Number one, you'll have the opportunity
24  after this deposition if you want to read the
25  transcript.  Do you have any desire to read the

Page 75

1   transcript and go back through and try to make
2   sure --
3      A    No.
4      Q    Okay.  Didn't think so.
5          THE REPORTER:  I'm sorry.  I didn't get that
6   answer.
7      A    No.
8   BY MR. DORMER:
9      Q    Have you found any of the questions that
10  we've asked to be confusing or not all together clear
11  today?
12     A    Yes.
13     Q    What's been your overall impression of this
14  process, if I can ask you that?  I want you to be --
15  remember you're under oath and all of us have a thick
16  skin, so --
17          MR. GARNETT:  Objection; form.
18     A    No.  I have nothing to say.
19  BY MR. DORMER:
20     Q    Do you have an opinion to a reasonable
21  degree of medical certainty if that means more
22  probably than not as to what caused Don Harper's
23  ulnar nerve problems?  Maybe not what specifically
24  is -- what caused it.
25     A    No, I don't.

Page 76

1      Q    Why not?
2      A    Because I don't think I know all the
3   information that I would need to know to answer that
4   question.
5      Q    Yeah.  What more would you need to know?
6      A    I don't know what I don't know.
7      Q    Now, if the law says that if you combine
8   plausibility, temporality, and no more likely
9   alternative, and that equals legal causation, would
10  you agree that the umbrella incident is probably a
11  cause of his symptoms?
12          MR. GARNETT:  Objection; form.
13     A    I would say that it's certainly plausible.
14  There's so much -- it's so difficult to answer these
15  questions.
16  BY MR. DORMER:
17     Q    Yeah, and I get it.  What's -- I think I get
18  it.  Why don't you tell me, actually?  What is --
19  what is the difficulty because I want to understand
20  that.
21          MR. GARNETT:  Objection; form.
22     A    When I saw him in 2019 or 2020 -- sorry --
23  July 2020, it was not my intent to determine the
24  exact causative nature, and I didn't look into every
25  bit of information that might contribute to that

**Page 77**

1  diagnosis, and I -- you know, the fact that there's
2  an EMG two months later that shows no abnormalities
3  is a factor.  So I don't know.  Bottom line is, I
4  don't know.
5  BY MR. DORMER:
6      Q    So the lack of a positive EMG finding?
7      A    EMG, nerve conduction studies, there may be
8  more information out there that I'm not aware of.
9      Q    So what if we just say, based on what you
10 know alone, based on your treating -- your treatment
11 of him, your workup of him, did you come to an
12 opinion that was valid in terms of enough to write in
13 your documentation?
14          MR. GARNETT:  Objection; form.
15     A    I wrote down what I thought seemed likely
16 based on what he told me and based on what I saw.
17 BY MR. DORMER:
18     Q    So it almost sounds like there's kind of a
19 discomfort about the difference between what you
20 might see as a forensic opinion based on all possible
21 information and an opinion that's adequate for
22 treating a patient; am I getting --
23          MR. GARNETT:  Objection; form.
24     A    That's -- I think that's probably right.
25 BY MR. DORMER:

**Page 78**

1      Q    So let me ask the question a little
2  differently then.  In your role as a treating
3  physician, to a reasonable degree of medical
4  certainty for a treating physician, what do you
5  believe the cause was of his injuries?
6          MR. GARNETT:  Objection; form.
7      A    When I saw him in July of 2020, I thought
8  that he suffered an injury to his neck and brachial
9  plexus likely, and that's why I sent him to
10 Treadwell, to see if there was some answer for what
11 happened, something that more specific could be
12 determined, and I didn't think that his rotator cuff
13 was the number one problem at the time.
14 BY MR. DORMER:
15     Q    So when we ask this question of reasonable
16 degree of medical certainty, we want to know what's
17 reasonable for treating doctors.
18          MR. GARNETT:  Objection; form.
19 BY MR. DORMER:
20     Q    All right.  Let me take a break real quick.
21          THE VIDEOGRAPHER:  We're off the record at
22 3:55 p.m.
23          (Break from 3:55 p.m. to 4:00 p.m.)
24          THE VIDEOGRAPHER:  We're back on the record
25 at 4:00 p.m.

**Page 79**

1  BY MR. DORMER:
2      Q    So just a couple more questions, Doctor.
3  You've never been an expert witness, like a hired
4  expert witness, right?
5      A    Correct.
6      Q    You've never done a forensic medical review,
7  right?
8      A    Correct.
9      Q    You've never been taught to do one?
10     A    Right.
11     Q    Do you know that some people do those,
12 right?
13     A    Yes.
14     Q    And I guess to put it simply, you have no
15 idea what types of things they interrogate to look
16 for their definition of medical certainty or forensic
17 causation, right?
18     A    Right.
19          MR. GARNETT:  Objection; form to the last
20 question.  I was on mute.  Sorry.
21 BY MR. DORMER:
22     Q    All of your training and experience and the
23 drive of your career has been to meet with people
24 like Mr. Harper and try to help them with their
25 orthopedic issues?

**Page 80**

1      A    Correct.
2      Q    What did you tell Mr. Harper was more likely
3  than not the cause of his ulnar nerve problems?
4          MR. GARNETT:  Objection; form.
5      A    I don't remember him asking that
6  specifically, but . . .
7  BY MR. DORMER:
8      Q    If he did ask?
9      A    Yeah.  I think I'd have said, "Well, it
10 certainly could have happened with your injury.  It's
11 consistent with your injury."
12     Q    And that's the --
13     A    Historical injury of the umbrella hitting
14 the side of his neck, the clavicle.
15     Q    When you don't know enough to give a patient
16 an opinion in a treating context, you tell them so,
17 right?
18          MR. GARNETT:  Objection; form.
19     A    Yes.
20 BY MR. DORMER:
21     Q    And the information that you had as a
22 treating doctor was good enough for you to give that
23 opinion to Mr. Harper or put it in your records,
24 right?
25          MR. GARNETT:  Objection; form.

Page 81

1    A    Yes.
2  BY MR. DORMER:
3    Q    That's what's been taught to you throughout
4  your training, right?
5         MR. GARNETT:  Objection; form.
6    A    Right.  Just to be clear, the cause and the
7  diagnosis are different, so we're not focused
8  primarily on cause.
9  BY MR. DORMER:
10   Q    Yeah, and when you think about cause, in
11 medicine that's called the etiology or etiology, I've
12 heard it pronounced, right?
13   A    Sure, sure.
14   Q    And it's one of the things you have to
15 understand to get to a diagnosis, right?
16   A    Yes.
17   Q    And the diagnosis is what you need to be
18 able to help people?
19   A    Right.
20   Q    And so if we don't -- you know, in this
21 case -- I guess, let me end on this.  I have never
22 asked you to come be our expert witness in this case,
23 right?
24   A    That's correct.
25   Q    And if I had asked, you would have

Page 82

1  disagreed?
2    A    Probably.
3    Q    Fair enough.  I have not presented you with
4  any records that you didn't have access to through
5  your own system, right?
6         MR. GARNETT:  Objection; form.
7    A    Correct.
8  BY MR. DORMER:
9    Q    You don't have a camera into Don Harper's
10 life?
11   A    Right.
12   Q    And yet, you still are perfectly capable of
13 coming up with accurate diagnoses consistently in
14 your practice, right?
15   A    Right.
16   Q    Doctors come to reliable opinions as
17 treaters all the time with incomplete information,
18 don't they?
19   A    Yes.
20   Q    And that's good medicine, right?
21   A    Yes.
22        MR. GARNETT:  Objection; form.
23 BY MR. DORMER:
24   Q    If you wait until you have perfect
25 information, you withhold care from people who really

Page 83

1  need it?
2         MR. GARNETT:  Objection to form.
3    A    Right.
4  BY MR. DORMER:
5    Q    Are you confident that your care for
6  Mr. Harper, your evaluation, and your treatment was
7  up to your standard for the best you could possibly
8  do?
9    A    Yes.
10   Q    He is, too.  Nothing further.
11                EXAMINATION
12 BY MR. GARNETT:
13   Q    So Dr. Luker, I know we only had you until
14 4:00.  I probably have 10 or 15 minutes of additional
15 questions.  I want to be respectful of your time, but
16 I also don't want to come back and do this again.
17   A    Neither do I.  I will give you 15 minutes
18 more.
19   Q    Okay.  That's all I need.  So I want to -- I
20 want to take a step back and kind of get some context
21 to what we are doing here because this is under-oath
22 testimony in a legal proceeding, and the transcript
23 will be presumably part of the court record pretty
24 soon.  It's important that we are focused on some
25 specific things rather than just possibilities

Page 84

1  because as the witness, it is your testimony that's
2  going to carry on past the life of this case, okay?
3    A    Okay.
4    Q    So couple of questions.  Do you understand
5  the difference between probability and
6  plausibility?
7    A    Yes.
8    Q    So when I'm asking you to a reasonable
9  degree of medical probability, and you're indicating
10 that you do not have any expert opinions to provide,
11 do you understand what you're saying?
12   A    Yes.
13        MR. DORMER:  Object to foundation.
14
15 BY MR. GARNETT:
16   Q    So you met with Mr. Dormer or talked to him
17 on the phone, correct?
18   A    Yes.
19   Q    When Mr. Dormer met with you, did he give
20 you the EMGs or the MRIs in this case?
21   A    I don't recall him giving me anything, no.
22   Q    And because that's the whole point of, I
23 think, what you're kind of talking about.  You don't
24 have it, right?
25   A    That's correct.

**Page 85**

1  Q   You don't know it, correct?

2  A   That's correct.

3  Q   So when Mr. Dormer asks you in the

4  differential diagnosis whether or not you found

5  anything that was plausible or more plausible, do you

6  know what happened to Mr. Harper between July 19th,

7  2020 -- or excuse me -- July 21st, 2020, and July

8  19th, 2023?

9      MR. DORMER:  Object to foundation and form.

10  A   I do not have complete knowledge, certainly.

11  I have a few items from his history that he told me,

12  but no.  The answer is, no.

13  BY MR. GARNETT:

14  Q   Right.  Do you know he had three back

15  surgeries -- at least three back surgeries?

16  A   I do know he had some back surgeries, yes.

17  Q   Do you know the extent of those?

18  A   No.

19  Q   And you don't know the cause of those?

20  A   No.

21  Q   And you didn't know -- did you know that he

22  was in a wheelchair for nearly a year?

23  A   I don't recall, but I think he told me

24  something about this, but I don't recall.

25  Q   And that's the problem that we're kind of

**Page 86**

1  getting at in the big picture.  Is if you're coming

2  in to give a causation opinion, you have to have all

3  of the information, and you, as you just testified,

4  weren't focused on causation?  You're focused on --

5      MR. DORMER:  Andrew, I'm not going to let

6  you continue to lecture the doctor about --

7      MR. GARNETT:  Mr. Dormer, make an objection.

8  I have 12 more minutes, and put it on the record.

9      MR. DORMER:  You just keep brow-beating him,

10  and that's getting to the point of harassing him, and

11  client especially since he's given us two hours to --

12      MR. GARNETT:  Mr. Dormer

13      MR. DORMER:  -- if that kind of thing

14  continues.  Asking questions that are compound and

15  not just telling him your opinions and what you think

16  the process is.  You've also misstated the law

17  multiple times, so . . .

18      MR. GARNETT:  Mr. Dormer, please just make

19  an objection.  Don't continue.

20      MR. DORMER:  I've done so, and I'm just

21  really trying to confer with you about what I think

22  is borderline harassing, but if you don't want to

23  hear it, you don't want to hear it.  Move on.

24  BY MR. GARNETT:

25  Q   Okay.  Dr. Luker, in no way, shape, or form

**Page 87**

1  am I attempting to harass you.  I apologize if that's

2  ever insinuated.  I appreciate all of your time and

3  all of your responses today.  So let's go back.

4      When you saw him, you saw him not to

5  determine causation, but to determine diagnosis,

6  right, to diagnose his injuries?

7  A   Yes.

8      MR. DORMER:  Object; form.

9  BY MR. GARNETT:

10  Q   And to determine causation, you're going to

11  need more information, right?

12      MR. DORMER:  Same objection.

13  A   Yes.

14  BY MR. GARNETT:

15  Q   And you did not have that information,

16  correct?

17  A   Yes.

18  Q   So you cannot, under oath in this legal

19  proceeding, provide an opinion as an expert to a

20  reasonable degree of medical probability regarding

21  the causation of his injuries, correct?

22      MR. DORMER:  Same objection.

23  A   Yes.

24  BY MR. GARNETT:

25  Q   I also want to go back just quickly to your

**Page 88**

1  testimony with Mr. Dormer where you testified that he

2  came in for left shoulder pain because he had an

3  injury, right, and that's why you were evaluating?

4  A   Yes.

5  Q   All right.  So I want to show you what we'll

6  mark as whatever the next exhibit is in our list.  I

7  think it's Exhibit 10.  Might be 11, and this is --

8  and you can look on the screen because I'm going to

9  admit this one or you can look at yours.  It's the

10  January 30th, 2024 record.  Can you see my screen or

11  can you see the record?

12  A   I can see the screen from --

13  Q   Is it legible for you?

14  A   It is.

15  Q   So did Mr. Harper report to you in January

16  of 2024 that he was very clear that his shoulder pain

17  and some of the weakness pre-dated the umbrella

18  incident at Starbucks?

19  A   Yes.

20  Q   Stop sharing my screen.  That's consistent

21  with the fact his torn rotator cuff was diagnosed

22  years before the umbrella incident, correct?

23  A   Yes.

24  Q   Dr. Luker, are you a nerve expert?

25  A   No.

Page 89

1    MR. DORMER:  I'll object to form and
2 foundation.
3 BY MR. GARNETT:
4    Q    Do you know -- have you read Mr. Harper's
5 transcript of his deposition?
6    A    No.
7    Q    Do you know the specifics of how the
8 umbrella and where the umbrella hit him?
9    A    No.
10    Q    And when somebody has a stretch injury, is
11 that more consistent with, like, falling off of a
12 cliff and grabbing onto a branch, and you're holding
13 onto something, and then you're falling another
14 direction or there's a force pulling in a different
15 direction, and there's a stretch of your appendage?
16    MR. DORMER:  Object to form.
17    A    That's another mechanism for a stretch
18 injury to, you know, portions of the brachial plexus,
19 BY MR. GARNETT:
20    Q    And Dr. Luker, would you consider yourself
21 to be a double-crush syndrome expert?
22    MR. DORMER:  Same objections.
23    A    No.
24 BY MR. GARNETT:
25    Q    And candidly, you didn't have all of

Page 90

1 Mr. Harper's medical records regarding his four-plus
2 cervical spine surgeries, correct?
3    A    No.
4    Q    So you're not saying to a reasonable degree
5 of medical probability that any of Mr. Harper's
6 injuries were caused by double crush?
7    A    I'm not.
8    MR. DORMER:  Same objection on that.
9 BY MR. GARNETT:
10    Q    All right.  Dr. Luker, I mean, I'm just --
11 if you have anything else you want to say, the floor
12 is yours.  I appreciate your time.  I don't have any
13 additional questions for you.
14    THE WITNESS:  Nothing more.
15    THE VIDEOGRAPHER:  This concludes today's
16 proceedings.  The time is 4:15 p.m.
17    MR. GARNETT:  So Doctor, you said this
18 on the record, but you don't want to read and sign
19 your deposition?
20    THE WITNESS:  Do not.
21    MR. GARNETT:  If there's, like,
22 transcription errors is really the only thing we
23 allow people to edit, although people try do all
24 kinds of crazy things.
25    THE WITNESS:  I do not.

Page 91

1    MR. GARNETT:  In that case, do you need any
2 spellings?  We can probably provide them, so I think
3 we let Dr. Luker go.
4    THE VIDEOGRAPHER:  Mr. Garnett, would you
5 like a copy of the recording?
6    MR. GARNETT:  Yes.  We don't need the video.
7 We need the transcript, and we do need a rush
8 transcript, too, if you could, Rosemary.
9    (The remote video deposition of MARK G.
10    LUKER, MD, concluded at 4:15 p.m., July 30,
11    2024.)
12    * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 92

1 STATE OF WYOMING )
2                 )ss.  REPORTER'S CERTIFICATE
  COUNTY OF LARAMIE )
4    I, Rosemary Novario, do hereby certify that I am
5 a Registered Merit Reporter and Notary Public within
6 the State of Wyoming; that previous to the
7 commencement of the examination, the deponent was
8 duly sworn to testify to the truth.
9    I further certify that this deposition was taken
10 in shorthand by me at the time and place herein set
11 forth, that it was thereafter reduced to typewritten
12 form, and that the foregoing constitutes a true and
13 correct transcript.
14    I further certify that I am not related to,
15 employed by, nor of counsel for any of the parties or
16 attorneys herein, nor otherwise interested in the
17 result of the within action.
18    In witness whereof, I have affixed my signature
19 this 5th day of August, 2024.
20    My commission expires July 17, 2029.
21
22
23
   Rosemary Novario, RMR, RPR
24    216 - 16th Street, Suite 600
   Denver, Colorado  80202
25

*AB Litigation Services*

```
 1   AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202

 3

 4
                   MARK G. LUKER, MD
 5                  July 30, 2024
             Harper v. Starbucks Corporation
 6           Civil Action No. 1:21-cv-03295-GPG-KAS

 7

 8   The original deposition was filed with

 9   Andrew Garnett, Esq. on approximately the

10   5th day of August, 2024.

11
      _XXX_  Signature waived
12
      _____  Signature not requested
13
      _____  Unsigned; signed signature page and amendment
14           sheets, if any, to be filed at trial
15    _____  Unsigned; original amendment sheets and/or
             signature pages should be forwarded to
16           AB Litigation Services to be filed in the
             envelope attached to the sealed original
17
     Thank you.
18
     AB LITIGATION SERVICES
19
     cc:  All Counsel
20
21
22
23
24
25
```

*AB Litigation Services*

**Exhibits**

**EXHIBIT 11**

**1**

**1**  43:5

**10**  83:14 88:7

**11**  88:7

**11...01/30/2024**
3:14

**110**  2:3

**12**  86:8

**13th**  21:23

**15**  83:14,17

**1512**  2:8

**15th**  34:22

**1990s**  37:5

**19th**  85:6,8

**2**

**2012**  27:19

**2019**  9:4,8,9,20
23:16,24 27:4 30:20
76:22

**2020**  9:10 10:12
11:10,19 15:12
21:10,23 22:4,5 24:2
30:25 31:14 76:22,23
78:7 85:7

**2023**  9:10 30:20 31:8
32:10 34:22 35:13
36:1,3 85:8

**2024**  3:5 4:3 9:11
73:4 88:10,16 91:11

**21st**  11:18 85:7

**23rd**  9:4,8,20

**2:02**  3:5 4:3

**2:43**  33:7,8

**2:48**  33:8,10

**3**

**30**  3:4 59:3 91:10

**30th**  4:3 88:10

**3457**  2:3

**3:03**  42:19,20

**3:07**  42:20,22

**3:55**  78:22,23

**4**

**4**  3:11 21:14 34:25

**45**  3:12

**4:00**  78:23,25 83:14

**4:15**  90:16 91:10

**5**

**5**  44:3

**50**  45:23

**8**

**80202**  2:9

**80216**  2:4

**83**  3:11

**87**  3:15

**9**

**950**  2:8

**A**

**ability**  39:20

**abnormalities**  77:2

**Absent**  72:11

**acceptable**  8:11

**access**  21:15 26:15
39:20 65:6 82:4

**accurate**  17:7 24:21
82:13

**acute**  24:22

**additional**  19:4
37:25 39:21 40:13
45:12 83:14 90:13

**adequate**  77:21

**admit**  88:9

**advice**  72:23

**affect**  56:4 68:19

**aggressively-toned**
54:20

**agree**  76:10

**Agreed**  33:14

**ahead**  30:11 40:3
55:11 73:15

**all's**  10:21 65:25

**alternative**  47:12
76:9

**Amy**  4:14

**analysis**  13:6

**anatomic**  57:9

**anatomy**  47:3 49:23
69:25

**Andrew**  2:7 4:16 5:1
10:25 16:25 17:22
86:5

**andrew.garnett@
garnettlegalgroup.
com**  2:9

**answer's**  35:12

**answers**  6:8,10,11,
21 8:11

**anyone's**  66:17

**apologize**  87:1

**apparent**  21:7

**apparently**  21:15
44:23

**APPEARANCES**
2:1

**Appearing**  2:5,10

**appendage**  89:15

**appointments**  9:14

**approximately**
58:25

**area**  10:2

**argue**  25:6

**arm**  36:9 56:24 57:23
58:10 70:17

**asks**  85:3

**assess**  11:19,20

**assisting**  37:7,8

**assume**  71:12

**asymptomatic**
69:13

**attempting**  87:1

**attorney**  7:6,16,17

**audible**  6:8,11

**August**  9:4,7,10,20
23:25 30:19,20 32:9
34:22 35:13 36:1,3

**avoid**  49:20

**aware**  10:7 26:21,24
27:18,21 51:17,21
74:4 77:8

**B**

**back**  8:12 9:12 30:11
31:14 33:9,16 36:9,
11,12,14,16 38:7
42:21 48:10,11 67:2
75:1 78:24 83:16,20
85:14,15,16 87:3,25

**background**  17:16

**Barlow**  2:6,7 3:4
4:17 5:2

**based**  11:23 17:5
20:11 25:11 31:17
40:6 47:2,6 53:3 67:9
74:10 77:9,10,16,20

**basic**  57:9

**basically**  18:14

**basing**  13:8 24:25
26:20

**bat**  62:10

*AB Litigation Services*

bearing 29:2

beginning 4:11 20:3

begins 4:3

behalf 2:5,10 4:17

bell 27:23

bend 55:23 56:17,24

big 43:20 55:22
  56:18 86:1

biggest 36:11

biological 46:24
  47:1

biologically 62:21
  63:3

bit 5:4 7:2 9:17 13:23
  16:10 33:14 34:3
  43:2 67:19 76:25

bite 30:6 31:1

blanche 39:20

blunt 20:14 24:10

boarded 49:17

body 57:22

borderline 86:22

Bottom 77:3

brachial 19:14,18,20
  21:19,23,24 22:6
  24:17,20 25:23,25
  29:20 34:4 36:21
  37:3,11,14,18,21,24
  38:11,14,19,22 39:7
  40:15 41:9 48:12,15,
  23 49:3,5,21,23 56:9,
  20 58:18 68:6,8
  69:13 78:8 89:18

brain 20:2

branch 89:12

break 11:12 33:5,8
  42:16,20 78:20,23

brings 5:3 52:1

broad 22:14

brow-beating 86:9

but-for 70:13

---

**C**

call 7:16 11:15 18:8
  58:19 69:23

called 3:3 70:13
  81:11

camera 11:4 82:9

candidly 89:25

capable 82:12

care 25:24 82:25
  83:5

career 79:23

careful 51:7

carefully 51:2

carry 84:2

carte 39:19

case 5:16 7:14 14:25
  24:14,18 25:1 28:24
  40:8 42:6,12 44:2
  45:8 81:21,22 84:2,
  20 91:1

cases 46:25 66:21

category 22:14

causation 17:14
  28:18 29:9 41:8,17,
  24 70:12 76:9 79:17
  86:2,4 87:5,10,21

causative 76:24

caused 14:6 18:22
  19:11 20:13 24:10
  32:11 36:13 72:6,17
  75:22,24 90:6

causing 29:10 53:22
  73:11

certainty 39:10
  45:18,20 46:7,8,9,14,
  17 54:6 75:21 78:4,
  16 79:16

cervical 27:21 90:2

chain 30:15

chance 66:23

change 71:1

---

chart 8:13,15 9:21
  27:14

chase 45:22

check 53:1 58:8

chest 10:1

Civil 3:2

clarify 13:17 16:21
  45:3 66:4

clavicle 10:2 20:15
  24:11 53:12 55:18
  80:14

clear 6:10,21 24:20
  25:25 29:13 68:16
  73:9,17 75:10 81:6
  88:16

clearer 11:7

client 86:11

cliff 89:12

Clinic 3:15

clinical 55:14

close 53:21

closer 11:3 69:18

code 53:20

Colorado 43:18

combine 70:6 76:7

commencing 3:5

common 60:17

communicating
  28:6

communication 7:6

complain 13:10

complaining 11:10
  15:8 29:8

complaint 15:14
  23:6 31:2 52:13

complaints 11:24
  12:1,7,19 14:8,17
  15:19 16:2,23 26:21
  28:2,5 31:18 33:23

complete 85:10

Completed 44:17

---

complex 28:2,17
  71:13

complying 44:10

component 68:8

compound 86:14

compressed 61:21

compression 67:6,
  24

computer 35:1

concept 63:22 67:21
  69:21

concluded 91:10

concludes 35:17
  90:15

conclusively 31:20

condition 48:1 64:1

conditions 69:3,6

conduction 22:20
  77:7

confer 86:21

conference 4:7

confidence 67:12

confident 20:20
  21:9 54:12 67:9 83:5

confusing 75:10

connected 20:5

considered 50:19

consistent 55:15
  80:11 88:20 89:11

consistently 82:13

context 5:15 80:16
  83:20

continue 86:6,19

continues 86:14

continuing 13:10

contribute 76:25

contributes 49:12

copy 91:5

Corporation 4:6,17
  5:3

**AB Litigation Services**

**correct** 9:15 10:5,6
11:21 12:13 13:7
14:8,12 15:1,10,20
16:2,11,19,24 18:23
19:22 25:14,15,19,21
26:11,13,14 27:3,7,
12,15 28:2,3,7,8,11,
12,15,22 29:11,21
30:23 31:6,7,12,13
32:4,8,16 33:1,20,23,
24 34:1 35:24,25
36:1,2,18,19 37:11,
12,19 40:9,16,17,20
41:4,5,9,13,18,20,25
42:2,12,14 44:22
46:4 49:7,16,24 50:8
51:9 54:8 61:19,24
62:12,17 63:19 66:12
73:21 79:5,8 80:1
81:24 82:7 84:17,25
85:1,2 87:16,21
88:22 90:2

**corroborate** 23:5
28:5

**counsel** 4:10,12
44:2

**couple** 6:2 11:12
18:10 40:12 79:2
84:4

**court** 2:3 4:7,18 40:1
43:18 83:23

**crazy** 90:24

**creating** 64:3

**crucial** 30:18

**crush** 67:21,23
68:19 69:1,19 90:6

**cubital** 13:23,25
14:3 20:13 31:12
67:7 69:11

**cuff** 26:22 27:2,6,10,
11 33:18 34:16
35:10,16,22,23 36:5
50:6,11 53:10,11
55:6,7,15 63:17
74:10,16 78:12 88:21

**cut** 6:4 45:22

**cycle** 62:3

---

**D**

**damage** 67:24

**date** 9:6

**dated** 34:23

**dates** 9:3,5

**day** 53:15

**dealing** 39:25

**decide** 35:22

**decision** 35:18
36:10

**defendant** 2:11 4:5
5:2

**defer** 12:17 43:8

**defined** 62:19

**definition** 45:17
46:20 79:16

**degree** 19:9,10
31:16,21 32:13 38:21
39:9,22 40:7,14,19
41:2,7,16,23 42:11
44:21 45:7,17 46:7,
16 75:21 78:3,16
84:9 87:20 90:4

**demonstrate** 28:13

**demonstrated**
23:18 35:6

**Denver** 2:4,9

**depo** 43:4

**deponent** 4:19

**deposed** 5:8,14

**deposition** 3:2,9
4:4,6 18:12 45:24
66:6 74:24 89:5
90:19 91:9

**describe** 13:3 68:13,
23

**designation** 43:8

**desire** 74:25

**detail** 13:3

**details** 8:7

---

**determine** 15:18
16:13 76:23 87:5,10

**determined** 78:12

**determining** 63:25

**developed** 19:3

**diagnose** 12:11
13:23,25 34:15 50:5
51:23 87:6

**diagnosed** 12:24
19:25 27:9 31:9
50:11 88:21

**diagnoses** 14:11,18
82:13

**diagnosing** 29:11
58:18

**diagnosis** 12:18
20:10,12,21,23 21:9
23:4 29:4,6 30:7,13
31:3 34:20 35:21
37:25 47:7,11 53:4,8,
15,20 54:11,12 55:1
58:14 63:22,23,24
67:9 77:1 81:7,15,17
85:4 87:5

**diagnostic** 19:4
21:12 22:9,12,14,17,
23 23:1,9 26:7 28:4,
19 29:4 31:19

**diatribe** 17:21

**difference** 77:19
84:5

**differential** 47:10
63:21,23,24 64:17
85:4

**differently** 78:2

**difficult** 61:6 76:14

**difficulty** 76:19

**direct** 60:9 67:8

**direction** 89:14,15

**disagree** 12:23
14:18 20:9,15

**disagreed** 82:1

**disclosed** 17:24

**disclosure** 17:25
44:19

---

**disclosures** 18:9
43:5 44:1

**discomfort** 77:19

**discount** 24:19
50:20

**discussed** 35:16

**disease** 35:16 48:1

**distribution** 71:7

**District** 43:18

**divisions** 56:9

**doctor** 5:20 43:13
45:16 55:11 79:2
80:22 86:6 90:17

**doctor's** 10:9

**doctors** 8:25 78:17
82:16

**document** 42:25
52:11

**documentation**
54:25 77:13

**documented** 57:20
58:7

**Don** 70:16 75:22
82:9

**Donald** 4:5,15 5:5

**Dormer** 2:2 3:12
4:13 7:9,18 10:23
11:2 12:14,20 13:11
14:13 15:2,21 16:3,
17,25 17:3,20 18:3,
19,24 20:16 26:23
28:21 29:15,22 30:2,
21 31:23 32:1,15,25
38:24 40:2,21 41:11,
19 42:1,13 43:3,9
44:24 45:9,15 46:15
47:17,24 48:5,20
49:1 51:1,22 52:10,
20 53:7,13,24 54:5,
17 55:10 56:6,23
57:4,19 58:1,22 59:4,
13 60:2,7,16,22 61:8,
20 62:1,8,13,18 63:1,
7,14,20 64:9,15,22
65:5 66:3,8,9 67:17
68:10 69:7,17 70:10,
21 71:3,16,22 72:3,
10,15,21 73:1,23

*AB Litigation Services*

74:3,9 75:8,19 76:16
77:5,17,25 78:14,19
79:1,21 80:7,20 81:2,
9 82:8,23 83:4 84:13,
16,19 85:3,9 86:5,7,
9,12,13,18,20 87:8,
12,22 88:1 89:1,16,
22 90:8

**Dormer's** 7:9 42:6

**double** 67:21,23
68:18 69:1,19 90:6

**double-crush** 14:4
67:20 68:11,12 89:21

**doubt** 46:10

**drive** 79:23

**duly** 4:21

**dynamic** 17:16 38:7

**dysfunction** 20:1
53:22 61:13,16,22

**dysfunctional** 20:4,
7

---

**E**

**earlier** 8:10 34:3
45:24 73:3

**easier** 43:10

**edit** 90:23

**elbow** 11:16,25 12:8,
12,25 13:10,16,18,
19,20 14:19 15:19
17:18 32:20 33:13
57:3 58:11 65:21
67:7,16 69:12

**electrical-shock**
57:18,21

**electronic** 66:13

**EMG** 22:20,23 23:11,
15 24:4,7,17,23
26:10 29:25 60:3,10,
18 61:2,3,10 62:15
77:2,6,7

**EMGS** 60:12 64:11
84:20

**employer** 8:20

**EMR** 66:13

**encounters** 9:6

**end** 20:4 35:17 81:21

**ended** 71:19

**entire** 58:10

**equals** 76:9

**Eric** 7:17

**errors** 90:22

**Esq** 2:2,7

**etiology** 81:11

**evaluate** 11:25

**evaluating** 10:15
15:9 88:3

**evaluation** 12:18
14:7 20:12 31:3,17
83:6

**evaluations** 14:11

**event** 17:15 18:22
19:11,15

**evidence** 21:24
24:22 50:18,20 63:9
71:23 72:4,9,11

**exact** 76:24

**exam** 25:4,5 51:10,
24

**examination** 3:10
4:23 18:18 25:11
45:14 83:11

**examine** 66:24

**examined** 4:22

**examining** 29:7

**excuse** 10:20 33:25
44:4 65:24 85:7

**exhibit** 43:5 88:6,7

**EXHIBITS** 3:13

**existed** 59:9

**expectation** 9:13

**experience** 37:2
79:22

**experiencing** 68:2

**expert** 5:10,12,24
14:25 15:5 17:12,25
18:9 37:13 38:23
39:21 40:14,18 41:1,
6,15,22 42:5,10 43:4,
25 44:20 45:6 48:12,
15 51:17 79:3,4
81:22 84:10 87:19
88:24 89:21

**expertise** 38:1 74:11

**explain** 55:13 56:7
61:9,11 63:22 64:1
67:10 68:18

**explaining** 69:19

**explains** 18:16

**explanation** 19:16
39:8 69:23

**explanations** 47:12

**extended** 36:8

**extent** 85:17

**extremity** 10:18
11:11,13 15:9 25:14
49:13

---

**F**

**facing** 11:3

**fact** 14:21 34:9 77:1
88:21

**factor** 58:14 68:1
77:3

**factors** 55:1

**fail** 6:16

**fair** 32:20 47:8 48:21
50:15 53:25 59:15
61:17 82:3

**fall** 27:22

**falling** 89:11,13

**false** 60:12

**familiar** 27:17 47:13,
20

**Farbes** 2:6 3:4

**faulty** 70:7,9

**favor** 72:5

**Federal** 3:1

**feeding** 68:14

**fell** 27:18

**felt** 52:23

**fibers** 56:12,14

**figure** 43:12

**figuring** 30:8

**finding** 77:6

**findings** 60:3,10,18
61:2

**fine** 8:11 18:17

**finger** 58:8

**fingertips** 58:11

**finish** 30:11

**finished** 17:1

**five-minute** 42:16

**fix** 54:7 67:5 73:12
74:5,11

**flexion** 57:2

**floor** 90:11

**focus** 36:12

**focused** 81:7 83:24
86:4

**follow** 72:23

**follow-up** 3:14
40:13

**force** 20:14 24:10
89:14

**foremost** 4:25

**forensic** 77:20 79:6,
16

**forgive** 27:4

**form** 12:14 13:11
15:3,21 16:17 17:20
18:15,24 26:23 28:21
29:15,22 30:21
31:24,25 32:2 38:24
40:2,22 47:16,22
48:3,17,24 50:22
51:20 52:7,18 53:5,9,
19 54:4,14 55:8 56:1
57:1,16,25 58:21

*AB Litigation Services*

59:2,12,25 60:14,19
61:5,13,18 62:6,16,
24 63:5,12,18 64:8,
13,20 65:2,23 66:1,3
67:13 68:4,6 69:4,15
70:1,19,24 71:8,20
72:1,8,13,19,24 74:1
75:17 76:12,21
77:14,23 78:6,18
79:19 80:4,18,25
81:5 82:6,22 83:2
85:9 86:25 87:8 89:1,
16

**formal** 34:20

**formally** 12:10

**formulating** 24:3

**forward** 35:22

**found** 75:9 85:4

**foundation** 13:11
14:13 15:3,21 16:17
18:25 20:17 29:22
30:2 32:2,3 40:3,22,
23 42:13 44:24 84:13
85:9 89:2

**four-plus** 90:1

**fourth** 58:9

**front** 8:8 27:16

**frustrated** 36:7

**full** 27:25 28:20 35:7
49:25 50:2,3

**function** 49:12

**functional** 62:4,14

**fundamental** 74:19

---

**G**

**GARNET** 61:5

**Garnett** 2:6,7 3:3,11
4:16,24 5:1,23 10:20
11:1,5,8 12:16,22
13:14 14:15 15:6,24
16:8,20 17:2,9 18:2,
17,20 19:6 20:22
27:1 28:23 29:17,24
30:4,22 31:25 32:5,
17 33:3,11 39:3 40:4,
25 41:14,21 42:3,15,

23 43:3,12,14 45:2,
11 46:6,11 47:16,22
48:3,17,24 50:22
51:20 52:7,18 53:5,9,
19 54:4,14 55:8 56:1,
21 57:1,16,25 58:21
59:2,12,25 60:14,19
61:18,25 62:6,11,16,
24 63:5,12,18 64:8,
13,20 65:2,23,24
66:2 67:13 68:4 69:4,
15 70:1,19,24 71:8,
20 72:1,8,13,19,24
73:22 74:1,8 75:17
76:12,21 77:14,23
78:6,18 79:19 80:4,
18,25 81:5 82:6,22
83:2,12 84:15 85:13
86:7,12,18,24 87:9,
14,24 89:3,19,24
90:9,17,21 91:1,4,6

**Garnett's** 51:17

**general** 40:21 54:11
67:3

**generally** 5:17
28:22,25 49:18

**gesturing** 55:17

**give** 6:8 14:25 15:4
18:3 27:25 39:1
80:15,22 83:17 84:19
86:2

**giving** 6:11 39:5
84:21

**good** 6:3 18:19
19:16 50:19 80:22
82:20

**grabbing** 89:12

**Great** 43:17

**greater** 68:21

**ground** 6:2

**guess** 54:19 74:22
79:14 81:21

---

**H**

**H-E-H-M-A-N-N**
10:10

**hairs** 17:8,10

**half** 58:12

**hand** 6:5 11:16,19
41:3,25 58:12

**happen** 62:9

**happened** 9:19
19:3,8 36:3 47:2
78:11 80:10 85:6

**happening** 53:22

**happy** 43:5,7

**harass** 87:1

**harassing** 86:10,22

**hard** 17:8 55:23

**Harper** 4:5,15 5:5
7:5,10 8:16,18,24
9:4,15,18 10:4,19,21
11:9,18 12:3,11 13:4,
8,16,23 14:7,10,12
15:1 16:23 18:23
20:12 21:11 23:12,15
24:9 25:7,13 27:18
29:19 30:19 31:8,15
32:11 33:22 34:16
35:9 36:4 38:22 40:6
41:3 48:7 50:10
51:14,19 52:2 60:18
62:21 64:17 65:14
66:11,24 68:2 70:16
72:23 73:2 79:24
80:2,23 83:6 85:6
88:15

**Harper's** 11:24 12:8,
18,24 14:16,19 16:1
17:15 19:11 21:19
33:17 34:3,7 36:14
38:11,13 40:15,20
41:8,17,24 43:25
57:20 75:22 82:9
89:4 90:1,5

**HARPRING** 2:2

**head** 6:9 7:22 56:17

**Health** 8:19,20

**hear** 6:5 10:22 17:22
45:20 50:17 86:23

**heard** 46:6 81:12

**heavily** 24:19

**Hehmann** 10:8,10

**helpful** 24:21,24

**helps** 70:11

**higher** 46:8

**hired** 5:24 51:18
79:3

**Historical** 80:13

**history** 17:5 19:2
25:2,5,6,16,19 28:17
31:20 47:7 50:23,25
51:2,3 58:5,13 64:12
68:5 70:25 85:11

**hit** 52:2,6 55:16,21,
23 71:4,18,25 89:8

**hitting** 20:14 80:13

**Hold** 31:23 32:1 66:8

**holding** 89:12

**honestly** 7:7,25
27:13 54:21

**hospital** 8:25

**hours** 86:11

**hundred** 46:9,14

**hurts** 28:11

**hypothesis** 69:23

---

**I**

**idea** 18:4 36:13
79:15

**illness** 58:9

**imaging** 50:14

**immediately** 24:22
61:16,23

**impact** 24:8 62:23
63:3 64:18 70:15

**impingement** 53:11

**imply** 18:5

**important** 6:19
17:16 23:8,19 24:3,6
26:7 27:25 28:4
49:11 83:24

**impression** 75:13

**inaccurate** 42:12
44:22

*AB Litigation Services*

incident 9:18 10:5 23:17,21,24 24:5 26:12,16 27:12 32:12 36:17 48:8 63:11 76:10 88:18,22

includes 44:3

incomplete 82:17

indicating 84:9

indication 73:24 74:2

industrial 55:22

inflamed 62:2

inflammatory 62:3

information 8:1 23:3 24:14 27:14,24 39:17,19 46:18 59:15 76:3,25 77:8,21 80:21 82:17,25 86:3 87:11,15

initial 3:13 43:25

injuries 12:24 13:15 17:15 28:18 29:9 37:21 38:22 50:6 78:5 87:6,21 90:6

injury 10:16,17 14:17 16:6,11 18:22 19:2,12,14,15,24 21:24 24:22 28:17 29:4,6,10,20,21 30:1 31:10,22 32:11,14,23 38:15,19 39:7 41:3,8, 17,24 48:2 50:10 56:4 62:22 67:24 68:6,7 70:5 71:2,11, 14 78:8 80:10,11,13 88:3 89:10,18

insinuated 87:2

insinuation 44:20 50:17

intended 67:4

intense 58:11

intent 76:23

interaction 10:11

interjecting 6:3

Intermountain 8:20

interrogate 79:15

intervention 37:25

interview 51:6,7 66:24

interviewed 52:15

interviewing 51:3,4

introduce 4:10

involvement 9:18

irritated 62:2

irritation 61:17

issue 10:24 16:14,22 20:23 21:2,5,7,8 24:9 31:1 36:11

issues 12:25 13:10, 18 14:20 15:8,14,16, 19 17:17 20:13 23:18 24:8 79:25

items 85:11

---

**J**

January 9:11 21:23 22:4 73:4 88:10,15

jargon 51:4

job 6:3 49:25 50:5

July 3:4 4:3 9:10 10:12 11:10,18 15:12 21:10 24:2 30:25 31:14 76:23 78:7 85:6,7 91:10

---

**K**

kind 11:2,3 18:3 22:12 38:7 50:17 55:22 56:14 57:6 59:5 62:3 64:3 67:20 68:14,21 69:22 74:22 77:18 83:20 84:23 85:25 86:13

kinds 90:24

knowing 55:5 69:24

knowledge 47:3 57:9 67:3 85:10

---

**L**

lack 32:23 67:12 77:6

largely 25:2 71:13

Larimer 2:8

law 70:12 76:7 86:16

lawyers 54:20

laypeople 49:2

layperson 61:10 63:23

lead 37:10

learn 7:3 57:6

learned 57:12

learning 51:8

lecture 86:6

led 55:1 67:11 68:7

left 9:25 11:13 12:8, 11,25 21:23 22:6 26:22 27:6,11 34:7, 16 35:7,10,23 36:5 53:10,11,12 55:18 63:17 71:10 88:2

left-elbow 12:19

left-upper 10:18 11:11 15:8 49:13

legal 2:12 40:3 45:16 46:20 76:9 83:22 87:18

legally 47:19

legible 88:13

length 59:5

lesion 53:11,14 54:1 58:19

level 70:4,5,8

levels 67:24

life 82:10 84:2

lift 56:24

limited 37:2

limiter 36:10

list 64:4 88:6

listen 50:24

literature 68:13 69:24 70:3

litigation 5:3,25 6:25

live 40:9

LLC 2:2

localized 58:10

location 10:16 70:5, 6

long 7:13,24 12:21 37:4 54:15 58:25 59:9

longer 59:7

looked 14:21 39:10

lot 33:12 51:7

louder 11:6

low 70:4,5

lower 56:19

Luker 3:3,9 4:4,20, 25 11:9 17:25 18:5, 18,21 22:10 33:12 36:20 39:12 40:12 42:4,24 43:6,15 44:4, 19 45:3,13 66:5,10 83:13 86:25 88:24 89:20 90:10 91:3,10

---

**M**

made 12:21 14:11,19 30:13 31:2 35:17 36:10

major 35:16 36:10

make 5:5 6:11,17,19, 20,21 23:3 24:18 29:13 30:13 34:19 47:3 58:8 68:20 74:19 75:1 86:7,18

making 5:1 68:22

maneuvers 53:1

mark 3:3,9 4:4,20 43:11 44:4 88:6 91:9

*AB Litigation Services*

**Mary's** 22:6

**match** 47:7

**matter** 4:5 59:19

**Maximon** 2:6 3:3

**MD** 3:3,9 4:20 44:4
91:10

**meaningful** 26:1,2

**means** 32:18 47:6
67:23 75:21

**meant** 8:9 46:1,8,14

**mechanism** 57:12
68:6 89:17

**medical** 8:22 17:13
19:9,10 25:18 26:16
28:20 29:1 31:16,20,
21 32:13 38:21,23
39:10,20,22 40:7,14,
19 41:1,2,7,16,23
42:11 44:20,21 45:7,
17 46:17 48:11 49:10
51:4 57:8,11 66:14,
17 75:21 78:3,16
79:6,16 84:9 87:20
90:1,5

**medicine** 47:14,25
50:20 64:12 81:11
82:20

**meet** 79:23

**meeting** 15:12

**memory** 45:19

**mention** 8:9

**mentioned** 60:4,9

**Merit** 3:6

**met** 65:11 84:16,19

**metal** 55:23 56:19

**middle** 37:5

**mike** 10:24,25

**minimize** 59:19

**minute** 26:3,6

**minutes** 83:14,17
86:8

**misleading** 17:23

**misstated** 86:16

**moment** 40:10

**months** 7:23 23:16,
17,20 24:4 26:12
65:11 77:2

**motor** 20:2

**Mountain** 3:15

**move** 44:13,14 86:23

**moving** 10:24

**Moyer** 7:17

**MRI** 21:15,22 22:17
24:19,20 28:13 34:19
35:5,6 58:16,17

**MRIS** 21:18 22:15
24:16 25:22,25 34:4,
6 58:25 59:22 60:12
64:11 84:20

**muffled** 65:25

**multiple** 48:1 86:17

**muscle** 61:15

**mute** 79:20

— **N** —

**name's** 5:1

**named** 7:17

**names** 38:4

**narrow** 54:12 64:6,
10

**narrowed** 69:12

**nature** 76:24

**necessarily** 34:21
68:24

**neck** 10:1 20:8 78:8
80:14

**needed** 37:24 66:17

**negative** 24:24 26:2
60:12 62:15

**nerve** 11:20 12:8,18,
25 13:18 14:5,20
15:14 16:1,6,11,14,
22 18:22 19:12,18,
19,20,25 20:1,3,4,7,

13,23 21:2,5,7,8
22:20 23:18 24:7,9
29:20 30:1,7,14 31:1,
10,11,22 32:11,14,23
40:20 41:18 53:12,
14,23 54:13 55:25
56:2,5,8,11,12,14,25
57:2 58:19 61:14,16,
17,21,22 62:2,4,14,
22 63:4,9,10 64:19
65:18 67:6,16,25
69:11,25 70:7,18
71:19,24 72:6 73:5,6,
11,19 74:12 75:23
77:7 80:3 88:24

**nerve's** 61:14

**nerve-based** 11:25

**nerve-stretch** 56:4

**neurologist** 10:8

**nodding** 6:9

**normal** 22:6

**Notary** 3:7

**note** 8:6

**noted** 58:6

**notes** 7:12,19 8:25
17:14 36:6

**Notice** 3:1

**Novario** 3:6 4:8

**number** 43:6 60:24
74:23 78:13

**numbness** 10:18
11:11 57:17,21 67:14
71:6

**numerous** 9:5

— **O** —

**oath** 75:15 87:18

**object** 12:14 13:11
14:13 15:2,21 16:17
17:20 18:24 20:16
26:23 28:21 29:15,22
30:2,21 44:24 54:4
84:13 85:9 87:8 89:1,
16

**objection** 12:20

16:3 17:3 18:15
31:23,24 38:24 41:19
42:1,13 45:9 46:11
47:16,22 48:3,17,24
50:22 51:20 52:7,18
53:5,9,19 54:14 55:8
56:1,21 57:1,16,25
58:21 59:2,12,25
60:14,19 61:5,18,25
62:6,11,16,24 63:5,
12,18 64:8,13,20
65:2,23,25 66:3
67:13 68:4 69:4,15
70:1,19,24 71:8,20
72:1,8,13,19,24
73:22 74:1,8 75:17
76:12,21 77:14,23
78:6,18 79:19 80:4,
18,25 81:5 82:6,22
83:2 86:7,19 87:12,
22 90:8

**objection's** 18:4

**objections** 32:15,25
40:2,22 41:11 89:22

**Occasionally** 37:22

**occur** 69:2,5

**October** 9:10 23:16,
24 36:6

**office** 7:9 42:6

**oftentimes** 47:25

**older** 64:11

**ongoing** 5:3 35:15

**open** 18:6

**operate** 28:9 49:5
59:14

**opine** 31:15,20
32:12

**opinion** 5:25 14:25
15:5,25 16:4,7,10,22
17:5,12 18:6,9,10,11,
21 19:1,3,5,7,8,10,18
20:15 21:1 24:8 26:2
28:16 29:9,19 31:10
38:10,13,17,20,23
39:1,5,22 40:14,18
41:15,22 42:10 73:18
75:20 77:12,20,21
80:16,23 86:2 87:19

*AB Litigation Services*

opinion/causation 38:7

opinions 13:15 24:3,18,25 32:22 40:3,7 41:2,6 42:5 44:21 45:6 59:23 82:16 84:10 86:15

opportunity 74:23

ordered 27:10

original 43:8,10

orthopedic 59:22 79:25

orthopedics 3:15 48:22 49:17 50:2 59:9 67:3

outcome 14:22

---

**P**

p.m. 3:5 4:3 33:7,8, 10 42:19,20,22 78:22,23,25 90:16 91:10

Pace 2:12 4:9

pages 44:6

paging 35:2

pain 10:18 11:11 28:2,5 36:7,8,9,11,14 53:12 57:18,21 58:10 71:10 88:2,16

paragraph 44:7

part 5:16 57:22 69:11 83:23

parties 4:11

partly 50:14

parts 68:22

past 7:6 84:2

patient 15:7 23:6 28:1,6 37:17,23 51:4 61:12 63:23 77:22 80:15

patient's 47:6 50:23, 24 67:14

patients 37:20 50:21

patio 9:25

**Pause** 8:5 40:11 44:12,16

**Pavilion** 22:6

people 6:13 79:11, 23 81:18 82:25 90:23

percent 45:23 46:9, 14

perfect 70:11 82:24

perfectly 8:11 82:12

perform 23:8 35:23

performance 37:7,9

performed 14:10 23:11 36:20

performing 37:6

period 51:14

person 12:3 15:15 38:3

person's 28:10

phone 7:16 18:8 84:17

physical 25:4,5,11 51:10 64:12

physically 29:7 31:18

physician 5:22 37:16 39:6 51:24 66:16 78:3,4

physicians 8:24 48:22

picture 27:25 55:14, 19 86:1

piece 47:10 56:19

pieces 27:24

pinky 58:7

place 73:10

**Plaintiff** 2:5

plaintiff's 4:11

plausibility 46:25 47:1 76:8 84:6

plausible 55:24 56:3 62:22 63:4 64:16,18

76:13 85:5

play 29:5

plexus 19:14,18,21 21:19,23,25 22:7 24:17,20 25:23,25 29:20 34:4 36:21 37:3,11,14,18,21,24 38:11,14,15,19,22 39:7 40:15 41:9 48:12,15,23 49:3,5, 22,23 56:9,20 58:18, 19 68:6,8 69:14 78:9 89:18

point 13:21 46:13 58:4,17 73:9 84:22 86:10

pointing 19:5 69:21

points 5:5

poor 63:2

portion 58:10

portions 11:13 89:18

positive 26:1 61:2,3 77:6

possibilities 64:4 83:25

possibly 59:16 83:7

potential 16:14 28:18 29:10 41:17,24

potentially 10:24 24:8 74:18

**Powell** 2:6 3:3

practice 22:10 23:2, 9 26:7 36:23 59:9 66:11 82:14

practicing 59:6

pre-dated 88:17

predating 26:16

preexisting 69:2,5

prefer 51:25

prepared 39:9 42:5

presence 43:13

**Present** 2:12 58:9

presentation 25:4

presented 71:11 82:3

presume 52:9

pretty 57:9 65:13 83:23

previous 13:17 45:4

previously 17:7

primarily 81:8

probability 19:9,11 31:17,21 32:13 38:21 39:23 40:8,15,19 41:3,7,16,23 42:11 44:22 45:7 84:5,9 87:20 90:5

probable 45:25 53:18 62:20,21 63:25 70:23 71:5 72:16

problem 8:9 10:23 11:5 13:20 14:5,23 20:8 36:12,14,16 39:8 49:22 50:11 55:15 74:20 78:13 85:25

problems 12:25 13:19 31:11 62:4,15 63:4,9,10,17 64:19 71:19,25 72:7 73:6, 11,19,25 74:12 75:23 80:3

procedure 3:2 14:22 27:22

proceeding 83:22 87:19

proceedings 90:16

process 47:13 63:24 74:21 75:14 86:16

prohibited 36:4

pronounced 81:12

provide 5:25 23:3 28:16 39:21 40:8 45:7 66:4 84:10 87:19 91:2

provided 25:6 39:18

providing 17:12 44:20

**Public** 3:7

**pull** 7:12

**pulling** 89:14

**purely** 13:20

**purporting** 42:9

**purpose** 12:13 32:7

**Pursuant** 3:1

**pursue** 35:18

**put** 18:8 52:25 79:14
  80:23 86:8

**putting** 74:20

---

**Q**

**qualitatively** 60:24

**question** 13:17
  17:1,4,21 30:3 45:4
  48:12 51:15 57:6
  60:6 61:6 62:25
  67:18 68:16 70:2
  76:4 78:1,15 79:20

**questioning** 58:23
  60:9

**questions** 6:17,20
  18:13,14 40:13 45:12
  46:5 52:17 54:20
  67:2 70:14 74:23
  75:9 76:15 79:2
  83:15 84:4 86:14
  90:13

**quick** 58:3 66:3
  78:20

**quickly** 87:25

---

**R**

**Raise** 6:5

**rare** 60:21,25

**rate** 60:12

**read** 17:12 20:19
  43:21 44:6,8,11 65:4
  66:17 74:24,25 89:4
  90:18

**ready** 44:13,14

**real** 58:3 66:3 78:20

**reason** 6:6 12:23
  14:18

**reasonable** 19:9,10
  31:16 38:21 39:7,9,
  22 40:7,14,19 41:2,7,
  16,23 42:11 44:21
  45:7,17 46:7,10,16
  72:22 74:16 75:20
  78:3,15,17 84:8
  87:20 90:4

**recall** 7:4,7,8,19 8:7,
  10 10:11 21:13,20
  23:13,14 26:17 34:5
  42:7 84:21 85:23,24

**receiving** 36:4

**recently** 21:15 73:2,
  3

**receptors** 20:2

**recollection** 7:15

**recommend** 35:9,
  14

**recommended**
  27:10

**record** 4:2 6:10,21
  8:19,20,22 9:21 33:7,
  9 34:23 35:15 42:18,
  21 43:7 55:17 65:11
  66:4,14 78:21,24
  83:23 86:8 88:10,11
  90:18

**recorded** 4:7

**recording** 91:5

**records** 8:23 17:13
  18:12 20:19 25:18
  26:16,25 28:20 29:1
  31:20 34:10 39:20
  52:9 65:4,6 66:5,17
  67:22 80:23 82:4
  90:1

**recover** 13:5

**refer** 14:6 37:20,23
  38:3

**REFERENCE** 3:13

**referred** 10:13 11:19
  12:3,12 15:7,15 16:4
  31:1 32:6 37:17

65:14 72:17

**referring** 15:13 22:2,
  3 28:19

**refresh** 45:19

**refute** 23:5

**Registered** 3:6

**related** 12:7,11 14:8
  33:23 36:17 71:14

**relates** 38:11 44:8

**relating** 25:11

**relative** 48:16

**release** 31:12

**reliable** 82:16

**relied** 34:19

**rely** 22:9,12,15,20
  60:8,9

**relying** 24:17

**remember** 15:4
  21:21 43:6 48:11,13
  51:14 54:22 58:23
  75:15 80:5

**remote** 3:2,9 91:9

**remotely** 2:5,10

**repair** 27:11

**repaired** 27:2

**repeat** 5:19 10:9
  23:20 25:8 60:6,8
  62:25

**report** 58:14 88:15

**reporter** 3:6 4:8,18
  5:19 10:20 60:5
  65:24 75:5

**represent** 4:11,14
  5:2 42:10 44:1

**represents** 7:10

**requires** 46:17

**requiring** 46:9

**residency** 37:1,4,16
  49:9

**resolve** 14:17

**resolved** 67:15

**respectful** 83:15

**responses** 87:3

**responsible** 30:8

**result** 27:22

**resulting** 15:13

**results** 35:5 67:10,
  11

**returned** 36:7

**review** 21:11 23:8
  66:6,17 79:6

**reviewed** 31:19 35:5

**rings** 27:23

**Ringsby** 2:3

**risks** 59:18

**Rob** 4:17 5:2

**rob.barlow@**
**garnettlegalgroup.**
**com** 2:10

**Robert** 2:7

**Rocky** 3:14

**Rogers** 4:14

**role** 78:2

**roof** 27:19

**roots** 56:8

**Rosemary** 3:6 4:8
  6:2,9 91:8

**rotator** 26:22 27:2,6,
  9,11 28:14 33:18
  34:16 35:7,10,16,21,
  23 36:5 50:6,11
  53:10 55:6,7,15
  63:17 74:10,16 78:12
  88:21

**rules** 3:1 6:2

**running** 70:17

**runs** 58:10

**rush** 91:7

---

**S**

**safe** 11:23 24:13

*AB Litigation Services*

scan  35:5

scanned  8:21

scans  21:15

scapula  10:1

school  57:8

scientific  64:11

SCL  8:19

screen  43:15 44:18
88:8,10,12,20

scroll  44:7

Sean  2:2 4:13 7:18
31:25

searching  8:3

section  44:3,8,11,
14,15

select  53:20

sending  61:15

sense  5:6 6:18 12:21
47:3 68:22

sensory  20:2

September  22:5

series  46:5

served  5:12

set  28:20 68:14

setting  69:1,2,5

shaking  6:9

shape  86:25

sharing  44:18 88:20

shooting  70:17

shoulder  11:15
17:17 28:10 32:19
33:13,17,23 34:6,7,
17 36:8 49:21 53:11
71:10 88:2,16

shoulders  49:14
74:11

show  29:25 35:3
42:25 61:22 88:5

showed  24:7

shows  21:24 22:6
77:2

side  10:1 55:18 58:7
72:5 80:14

sign  61:14 90:18

signal  61:15 70:7

simple  32:7

simply  67:23 79:14

single  51:19

sitting  9:24 73:8
74:4

skin  75:16

small  58:7

smd@denvertrial.
com  2:4

solid  39:1

solve  14:22,23 21:7,
8

somebody's  28:17

someone's  49:21
68:19 69:10

something's  53:21

sort  16:6 38:19 39:19

sounds  18:5,19
27:15 30:24 57:5
77:18

speak  11:6

speaking  6:13 7:8
56:2

specialist  2:12
11:19,24 12:12 15:13
37:24

specialization
49:14

specific  52:16 58:13
60:24 73:14,18 78:11
83:25

specifically  12:10
65:20 69:10 71:4
73:10 75:23 80:6

specificity  12:1

specifics  89:7

speculative  71:17

spellings  91:2

spend  51:7

spine  27:22 90:2

split  6:13 17:8

splitting  17:10

spontaneously
73:25

St  22:5

standard  46:8 83:7

Starbucks  4:6,17
5:2 9:20,25 19:14
36:17 88:18

start  48:6

starts  64:3

State  3:7

statement  51:13

States  43:17

step  83:20

stop  19:17 30:10
88:20

stopped  44:18

Street  2:8

stretch  55:24 57:2
68:6 69:13 89:10,15,
17

stretched  56:12

stretches  56:22

stretching  57:12

Strictly  56:2

strike  20:10

struck  9:24,25

structure  49:11

studies  22:21 23:11
24:17,19,23 28:4
29:25 50:15 77:7

study  24:4,7 26:10

stupid  6:17 57:6

subjective  23:6
25:19 26:20 31:2,18
50:18,20,24

subjectively  25:6,8
28:6 29:8

submitted  44:2

substantial  71:1

successful  8:8
33:20

suddenly  56:18

suffered  16:5 19:2,
13 78:8

suggest  17:23 72:4

suggested  17:6

suggests  71:1

Suite  2:3,8

sum  9:11 68:22

summarize  29:18
40:1

summary  42:5

suppose  7:2

surgeon  37:10

surgeons  59:23

surgeries  85:15,16
90:2

surgery  13:5 14:16
27:11 32:10,24
33:16,25 35:10,22,23
36:4,21 37:6,7,9,11,
18 54:7 65:18,20
67:4,10,11 73:11
74:10

surgical  35:18 37:24

surprised  21:22
22:1

suspect  23:13 48:18

suspected  14:3

suspicion  14:6

suspicions  40:5

swear  4:19

sworn  4:21

symptom  71:13

symptomatic  69:14

symptomology
49:23

symptoms  11:20

*AB Litigation Services*

29:8 52:5,16 55:6
57:13 60:17 68:1,8,
14,19,20 70:16,18
71:2,12,13 73:5
76:11

**syndrome** 13:24
14:1,4 53:11 68:11,
12 89:21

**system** 66:14 82:5

---

**T**

**taking** 7:13 51:2,3

**talk** 5:4 6:12 9:17
17:25 33:13 38:6,10
39:13 43:1 46:25
47:5,18 48:6 70:12

**talked** 33:12 34:2
65:9 67:8 84:16

**talking** 17:18 18:2
19:19 29:3 45:25
84:23

**targeted** 51:7

**tasked** 15:9

**taught** 47:13 79:9
81:3

**Taylor** 2:12 4:9

**tear** 28:14 35:6,7
53:10

**telling** 7:5 25:20
86:15

**temporality** 47:6
48:7 52:1 76:8

**tend** 61:2

**terms** 57:13 70:23
77:12

**test** 22:18,24 24:21

**testified** 4:22 86:3
88:1

**testimony** 83:22
84:1 88:1

**tests** 17:6 21:12
22:9,12,14 23:1,9
26:7 28:19 31:19

**theory** 64:25 69:22

70:3

**thereof** 32:23

**thick** 75:15

**thing** 6:19 57:7
86:13 90:22

**things** 8:21 29:5
39:21 45:25 79:15
81:14 83:25 90:24

**thinking** 16:5 54:16,
22

**thorax** 10:1

**thought** 32:6 65:3,9
74:18 77:15 78:7

**thoughts** 40:5

**three-minute** 33:4

**time** 5:1 6:14 7:13,24
8:4 9:9 10:16,17
21:11 30:19 31:22
36:11 44:9 49:25
50:2,3 51:8,14,19
54:15 58:2 59:6
61:22 62:5 65:13
66:10 78:13 82:17
83:15 87:2 90:12,16

**timeline** 30:18

**times** 18:10 60:10
86:17

**timing** 47:7

**tingling** 57:17,21
70:17 71:7

**today** 4:3,8 66:7
69:8 73:8 74:5 75:11
87:3

**today's** 90:15

**told** 18:7,9 46:16
49:6 74:14,18 77:16
85:11,23

**tools** 64:11

**top** 7:22

**topic** 18:13

**tore** 26:21

**torn** 27:7,9,11 33:17
34:16 35:21 88:21

**traction** 56:18

**training** 36:22,24
37:1 48:11 49:9,10
57:11 79:22 81:4

**transcript** 74:25
75:1 83:22 89:5 91:7,
8

**transcription** 90:22

**transmission** 70:7

**trauma** 20:14 24:10

**traumatic** 24:22
53:10

**Treadwell** 12:4,7,24
13:5 14:7,10,19
15:16 16:5 20:11,17
21:6 30:8 31:3,9 32:7
64:23,25 65:3,14,17
66:10,25 67:4 72:12,
18 78:10

**Treadwell's** 12:17
13:6 20:9,19,20
32:24 43:4 66:5 67:9
72:23

**treated** 13:19 31:9

**treaters** 82:17

**treating** 5:22 8:24
15:1,10 39:5 50:20
66:16 77:10,22 78:2,
4,17 80:16,22

**treating-physician**
5:17

**treatment** 5:4 8:15
13:2 14:8 15:15 31:4
35:18 40:6 54:9
67:15 73:18 74:5
77:10 83:6

**true** 48:25 68:24

**trunks** 56:9

**Tuesday** 3:4

**tunnel** 13:24,25 14:3
20:13 31:12 67:7
69:11

**turned** 36:12

**Turning** 67:20

**type** 57:12,18,21

**typed** 6:10

**types** 79:15

---

**U**

**ulnar** 11:20 12:8
13:18 14:4,20 15:14
16:1,6,11,14,22
18:22 19:12,19,20,24
20:1,3,4,7,13,23
21:2,5,7,8 23:18
24:7,9 29:20,25 30:7,
14 31:1,10,11,15,21
32:11,13,23 40:20
41:18 53:12,14,22
54:13 55:25 56:2,5,8,
10,25 57:2 58:12,19
62:22 63:4,9,10
64:19 65:18 67:6,16
69:11 71:7,19,24
73:6,10,19 74:12
75:23 80:3

**umbrella** 9:24 20:14
23:16,21 27:12 32:12
36:17 48:7 50:10
52:2,6 55:21 62:23
63:2,3,10 64:18
70:15 71:5,18,25
72:11,17 76:10 80:13
88:17,22 89:8

**umbrella's** 24:10
72:5

**umbrellas** 55:22

**under-oath** 83:21

**understand** 6:19,20
7:1 9:22 10:3 17:4,11
29:13 45:21 46:13
65:17 67:21 68:17
76:19 81:15 84:4,11

**understanding**
6:22 9:13,23 12:6
13:4 49:8

**Understood** 6:15
29:16

**United** 43:17

**units** 20:2

**unpack** 13:22 16:9
30:12

*AB Litigation Services*

| | |
|---|---|
| **unsuccessful** 32:10 | **Wyoming** 3:7 |
| **upper** 10:1 | |
| **upper-left** 25:13 | **Y** |
| | |
| **V** | **year** 10:5 73:3 85:22 |
| | **years** 9:15 13:9 |
| **VA** 21:16 22:2,4 | 21:20 27:12 54:22 |
| **valid** 77:12 | 59:3 88:22 |
| **versus** 4:5 | |
| **video** 2:12 3:2,9 4:6, | **Z** |
| 7 91:6,9 | |
| **video-recorded** 4:4 | **Zoom** 6:4 |
| **visit** 36:7 53:4 | **zoomed** 43:21 |
| **visits** 8:18 9:14 | |
| | |
| **W** | |
| | |
| **wait** 82:24 | |
| **weakness** 36:8 | |
| 57:17 67:15 88:17 | |
| **weighs** 72:5 | |
| **well-done** 24:23 | |
| **wheelchair** 85:22 | |
| **when'd** 57:6 | |
| **withhold** 82:25 | |
| **word** 45:20 | |
| **wording** 40:21 41:11 | |
| **work** 39:1 | |
| **working** 37:2 49:20 | |
| 63:16 69:22 | |
| **works** 69:19 | |
| **workup** 19:4 77:11 | |
| **worse** 68:20 74:19 | |
| **worth** 74:20 | |
| **wrap** 42:25 | |
| **write** 77:12 | |
| **written** 18:7 55:17 | |
| **wrong** 30:14 | |
| **wrote** 77:15 | |