

Transcript of **Matthew R. Delarosa, M.D.**

Thursday, June 6, 2024

*Harper v. Starbucks*

www.TP.One
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 142562

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3     _____

4    Donald Harper,                    Civil Action No.:

5            Plaintiff,           1:21-CV-03295-DDD-GPG

6         v.

7    Starbucks Corporation,

8            Defendant.

9     _____

10        VIDEO DEPOSITION OF MATTHEW R. DELAROSA, M.D.

11

12   Date:      Thursday, June 6, 2024

13   Time:      12:00 p.m.

14   Location:  Zoom Videoconference

15   Reporter:  Leslie Corbett, Notary Public

16   Job#:      142562

17

18

19

20

21

22

23

24

25

Page 3

APPEARANCES

1
2 ON BEHALF OF THE PLAINTIFF:
3    EMMA JAMERSON, ESQUIRE
4    Dormer Harpring, LLC
5    3457 Ringsby Court, Unit 110
6    Denver, Colorado 80216
7    ekj@denvertrial.com
8    (303) 747-4404
9
10 ON BEHALF OF THE DEFENDANT:
11    ROB BARLOW, ESQUIRE
12    ANDREW GARNETT, ESQUIRE
13    Garnett, Powell, Maximon, Barlow & Farbes, LLC
14    1512 Larimer Street, Suite 950
15    Denver, Colorado 80202
16    rob.barlow@garnettlegalgroup.com
17    andrew.garnett@garnettlegalgroup.com
18    (303) 991-3344
19
20 ALSO PRESENT:
21    Deandre Shivers, Videographer
22
23
24
25

Page 4

I N D E X

1
2 EXAMINATION:                        PAGE
3    By Ms. Jamerson                   5, 87
4    By Mr. Barlow                     71, 89
5
6
7
8         EXHIBITS
9 NO.     DESCRIPTION              PAGE
10 1:   Delarosa CV                    10
11 2:   Delarosa Initial and 1st Addendum CV    17
12 3:   Double Crush Picture           30
13 4:   Ulnar Nerve Double Crush Picture    30
14 5:   Brachial Plexus Structure      36
15 6:   Operative Report Treadwell     43
16 7:   Delarosa Second Addendum Report    45
17 8:   Dr. Luker Report               54
18 9:   Dr. Price Rebuttal Report      58
19 10:  Dr. Price Initial Expert Report    61
20 11:  Joel Dean Exhibit Report       66
21 12:  Article                        89
22
23
24
25

Page 5

PROCEEDINGS

1
2         THE VIDEOGRAPHER:  All right.  We are now on the
3 record in the matter of Harper versus Starbucks.  Today's
4 date is June 6, 2024.  And the time is 12:02 p.m.
5 Mountain.  This is the video recorded deposition of
6 Dr. Matthew R. Delarosa.  My name is Deandre Shivers, and
7 I'm in association with TP.one.  Counsel, please introduce
8 yourselves.  After which, our court reporter will swear in
9 the witness.
10         MS. JAMERSON:  Emma Jamerson, appearing on
11 behalf of Plaintiff Donald Harper.
12         MR. BARLOW:  Robert Barlow and Andrew Garnett on
13 behalf of Starbucks Corporation.
14              EXAMINATION
15 BY MS. JAMERSON:
16    Q    Okay.  Good afternoon, Dr. Delarosa.  How are
17 you today?
18    A    I'm good.  How are you?
19    Q    Good, thanks.  Have you ever given your
20 deposition before?
21    A    I have.
22    Q    And when was that?  When was the last time you
23 were deposed?
24    A    Within the past year.  Probably within the past
25 six months.

Page 6

1    Q    How many times have you been deposed overall?
2    A    Twice.
3    Q    And were these in your capacity as an expert
4 physician?
5         THE REPORTER:  Would you like me to swear in the
6 witness?
7         MS. JAMERSON:  Oh, yes.  Sorry.  We'll just redo
8 this.
9         THE REPORTER:  Okay.  Sorry about that.
10 Dr. Delarosa, could you please raise your right hand?
11 WHEREUPON,
12         DR. MATTHEW R. DELAROSA, M.D.
13 called as a witness, and having been first duly sworn to
14 tell the truth, the whole truth, and nothing but the
15 truth, was examined and testified as follows:
16         THE REPORTER:  Okay.  Thank you.
17              EXAMINATION
18 BY MS. JAMERSON:
19    Q    Okay.  So Dr. Delarosa, have you been deposed
20 before?
21    A    Yes, ma'am.
22    Q    And how many times have you been deposed?
23    A    Two times.
24    Q    Were those in your capacity as a expert
25 physician?

Matthew R. Delarosa, M.D.                                                    6/6/2024

Page 7

1    A   Yes.

2    Q   And when was the last time you were deposed?

3    A   It was between six months and a year ago.  Yeah.

4    Q   So I know you've done this before, but I'm just

5  going to lay a little -- some ground rules.

6    A   Yes, ma'am.

7    Q   Let's try not to talk over each other.  You

8  know, the court -- a court reporter and videographer are

9  here, but she is trying to take down everything that we're

10  saying.  So it's important that I finish my question, and

11  then you answer and allow me to finish before speaking so

12  that the record gets as clear as possible.  You

13  understand?

14    A   Yes, ma'am.  Yes, ma'am.

15    Q   If you need to take a break, that's absolutely

16  fine.  Just let me know.  My one rule is that I request

17  that you finish asking -- answering the question that I've

18  asked before we take a break.  Okay?

19    A   Yes, ma'am.

20    Q   Along those lines with the clear record, we like

21  yeses or nos, like mm-hmms, uh-huhs, head nods, that sort

22  of thing are not going to come across very well on a

23  record.  So I may ask you if you do a mm-hmm.  I'll say,

24  is that a yes or a no?  So we'll just clarify that.  But

25  try to keep that in mind when you're answering today,

Page 8

1  okay?

2    A   Yes, ma'am.

3    Q   Are you on any medications or drugs or alcohol

4  that would affect your memory or ability to testify today?

5    A   No, ma'am.

6    Q   Is there any reason you might have difficulty

7  answering questions today?

8    A   No, ma'am.

9    Q   Okay.  Now, today, when I refer to the Starbucks

10  incident, the accident, or the incident, I'm going to be

11  referring to the August 23, 2019 incident at Starbucks

12  with the umbrella as reported by Mr. Harper.  Is that

13  understood by you?

14    A   Yes, ma'am.

15    Q   Okay.  So today's deposition was also noticed as

16  a records deposition and a deposition for production of

17  documents.  Did you bring documents with you today to this

18  deposition?

19    A   I don't have documents in front of me.  I have

20  my reports from -- in my bag, but they're not in front of

21  me.

22    Q   Okay.

23    MR. BARLOW:  And Ms. Jamerson, we sent you a

24  link with the documents that were requested.  The only

25  thing we didn't have was the bills, and we added up the

Page 9

1  billing.  So we're aware of the billing.  I'm not sure.

2  Mr. Garnett, did you send the accrued bills to

3  Ms. Jamerson?

4    MR. GARNETT:  No.  I can, though.

5    MR. BARLOW:  Yeah, let's send those over to her

6  and then she can review them.

7    MS. JAMERSON:  Okay.  Great.

8  BY MS. JAMERSON:

9    Q   Dr. Delarosa, did you review any records to

10  prepare for your deposition today?

11    A   Yes, ma'am.

12    Q   And what did you review?

13    A   I reviewed my personal review, which I had done

14  in front of the medical records that I had reviewed

15  previously.

16    Q   Okay.  And is that a series of notes that you

17  have?

18    A   Effectively.

19    Q   Okay.  Did you meet with counsel at all to

20  prepare for your deposition today?

21    A   Yes, ma'am.

22    Q   How many times did you meet?

23    A   One time.

24    Q   And what did you discuss in that meeting?

25    A   We discussed how a deposition goes, sort of the

Page 10

1  actionable items, how -- how this happens.

2    Q   So just more or less how a deposition is

3  conducted?

4    A   Yes, ma'am.

5    Q   Okay.  Did you talk with anyone else to prepare

6  for your deposition today?

7    A   No, ma'am.

8    Q   Okay.  I'm going to share my screen.  I want to

9  go through your CV a bit and just discuss that with you.

10    A   Yes, ma'am.

11    MS. JAMERSON:  Okay.  Can everybody see this

12  document?

13    MR. BARLOW:  Yeah.

14    MS. JAMERSON:  Okay.

15  BY MS. JAMERSON:

16    Q   Dr. Delarosa, you can see this?

17    A   Yes, ma'am.

18    THE REPORTER:  Any of these exhibits that you're

19  providing or just review?

20    MS. JAMERSON:  I'm sorry, what was the question?

21    THE REPORTER:  I'm sorry.  Are these exhibits

22  that you will be adding to the report or just viewing?

23    MS. JAMERSON:  I'll be marking this as an

24  exhibit.  I can email everything over that I choose to

25  refer to as exhibits.  I think everything's been -- well,

Page 11

1 I have some demonstratives, but everything else
2 substantively has been produced, so. But I'll mark them
3 and then send them over.
4       THE REPORTER: So this would be Exhibit 1, then.
5       MS. JAMERSON: Yes.
6       THE REPORTER: Okay. Thank you.
7       (Exhibit 1 marked for identification.)
8 BY MS. JAMERSON:
9       Q   Okay. I do want to scroll down to your research
10 experience. And you're familiar with this document, is
11 that right, Dr. Delarosa?
12      A   Yes, ma'am.
13      Q   Okay. So I've reviewed the research experience
14 and articles. And I just want to make sure you have not
15 written any articles regarding the brachial plexus, is
16 that correct?
17      A   Peripheral nerve injuries I have.
18      Q   Okay. Is that that inclusive of the brachial
19 plexus nerve?
20      A   Yes, ma'am.
21      Q   And which articles are those?
22      A   So the branching patterns of the median nerve.
23 Discuss peripheral nerves. The median nerve, which is a
24 terminal extent of the brachial plexus, as well as
25 the -- there's a radial nerve paper in here as well.

Page 12

1       Q   Oh, the radial nerve palsy associated with
2 surgical repair.
3       A   Yes, ma'am.
4       Q   Okay. Have you given any lectures on brachial
5 plexus issues?
6       A   Yes, ma'am.
7       Q   And what are those?
8       A   What do you mean, what are those?
9       Q   Well, when did you get the lectures? What was
10 the topic about? Are they listed on this CV?
11      A   They're not listed on this CV. I've given, I
12 believe, three different brachial plexus lectures within
13 the past three years, one of which was at a meeting, and
14 last year. One was, I believe, two-ish years ago.
15      But these lectures encompass everything from
16 cervical root injuries all the way to peripheral nerve
17 injuries down to the fingertips, which spans the brachial
18 plexus, as well as more specialized topics, such as nerve
19 transfers that orthopedists are unaware of that should be
20 aware of to better help their patients, including
21 intraplexal transfers.
22      Q   I know you mentioned this was last year at a
23 meeting. Do you remember what meeting that was or where
24 that took place?
25      A   The Shoulder and Elbow Society in Avon.

Page 13

1       Q   Okay. Do you remember when that was last year?
2       A   I believe March.
3       Q   So March of 2023?
4       A   Yes, ma'am.
5       Q   I also saw on here, I think it was up at the
6 first page. So you had education and training post
7 graduately (sic) with Dr. Jayme Bertelli in Brazil. Can
8 you describe what that peripheral nerve and brachial
9 plexus training was?
10      A   Yes, ma'am. So throughout the fellowship year,
11 weekly, we would have a specialty clinic for peripheral
12 nerve injuries. One of the other specialty clinics was
13 for amputees with nerve injury, and we would perform
14 brachial plexus surgeries monthly throughout the year.
15 And then we also have the ability to further our
16 specialization and training with any sort of subspecialty
17 that we desire. And my sort of topic of interest was
18 brachial plexus. And so I traveled to Brazil and was able
19 to operate with Jayme Bertelli, who is one of the leading
20 minds within brachial plexus in the world.
21      Q   So that was a clinical -- a clinic that you
22 attended monthly?
23      A   So in fellowship, the brachial plexus clinic was
24 once a month, and then the surgery was once a month.
25 However, we had several spillovers, so it wound up being

Page 14

1 about two and a half days of surgery per month. And then
2 the Jayme Bertelli component was in Brazil, where it was
3 only brachial plexus stuff, and it was both clinical and
4 surgical.
5       Q   Okay. And when you were with Dr. Bertelli, then
6 that was a continuous time period. It wasn't like, once
7 or twice a month?
8       A   Correct.
9       Q   Okay. And that lasted -- how long did that last
10 with Dr. Bertelli in 2019?
11      A   I believe we had 14 clinical days or maybe 12
12 clinical days. And within that time, we did -- I can't
13 remember the exact breakdown as far as clinic like, seeing
14 patients in the office versus surgery, but it was more
15 heavily favored to the surgical side.
16      Q   Was that then 14 continuous clinical days. So
17 like, it was a two-week program?
18      A   Yes, ma'am.
19      Q   Okay. Do you have -- aside from what we've
20 talked about already, do you have any additional specific
21 training or background in the brachial plexus nerve that
22 we haven't discussed?
23      A   So I run my own brachial plexus clinic here and
24 perform surgeries on them. I do a clinic one day a month
25 and a surgery day one day a month for, specifically,

Page 15

1 brachial plexus.
2    Q   Okay.  Have you been qualified as an expert to
3 testify in brachial plexus injuries before?
4    A   No, ma'am.
5    Q   I know on your testimony list, you've been
6 qualified as an expert before, though, is that correct?
7    A   Yes, ma'am.
8    Q   What were the issues on those cases
9 involving -- that your expertise was about?
10   A   One was a wrist injury, and one was a hand and
11 thumb injury.
12   Q   Were they still addressing nerve issues or were
13 those orthopedic bone issues?
14   A   The hand and -- the hand and thumb one was
15 orthopedic bone.  And the wrist was -- there was a nerve
16 component and -- and a vascular component to it.  But
17 brachial plexus is up by the neck.
18   Q   Okay.  And aside from those two times that
19 you've testified that are listed on your testimony list,
20 there's been no other testimony?  Or sorry, you have not
21 given any other testimony as an expert witness?
22      MR. BARLOW:  Form.
23      THE WITNESS:  I -- do you consider record review
24 as an expert testimony?
25 //

Page 16

1 BY MS. JAMERSON:
2    Q   No, I'm just talking about actual testimony in a
3 deposition or at a trial.
4    A   Then those are the two.
5    Q   Okay.  So that's up to date, that list we
6 received?
7    A   Yes, ma'am.
8    Q   Okay.  What percent of your practice would you
9 say you spend as a expert witness, including doing records
10 review?
11   A   Less than 5 percent.
12   Q   Is the other 95 plus percent spent treating
13 patients?
14   A   Yes, ma'am.
15   Q   And I know you said you run your own brachial
16 plexus practice.  What percentage of your practice deals
17 with treatment of the brachial plexus injuries?
18   A   So if I do two effective, dedicated days to
19 that, a month, that's -- I'm not sure on the math, but
20 probably around 10 to 15 percent.  But then also since
21 those days are limited in the sense of timing, I also see
22 brachial plexus patients in my routine clinic as well, in
23 order to help facilitate getting the care that they need.
24   Q   And what does the remainder of your practice
25 consist of?

Page 17

1    A   Upper extremity injury and arthritis.
2    Q   Okay.  And do you perform orthopedic surgery as
3 well?
4    A   Yes, ma'am.
5    Q   Regarding Mr. Harper and his case, did you ever
6 evaluate Mr. Harper in person?
7    A   I did not.
8    Q   Have you ever spoken with Mr. Harper?
9    A   I have not.
10   Q   Have you ever had any personal interactions or
11 communications with Mr. Harper?
12   A   I have not.
13   Q   Okay.  And in connection with your report, you
14 reviewed some records from prior to the Starbucks
15 incident, is that correct?
16   A   Yes, ma'am.
17      MS. JAMERSON:  Okay.  I'm going to mark this as
18 will be Exhibit 2.  Oh boy, that's really big.
19      (Exhibit 2 marked for identification.)
20 BY MS. JAMERSON:
21   Q   Okay.  This is a copy of your initial report
22 that we received, dated March 8, 2023.  Are you familiar
23 with this report?  This looks like your report.
24   A   Yes, ma'am.
25   Q   Okay.  I just wanted to go down to some of the

Page 18

1 notes that we have on the prior records.
2      MR. BARLOW:  Counsel, can you zoom in?  It's a
3 little hard to read.
4      MS. JAMERSON:  Okay.  It's weird.  Mine is so
5 big.
6      MR. BARLOW:  Thank you.
7      MS. JAMERSON:  Is that better?  Okay.
8      MR. BARLOW:  Yep.
9 BY MS. JAMERSON:
10   Q   Okay.  So I'm gonna go to the second page.  On
11 May 17, 2017, this is the second paragraph from the top,
12 on the second page, it stated that at that time,
13 Mr. Harper had five out of five rotator cuff strength in
14 all directions, and he had pain with external rotation
15 testing bilaterally.  Do you see that?
16   A   Yes, ma'am.
17   Q   And is five out of five strength that's full
18 strength?
19   A   Yes, ma'am.
20   Q   Okay.  Then in the next paragraph was October
21 18, 2017, Mr. Harper presented back to Darrell Haan, three
22 lines down.  He had good range of motion bilaterally
23 passively.  He had pain at the end range, had five out of
24 five rotator cuff strength.  So that's, again, he has full
25 strength on October 18, 2017 on the rotator cuff?

Page 19

1    A   Yes, ma'am.
2    Q   Okay.  Then Looks like there's another strength
3  test.  August 21, 2018, he returns back to Darrell Haan.
4  He had 160 degrees of forward flexion.  He had a pain
5  response with external rotation, but five out of five
6  strength.  So you agree that record reflects he has full
7  strength to the rotator cuff on August 21, 2018?
8        MR. BARLOW:  Form 106.
9  BY MS. JAMERSON:
10   Q   You can answer.
11   A   Yes, ma'am.
12   Q   Okay.  Now what -- I'll stop sharing.  What
13  measurements do physicians do for rotator cuff strength
14  testing?
15   A   Forward flexion, abduction, external rotation,
16  internal rotation are the main ones.
17   Q   Okay.  Do you personally have any other
18  information that Mr. Harper had any complaints of weakness
19  to his upper extremities in the months leading up to the
20  Starbucks accident?
21       MR. BARLOW:  Form.
22       THE WITNESS:  Do I answer?
23       MS. JAMERSON:  Yeah, you answer.
24       MR. BARLOW:  Yeah.  Unless I direct you not to
25  answer, you should answer.

Page 20

1        THE WITNESS:  Okay.  No, ma'am.
2  BY MS. JAMERSON:
3    Q   Do you have any information that Mr. Harper's
4  left elbow or left hand was symptomatic prior to the
5  Starbucks incident?
6        MR. BARLOW:  Form 106.
7        THE WITNESS:  No, ma'am.
8        MR. BARLOW:  Completeness.
9  BY MS. JAMERSON:
10   Q   Do you have any information that Mr. Harper's
11  physicians documented weakness in the left upper extremity
12  prior to the Starbucks accident?
13       MR. BARLOW:  Form 106, completeness, based on
14  the records themselves?
15       THE WITNESS:  No, ma'am.
16  BY MS. JAMERSON:
17   Q   Do you see anything in your notes, or did you
18  review anything that reflects Mr. Harper was complaining
19  of numbness in his extremities prior to the Starbucks
20  accident?
21       MR. BARLOW:  Same objections.
22       THE WITNESS:  No, ma'am.
23  BY MS. JAMERSON:
24   Q   Do you have anything in your notes, or did you
25  review anything in the records reflecting that Mr. Harper

Page 21

1  was complaining of tingling in his extremities prior to
2  the Starbucks accidentally?
3        MR. BARLOW:  Same objections.
4        THE WITNESS:  No, ma'am.
5  BY MS. JAMERSON:
6    Q   Did you review anything documenting any electric
7  shock sensation, symptomatology complaints prior to the
8  Starbucks accident.
9        MR. BARLOW:  Same objections.
10       THE WITNESS:  No, ma'am.
11  BY MS. JAMERSON:
12   Q   Do you agree that Mr. Harper's complaints of
13  numbness, tingling and weakness in his left upper
14  extremity arose after the Starbucks accident?
15   A   Say that once more, please.
16   Q   Do you agree that Mr. Harper's complaints of
17  numbness, tingling and weakness in the left upper
18  extremity arose after the Starbucks accident?
19       MR. BARLOW:  Form.
20       THE WITNESS:  No, ma'am.  On his description,
21  his shoulder was a preexisting condition.  And his
22  complaints of numbness and tingling started after the
23  Starbucks incident.
24  BY MS. JAMERSON:
25   Q   Okay.  So the shoulder, the rotator cuff issues

Page 22

1  that he was having with the left shoulder were a
2  preexisting condition.  Is that true?
3    A   In his words, yes, ma'am.
4    Q   Okay.  But then the -- like you just said, the
5  complaints of the numbness and tingling started after the
6  Starbucks incident.
7    A   Yes, ma'am.
8    Q   Okay.  I'm going to go back to your initial
9  report.  Let me see.  Okay.  Now this is.  I know that
10  it's not Bates, the one that I have, but this is the 5th
11  page of your report.  And we'll look at this August 12,
12  2020 paragraph.  So the patient presented to
13  Dr. Treadwell.  He states the problem involves the small
14  and ring finger of the left hand.  He does not have any
15  shoulder pain today.
16       Does this indicate to you that the source of
17  pain is not coming from the shoulder if there's no
18  shoulder pain.
19   A   Not necessarily.
20   Q   And why not?
21   A   There are things, such as referred pain in the
22  body.  So I think that you can still have a problem within
23  the shoulder.
24   Q   Can you describe what referred pain is?
25   A   Referred pain is when, for instance, he's

Page 23

1 complaining of numbness and tingling in the left hand, but
2 he doesn't actually have a problem in the left hand. It's
3 being referred from another source.
4    Q    Okay. So if here, though, he has no complaints
5 of shoulder pain, how does the shoulder pain become
6 referred pain to the hand?
7    A    It doesn't.
8       MR. BARLOW:  Form.
9 BY MS. JAMERSON:
10    Q    Can you explain then why, if there's no pain in
11 the shoulder, why you think it's not necessary that -- I'm
12 sorry.
13       You testified, not necessarily, in response to
14 my question that, does this indicate to you that the
15 source of pain is not coming from the shoulder?
16    A    I believe your question was, does this indicate
17 that there's a problem in the shoulder, right?
18    Q    Well, it says here he has left hand and finger
19 numbness. The problem involves the small and ring finger
20 of the left hand, but he does not have any shoulder pain.
21       So my question for you is, does the lack of
22 shoulder pain mean that the source of his left hand and
23 finger numbness is not coming from his shoulder?
24       MR. BARLOW:  Form.
25       THE WITNESS:  I believe, yes. The lack of

Page 24

1 shoulder pain says that his ring and small finger numbness
2 is likely not arising from the shoulder.
3 BY MS. JAMERSON:
4    Q    Now, here Dr. Treadwell did some testing, and I
5 just want to go through those. He had a positive Tinel's
6 at the elbow. What is a positive Tinel's?
7    A    The Tinel's maneuver is when you are tapping on
8 the nerve peripherally. So in a particular location. And
9 then it sends radiating symptoms down in that nerve
10 distribution. So in this particular case, he tapped on
11 the medial elbow, and he -- his pain or his numbness and
12 tingling in his ring and small finger increased.
13    Q    So does that indicate to you that there's an
14 issue with the elbow?
15    A    Yes, ma'am.
16    Q    And is that the -- an ulnar nerve problem?
17    A    Yes, ma'am.
18    Q    Okay. He also did positive flexion compression.
19 Can you describe what that test is?
20    A    Yes, ma'am. So when you flex the elbow into a
21 significant amount of flexion, hyperflexion, and then you
22 press on the ulnar nerve at the medial elbow, a positive
23 version of this is when it increases or causes radiating
24 pain or radiating numbness and tingling into the ring and
25 small finger.

Page 25

1    Q    Okay. So in this case, he would have pressed on
2 Mr. Harper's elbow and had a pain response.
3    A    It could be pain, or it could be numbness and
4 tingling.
5    Q    Okay. But a positive response means it has to
6 be one of those three things, a pain, numbness, or
7 tingling response?
8    A    Yes, ma'am.
9    Q    Okay. He also had a positive Froment sign. Can
10 you describe what that is?
11    A    Yes, ma'am. So a Froment sign is when you ask
12 someone to pinch with their thumbs. And when the ulnar
13 nerve innervated musculature in the hand is weak, they
14 tend to compensate with the flexor pollicis longus, and so
15 they get a flexion moment at their thumb IP joint, as
16 opposed to being able to hold on to the thing they're
17 pinching with their thumb flat.
18    Q    Okay. So the positive Froment would also
19 indicate an issue with the ulnar nerve.
20    A    Yes, ma'am.
21    Q    Okay. Now, he had a negative Wartenberg sign.
22 Can you describe what the Wartenberg sign is?
23    A    Yes, ma'am. So when the ulnar nerve intrinsics
24 in the hand are weaker, there's an overpowering pull by
25 the finger extensors on the small finger, and it makes it

Page 26

1 challenging to be able to bring the small finger back in
2 towards the other fingers.
3    Q    So when he has negative, that means he is able
4 to do this?
5    A    Yes, ma'am. That means he has good strength in
6 his intrinsic muscles powered by the ulnar nerve in the
7 hand.
8    Q    Okay. And finally, there's the two point
9 discrimination to nine-millimeter. Can you describe what,
10 what that is and what that means to you.
11    A    Two-point discrimination is basically when
12 there's two points that are touched onto your finger, at
13 what distance can you tell that it's actually two points
14 versus a single point? And so less than 5 millimeters is
15 normal. Less than 15 is protected.
16    Q    Okay. So here he's at a nine-millimeter, so
17 that's a protective finding?
18    A    It's slightly increased, meaning that his
19 sensation in that location is slightly diminished.
20    Q    Okay. And do all these findings, these physical
21 exam findings that Dr. Treadwell found, does that indicate
22 he has an ulnar nerve problem to you?
23    A    Yes, ma'am.
24    Q    Okay. Do you have any information that
25 Mr. Harper had cubital tunnel syndrome or symptoms prior

Page 27

1  to the Starbucks incident?

2      A   No, ma'am.

3      Q   Okay.  Let me see.  Have you seen anything that

4  you've reviewed that indicates Mr. Harper was giving any

5  invalid efforts on his strength testing or any of these

6  tests?

7      A   No, ma'am.

8      Q   As a physician, do you have to treat a patient

9  based on their subjective symptoms, even if it's not

10  always supported by objective findings?

11     A   Yes, ma'am.

12     Q   And are there any documented findings of

13  malingering in this case?

14        MR. BARLOW:  Form.

15        THE WITNESS:  No, ma'am.

16  BY MS. JAMERSON:

17     Q   Have you seen any documented findings of symptom

18  magnification?

19        MR. BARLOW:  Form.

20        THE WITNESS:  No, ma'am.

21  BY MS. JAMERSON:

22     Q   Do you have any -- do you personally have any

23  reason to believe that Mr. Harper is not experiencing the

24  symptoms of pain in his elbow and brachial plexus that

25  he's complaining of?

Page 28

1      A   Could you please repeat that question?

2      Q   Yeah.  Do you personally have any reason to

3  believe that Mr. Harper is not experiencing the symptoms

4  of pain in his cubital tunnel and his brachial plexus that

5  he's complaining of?

6      A   I do not think -- I -- I do not think that the

7  brachial plexus is causing his pain.  I think that I do

8  not have any reason to believe that he is not experiencing

9  the pain as it relates to his ulnar nerve.  But I do have

10  reason to believe that he's not experiencing pain from an

11  injury to the brachial plexus.

12     Q   Okay.  So regarding the cubital tunnel syndrome,

13  do you agree with that he has that diagnosis?

14     A   I think that the physical exam findings in that

15  note point to that diagnosis.

16     Q   Okay.  And in your report, you mentioned the

17  treatment that he's had for the cubital tunnel syndrome

18  has been reasonable?

19     A   Yes, ma'am.

20     Q   Okay.  Are you familiar with double crush

21  syndrome?

22     A   Yes, ma'am.

23     Q   Can you explain to me what that is?

24     A   Double crush syndrome is historically described

25  as a patient having compression of a nerve in the cervical

Page 29

1  spine and then peripheral nerve compression as well.  So

2  for instance, if you have a C-8 nerve root compression in

3  the cervical spine, and then you have cubital tunnel

4  syndrome at the elbow, it can cause the symptoms to be

5  worse.

6      Q   And in your report, you did not evaluate --

7        MS. JAMERSON:  Can anybody else hear that?

8        MR. BARLOW:  No.

9        THE WITNESS:  What is it?

10        MS. JAMERSON:  Sorry, I'm having an audio issue.

11  BY MS. JAMERSON:

12     Q   Okay.  In your report, you did not evaluate or

13  analyze double crush syndrome.

14     A   What do you mean?

15     Q   Did you discuss the possibility of double crush

16  syndrome or discuss it at all in your report?

17     A   I don't think I touched specifically on double

18  crush.

19     Q   Okay.  Do you have any opinion on double crush

20  syndrome as it relates to this case?

21     A   Yes, ma'am.

22     Q   And what is your opinion?

23     A   I think that it's possible he has double crush

24  syndrome relating to his cervical spine into his cubital

25  tunnel.

Page 30

1        MS. JAMERSON:  I'm going to show you a couple

2  photos just to -- for my own education and clarification

3  and everything.  I think, are we going to be on Exhibit 3?

4        THE REPORTER:  Yes, ma'am.

5        MS. JAMERSON:  Okay.

6        (Exhibit 3 marked for identification)

7  BY MS. JAMERSON:

8      Q   Okay.  Are you able to see this image?

9      A   Yes, ma'am.

10     Q   Okay.  So this is an image showing common double

11  crush associations with the ulnar nerve, indicating that

12  thoracic outlet syndrome and cubital tunnel syndrome are

13  commonly associated with double crush.  Is that something

14  you agree with?

15     A   I disagree that I would say it's commonly

16  associated.  I would say the vast majority of double crush

17  relates to cervical spine pathology and peripheral nerve.

18  But I do think that thoracic outlet syndrome and cubital

19  tunnel syndrome can be a form of double crush.

20     Q   Okay.  So cubital tunnel syndrome can be

21  associated with double crush syndrome.

22     A   Yes, ma'am.

23        MS. JAMERSON:  Okay.  Okay.  We'll go on to

24  Exhibit 4.  Let me see.  I need to stop share.

25        (Exhibit 4 marked for identification.)

Page 31

1  BY MS. JAMERSON:
2      Q   This is an image of, I guess, what they say,
3  common double crush associations with cubital tunnel
4  syndrome and Guyon's canal syndrome impacting the ulnar
5  nerve. I really just want to go through the hand here.
6  So the ulnar nerve, as shown here, enters in through the
7  Guyon's canal, is that correct?
8      A   Yes, ma'am. Guyon's canal.
9      Q   Guyon's. Thank you. And it looks like the
10 ulnar nerve goes to the pinky finger side of the hand. Is
11 that correct?
12     A   One component of it.
13     Q   What is the other component?
14     A   There's a sensory branch and a motor branch.
15 The motor branch wraps around the hook of the hamate and
16 curves towards the thumb side, and the sentry component
17 goes distal towards the pinky and ring finger.
18     Q   Okay. So the ulnar nerve does affect the left
19 part of the hand, is that correct?
20     A   The ulnar side of the hand.
21     Q   The ulnar. The pinky and ring finger side of
22 the hand.
23     A   Yes, ma'am.
24     Q   Okay. And in Mr. Harper's case, he is
25 complaining of pinky paresthesia on his left hand. Is

Page 32

1  that your understanding?
2      A   Yes, ma'am.
3      Q   Okay. Now, as you noted in your report, a lower
4  brachial plexus nerve stretch injury can result from
5  abduction at the shoulder plus traction.
6      A   Yes, ma'am.
7      Q   Am I saying that right? Okay. So that sort of
8  mechanism of injury. And if I'm doing it right, that
9  would be like, your arm is -- your shoulder's abducted,
10 which means it's extended. Is that true?
11     A   It would be hyper abduction. So it would be
12 your arm is above your head.
13     Q   Okay. And then the stretch would be, if your
14 neck is moving away from the direction that arm is
15 stretched out at.
16     A   Correct. This usually happens in high energy
17 mechanisms, motorcycle accidents.
18     Q   I guess, can you demonstrate for us what that
19 would look like?
20     A   So if you're -- if you're going -- falling off a
21 cliff and you grab a tree and your arm is yanked
22 forcefully above your head, and the rest of your body is
23 being pulled away by gravity and, you know, being thrown
24 off a cliff or what have you, that's a traction mechanism.
25     Q   And that mechanism of injury could cause a

Page 33

1  compression of the brachial plexus.
2      A   Not historically. That usually causes a
3  stretching or an avulsing type injury to the brachial
4  plexus.
5      Q   Okay. So when we're looking at brachial plexus
6  in terms of a double crush diagnosis, would you consider
7  that stretching or tearing or avulsion to be a type of
8  crush injury?
9      A   No, ma'am.
10     Q   But it certainly would cause -- as you testified
11 to, it would cause damage to the brachial plexus, that
12 type of mechanism of injury?
13     A   Yes, ma'am.
14     Q   Is it possible that a compression to the ulnar
15 nerve could occur at the cubital tunnel as an elbow is
16 bent quickly?
17     A   Not historically.
18     Q   What causes a compression or injury to the ulnar
19 nerve at the cubital tunnel?
20     A   Usually it's repetitive motion or positioning
21 while you sleep over an extended period of time.
22     Q   Are there cases of traumatic entrapment of the
23 ulnar nerve at the cubital tunnel?
24     A   Not really. There's -- there's not really cases
25 of traumatic entrapment at the cubital tunnel. I guess,

Page 34

1  theoretically, significant swelling in the forearm
2  musculature can sort of cause a size mismatch, but
3  historically, no.
4      Q   Is it possible for the ulnar nerve to become
5  entrapped due to compression in the brachial plexus?
6      A   Please repeat the question.
7      Q   Is it possible for the ulnar nerve to become
8  entrapped due to compression in the brachial plexus form?
9          MR. BARLOW: Form.
10         THE WITNESS: No, ma'am.
11 BY MS. JAMERSON:
12     Q   And why not?
13     A   Because the ulnar nerve is the terminal extent
14 of the brachial plexus. Once it becomes the ulnar nerve,
15 it's no longer within the brachial plexus itself. And
16 entrapment of the ulnar nerve is, by definition, a
17 localized place of compression. So you can't have injury
18 in the brachial plexus that then is causing entrapment in
19 the ulnar nerve.
20     Q   What other mechanisms could cause a lower trunk
21 brachial plexopathy?
22         MR. BARLOW: Form.
23         THE WITNESS: A gunshot wound to the neck
24 region, sharp penetration trauma with a knife or blade,
25 besides traction, you know, substantial crush injury,



Page 35

1 gunshot wound or sharp injury, it's fairly limited.
2 BY MS. JAMERSON:
3    Q    Does the sharp injury have to be penetrating
4 into the actual skin?
5    A    I believe if we're saying that the lower trunk
6 is the only thing injured, yes, I believe it does.
7    Q    Why -- I know that's mentioned in your report,
8 too, but why do you -- why do the other levels of the
9 brachial plexus have to be involved?
10   A    The reason is the upper and middle trunk are
11 both slightly superior and anterior to the lower trunk.
12 It's sort of a stepwise progression down and posteriorly.
13 In order to get the angle to damage the lower trunk in
14 isolation and not cause any injury to the upper middle
15 trunk, you would have to go through the clavicle from the
16 front or through the scapula through the back.  So there's
17 bony protection on either side of this.  The only route to
18 the lower trunk is through the upper and middle trunk.
19   Q    Okay.  Do you agree that brachial plexopathy can
20 lead to complications in the arm like paresthesia?
21       MR. BARLOW:  Form.
22       THE WITNESS:  Yes, ma'am.
23 BY MS. JAMERSON:
24   Q    Do you agree that an MRI does not always detect
25 brachial plexus injuries?

Page 36

1    A    Yes, ma'am.
2    Q    Do you know what the percentage of MRI detection
3 of a brachial plexus injury is?
4    A    No, ma'am.
5    Q    Do you know if it's more than 50 percent or --
6    A    I don't know because it's not documented.  The
7 ability to put a number on how many times a test missed
8 something without doing -- having another test to identify
9 it is impossible to quantify.
10   Q    Have you, as a physician, ever had a patient
11 with a negative MRI that doesn't show brachial plexus
12 injury, and then as you do surgery, you do discover a
13 brachial plexus injury?
14   A    I've never operated on a brachial plexus from a
15 superior directed force without positive findings first.
16   Q    And by positive findings, that's not just
17 symptomatology, that's a positive radiographic finding.
18   A    It can be radiographs or not really radiographs,
19 but imaging.
20       MS. JAMERSON:  Imaging.  Thank you.  Let me pull
21 up -- okay.  I'm going to show you, I think this is
22 Exhibit 5.  Okay.  Can everybody see this?
23       (Exhibit 5 marked for identification.)
24       THE WITNESS:  Yes, ma'am.
25 //

Page 37

1 BY MS. JAMERSON:
2    Q    Dr. Delarosa, is this an accurate depiction of
3 the brachial plexus structure?
4    A    It's a schematic, but, yes, I believe it
5 represents the brachial plexus accurately.
6    Q    Okay.  And this shows the levels of the spinal
7 column that associate with the different nerves, is that
8 correct?
9    A    Yes, ma'am.
10   Q    Okay.  So you agree the ulnar nerve is tied to
11 an injury at the lower level of the brachial plexus?
12   A    I believe that there is an association with the
13 lower trunk and the ulnar nerve.
14   Q    What is that association?
15   A    There are nerve roots from C-8 and T-1 that go
16 through the brachial plexus and the lower trunk into the
17 ulnar nerve.
18   Q    Okay.  And the -- like, we know Mr. Harper has
19 injuries a prior neck condition.  Is that correct?
20   A    Yes, ma'am.
21   Q    And that was at the C-5 to C-6 level?
22       MR. BARLOW:  Form.  Misstates.
23       THE WITNESS:  I believe he had two level
24 fusions.  I can't remember the exact levels, but I think
25 C-5 and C-6 were included.

Page 38

1 BY MS. JAMERSON:
2    Q    Okay.  Based on this diagram, the C-5 and C-6
3 levels are associated with, is it just musculotaneous
4 (sic) or do those also affect the axillary?
5       MR. BARLOW:  Form.
6       THE WITNESS:  No, ma'am.  So C-5 can be found
7 through almost the entirety of this -- of the
8 distal -- the distal peripheral nerves by way of the
9 different anterior and posterior divisions, then the inner
10 weaving of the brachial plexus itself.
11 BY MS. JAMERSON:
12   Q    Okay.  I guess my question is, do injuries at C-
13 5 and C-6, can those affect the ulnar nerve?
14   A    They historically do not.
15   Q    So typically, historically, you would not expect
16 injury to the C-5 or C-6 levels to correlate with an ulnar
17 nerve problem?
18   A    No, ma'am.
19   Q    And typically, you would not see numbness or
20 paresthesia of the pinky finger correlating with injury to
21 C-5 and C-6 levels?
22   A    No, ma'am.
23   Q    Okay.  In your report, in your initial report,
24 you state that a large gust of wind picked up one of the
25 umbrellas and struck Mr. Harper in the left collarbone.

---

Page 39

1 Did you get that history from his medical records?
2    A  Yes, ma'am.
3    Q  Do you know any other details about the
4 mechanism of his injury?
5    A  In what way?
6    Q  Do you know what the umbrella weighed?
7    A  No, ma'am.
8    Q  Do you know the velocity of the umbrella?
9    A  No, ma'am.
10    Q  Do you know what part of the umbrella hit
11 Mr. Harper?
12    A  Per report, the bottom part of the umbrella.
13    Q  Do you know if that was a bottom edge or just a
14 bottom part?  Do you know what specifically part of the
15 umbrella hit him?
16    A  No, ma'am.  I -- you know, per his report, it
17 was the bottom component of the umbrella.
18    Q  Do you know what Angle Mr. Harper was hit at?
19    A  No, ma'am, not -- so I do think that you can
20 infer the angle based on the lack of bony injury to the
21 clavicle or the scapula.
22    Q  What would your inference then be on the angle
23 of impact?
24    A  Roughly about 45 degrees here, as he doesn't
25 have a clavicle fracture; he doesn't have a scapular

Page 40

1 fracture.  So it impacted within this region.  Sorry, I'll
2 explain it.  The region lateral to where the head meets
3 the shoulder.
4    Q  What angle would -- I mean, you noted there
5 wasn't a clavicle fracture.  And that's understood in
6 this case, correct?
7    A  Yes, ma'am.
8    Q  What angle would it have had to come in at to --
9    A  (Indiscernible).  Or the velocity would have to
10 be -- so it could have hit his clavicle.  However, it was
11 not with -- you asked me to -- based on sort of the
12 velocity and the force, it was without enough force to
13 break his clavicle.  It could have impacted posteriorly
14 without enough force to break his scapula.  So if he's
15 claiming that he has a brachial plexus injury, then I feel
16 that the location, the only place that it could have hit
17 was here.  But it -- to your point, it could have hit in
18 multiple other locations.
19    Q  Do you know how Mr. Harper's body reacted at the
20 time he was hit?
21    A  In what way?
22    Q  Do you know how his body moved at the time of
23 impact or prior to impact?
24    A  No, ma'am.
25    Q  Okay.  So you don't know if he raised his arm,

Page 41

1 is that correct?
2    A  Correct.
3    Q  You don't know if he moved his head to the side
4 to avoid an impact.
5    A  I mean, he did not describe that mechanism
6 either.
7    Q  Correct, but you don't --
8    A  So he didn't describe raising his arm.  In his
9 report, this came in and hit him here in the neck.
10    Q  Okay.  But you don't necessarily know -- or you
11 don't know how his body reacted at the time?
12    MR. BARLOW:  Form.
13    THE WITNESS:  No more than he's described.
14 BY MS. JAMERSON:
15    Q  Now, in your, what is this, December 7, 2023
16 addendum report, you opined that a traction injury, with
17 Mr. Harper's preexisting scar tissue, could pull
18 untethered nerves and cause a problem.  You agree with
19 that?
20    A  Yes, ma'am.
21    Q  But then you said that that was not your
22 understanding of the mechanism of injury in this case.  Is
23 that true?
24    A  Yes, ma'am.  This was, by his report, a
25 compression mechanism and not a traction mechanism.

Page 42

1    Q  Okay.  And I know this is not information that
2 you have or that's in the records, but hypothetically, if
3 Mr. Harper moved his head to the right when he was struck
4 and put his arm up.  Would that be consistent with a
5 traction type tear or injury?
6    THE WITNESS:  No, ma'am.
7    MR. BARLOW:  Improper hypothetical.
8 BY MS. JAMERSON:
9    Q  And why not?
10    MR. BARLOW:  Same objection.
11    THE WITNESS:  Because you would have to have the
12 hand tethered in some location, such as falling off a
13 cliff and grabbing a tree.  So even if he put his arm in
14 the air, the momentum impacting his body would bring his
15 arm with his neck.
16 BY MS. JAMERSON:
17    Q  Regarding the cubital tunnel syndrome,
18 have you had a chance to read -- did you review
19 Dr. Treadwell's operative report?
20    A  I did.
21    Q  And in the operative report, Dr. Treadwell did
22 observe that the cubital tunnel nerve was compressed.  Did
23 you see that as well?
24    A  I don't remember the exact details of the
25 report.  I reviewed it a while back.

Page 43

1    MS. JAMERSON: Okay. Let me bring this up. I
2  guess this will be Exhibit 6.
3    (Exhibit 6 marked for identification.)
4  BY MS. JAMERSON:
5    Q   Okay. We're going to page 2. Let me get my
6  notes. And this is four paragraphs from the top. Now,
7  this is Dr. Treadwell's operative report. He says a tight
8  point of compression was identified at the left cubital
9  tunnel region and the nerve was carefully decompressed at
10  that level. What does that mean to you?
11    A   That honestly means that this is more of a
12  chronic issue of the ulnar nerve. So a tight compressive
13  point in the cubital tunnel is very classic for cubital
14  tunnel syndrome, which is historically not a traumatic
15  problem to begin with. So this reads as a typical cubital
16  tunnel release.
17    Q   Okay. So there is -- but based on this report,
18  there was a compression in the cubital tunnel.
19    A   Yes, ma'am.
20    Q   Okay. And you agree that surgery was reasonable
21  to treat that condition?
22    A   Yes, ma'am.
23    Q   Can a previously asymptomatic cubital tunnel
24  syndrome become symptomatic through trauma?
25    A   In what way?

Page 44

1    Q   Well, you said this is more indicative of a
2  chronic issue regarding the ulnar nerve. Is that right?
3    A   Yes, ma'am.
4    Q   Can people have chronic ulnar nerve issues that
5  are asymptomatic?
6    A   They can.
7    Q   And can a traumatic experience cause that
8  condition to become symptomatic?
9    MR. BARLOW: Form.
10    THE WITNESS: Yes, it can, in the form of a
11  direct blow to the median -- or to the medial elbow.
12    MS. JAMERSON: Okay. We've been going for about
13  an hour. Is everyone okay taking like a five-minute
14  break?
15    THE REPORTER: Yeah.
16    MS. JAMERSON: Okay. Off record?
17    THE VIDEOGRAPHER: The time is 12:57 p.m. We're
18  off the record.
19    (Off the record.)
20    MS. JAMERSON: Okay. Dr. Delarosa, I want to
21  talk with you a bit about your most recent addendum
22  report.
23    THE WITNESS: Okay.
24    MS. JAMERSON: So I will bring that up. And are
25  we on 6 or 7?

Page 45

1    MR. BARLOW: I think this would be 7.
2    THE REPORTER: 7.
3    (Exhibit 7 marked for identification.)
4  BY MS. JAMERSON:
5    Q   Okay. So you prepared this report in response
6  to a review of some records from Rocky Mountain Orthopedic
7  Clinic?
8    A   Yes, ma'am.
9    Q   Okay. And regarding the left shoulder, your
10  review states he's very clear that his left shoulder pain
11  and some of the weakness predated his umbrella accident as
12  Starbucks. Is that correct?
13    A   Yes, ma'am.
14    Q   To your understanding, Mr. Harper has been
15  forthcoming about his prior left shoulder symptoms?
16    MR. BARLOW: Form.
17    THE WITNESS: Yes, ma'am.
18  BY MS. JAMERSON:
19    Q   And this evaluation noted a physical exam with
20  active elevation to 60 degrees, external
21  rotation -- active elevation to 60 degrees, external
22  rotation of 40, and internal rotation to his back pocket.
23  Can you explain what type of findings those are?
24    A   Limited range of motion.
25    Q   What would you expect findings to be for full

Page 46

1  range of motion?
2    A   Greater than 160, for forward flexion. External
3  rotations about -- on par with about normal. And internal
4  rotation. Usually L-1 or T-12 is very good range of
5  motion and sort of less than at -- degrees less than that
6  as it decreases. I would consider back pocket kind of L-
7  2, L-3.
8    Q   Okay. Is this a type of measurement that you
9  use to help you determine permanent impairment ratings?
10    A   It's a measurement to describe shoulder range of
11  motion. Impairment ratings include range of motion
12  measurements. But impairment ratings, typically your
13  internal rotation, is not to a spinal level. It's a
14  degree with the arm abducted and the elbow flexed at 90
15  degrees.
16    Q   Okay. Can you explain, then, how that's
17  different than what they did here for this type of range
18  of motion testing?
19    A   To test his internal rotation, they asked him to
20  put his hand behind his back, and he got his hand to his
21  back pocket. For an impairment rating, it needs to be a
22  number. And so you typically abduct the shoulder to about
23  90 degrees. You bend the elbow or -- excuse me. Yeah,
24  abduct the shoulder 90 degrees, bend the elbow to 90
25  degrees, and how far the forearm can go down. You measure

Page 47

1  that as a degree. And so 15 degrees, 30 degrees, what
2  have you will be the internal rotation amount.
3     Q   Your report also notes that Rocky Mountain
4  orthopedic clinic observed a grossly dysfunctional left
5  hand with no grip power at all in his ring and small
6  fingers. Is that correct?
7     A   Yes, ma'am.
8     Q   Is this a symptom that you normally see with a
9  rotator cuff tear?
10    A   No, ma'am. But it's a symptom, you see, after
11 cubital tunnel syndrome, that hasn't gone well.
12    Q   Okay. Do you have an opinion, then, on the
13 outcome of his cubital tunnel surgery?
14    A   Yes, ma'am.
15    Q   And what is that opinion?
16    A   I believe the surgery was done without any
17 positive finding on nerve conduction study. And then
18 after his surgery was done, he had, by the physician's
19 description, much larger hematoma and significant
20 ecchymosis than what he typically sees. He also felt that
21 his pain post operatively was pretty significant.
22        And then the EMG studies and the nerve
23 conduction studies after that or what showed changes in
24 the ulnar nerve. And so I believe that there was an ulnar
25 nerve injury at some point either during or after the

Page 48

1  cubital tunnel surgery, which likely is contributing and
2  is the reason for his dysfunctional hand on this physical
3  exam.
4     Q   Okay. So it's your opinion that the ulnar nerve
5  injury that he's -- is it your opinion that he has an
6  ulnar nerve injury?
7     A   Yes, ma'am.
8     Q   Okay. But you believe that happened at some
9  point during the cubital tunnel surgery procedure.
10    A   During or shortly after.
11    Q   What would happen -- would cause it to happen
12 shortly after the procedure was over?
13    A   So blood is really noxious to nerves. It
14 irritates nerves quite a bit. So during the surgery, the
15 nerve itself could have been stretched, could have been
16 damaged, could have been squeezed. Then when he did a
17 transposition, you usually do something to tether it
18 anterior to the medial epicondyle. That could have been
19 put in too tightly.
20        And then the bleeding, the significant amount of
21 bleeding that he had post operatively could have also
22 further damaged the nerve. And so it could be pressure on
23 the nerve from where he placed it intraoperatively, if he
24 sutured the sort of soft tissue sling to hold it
25 anteriorly too tightly, if he pinched it a little too hard

Page 49

1  or stretched it during the surgery, or if the hematoma
2  afterwards caused significant compression on the nerve, or
3  the blood itself caused a noxious response to the nerve.
4     Q   Okay. Earlier we looked at Dr. Treadwell's
5  operative report. Remember taking a look at that?
6     A   Yes, ma'am.
7     Q   And we looked at his findings in the operative
8  report on what he observed with the ulnar nerve. Do you
9  remember that?
10    A   Yes, ma'am.
11    Q   So we went over that. He did identify a
12 compression point at the left cubital tunnel region, and
13 the nerve was decompressed at that level.
14        MR. BARLOW: Ms. Jamerson, can you share that?
15        MS. JAMERSON: Oh, yeah.
16        MR. BARLOW: That just would be helpful, I
17 think.
18        MS. JAMERSON: Yeah. Sorry.
19 BY MS. JAMERSON:
20    Q   Okay. Okay. So this is on the second page of
21 his report, the fourth paragraph from the top. So
22 Dr. Treadwell said the ulnar nerve was identified
23 proximally and the fascia overlying it was divided. The
24 nerve was dissected from proximal to distal across the
25 retrocondylar groove. A tight point of compression was

Page 50

1  identified at the left cubital tunnel region, and the
2  nerve was carefully decompressed at that level.
3        So based on Dr. Treadwell's report, am I right
4  that the ulnar nerve was already compressed when he was
5  operating?
6     A   He was doing a surgery to relieve compression on
7  the ulnar nerve. Yes, ma'am.
8     Q   So is it your testimony then, that the ulnar
9  nerve was further damaged as a result of the surgery or
10 shortly after?
11    A   Yes, ma'am.
12    Q   Okay. But there was still -- the ulnar nerve
13 was compressed prior to the surgery.
14    A   It does not show up on electrodiagnostic
15 studies. But it does show up in this op report. So I'd
16 have to assume that there was some compression at the
17 medial elbow along the ulnar nerve.
18    Q   Yeah. Based on Dr. Treadwell's operative
19 report and his observations, he identified a compression
20 of the ulnar nerve during surgery.
21    A   Yes, ma'am.
22    Q   Okay. Okay. Going back to that finding in the
23 addendum report. I'll share that again.
24        MR. BARLOW: Thank you.
25 //

Page 51

1  BY MS. JAMERSON:
2     Q   This is in your March -- or, sorry, August.  Oh,
3  my God.  That's the date of injury.  May 21, 2024, most
4  recent addendum report.  Going back to that grossly
5  dysfunctional left hand with no grip power at all in his
6  ring and small finger, is that a symptom that you would
7  correlate with a C-5 to C-6 nerve injury?
8     A   No, ma'am.
9     Q   Okay.  Now, Dr. Luker, in this addendum, it
10 notes, at this point, Dr. Luker felt that repairing his
11 cuff and the presence of his current stiffness and
12 disability of his left upper extremity seems like a recipe
13 for disaster.  Can you explain to me what does this mean
14 to you?
15    A   So if you repair an individual's rotator cuff
16 and they won't move it, or they have pain that limits them
17 from moving it, their result is going to be very poor,
18 usually.  The -- you can develop something called frozen
19 shoulder, and that is both a painful and a stiffening sort
20 of diagnosis about the shoulder.  And so he did not feel
21 that it would be a good idea to perform a rotator cuff
22 repair, given his current issues with his hand, I would
23 assume.
24    Q   Would you agree -- based on what you've reviewed
25 regarding Mr. Harper's medical history, would you agree

Page 52

1  that a rotator cuff repair would not be your
2  recommendation?
3     A   I think in the presence of his pain here, I
4  would not recommend proceeding with cuff repair.
5     Q   Is there a procedure that you would recommend
6  proceeding with for treatment?
7     A   No, ma'am.
8     Q   In general, what would your treatment plan be
9  for a patient with a double crush syndrome diagnosis?
10       MR. BARLOW:  Form.  Foundation.
11       THE WITNESS:  I would get his neck worked up for
12 the likely proximal area of compression, and then I would
13 work up the distal extent.  In this case, it sounds like
14 the elbow.
15 BY MS. JAMERSON:
16    Q   And when you say workup on the neck, what does
17 that work up entail?
18    A   There's certain types of advanced imaging.  With
19 hardware in place, I don't think an MRI would be of much
20 benefit.  I believe he got a CT myelogram.  And sometimes
21 you can also do different types of guided injections to
22 localize the pain further, or to localize the source of
23 the pain further.  But additional diagnostic and sometimes
24 therapeutic treatment options.
25    Q   If the injections and therapeutic treatment

Page 53

1  fail, is surgery something you recommend to treat a double
2  crush syndrome foundation?
3        MR. BARLOW:  Form.  Foundation.
4        THE WITNESS:  It depends on the context.  Double
5  crush as described as a very broad term.  So --
6  BY MS. JAMERSON:
7     Q   I guess in what context would you recommend a
8  surgical procedure?  What type of double crush injury?
9        MR. BARLOW:  Form.  Foundation.
10       THE WITNESS:  If you had a double crush injury
11 where a cervical spine level was causing compression on a
12 nerve and you had cubital tunnel syndrome, you can release
13 both of those.  You know, so if you work it up and you
14 find objective data that supports those diagnoses, then
15 you act on that objective data.
16 BY MS. JAMERSON:
17    Q   Okay.  And the release is a surgical procedure?
18    A   A cubital tunnel release is a surgical procedure
19 for the medial elbow.  There's different types of cervical
20 spine procedures, whether it be discectomies, fusions,
21 there's a couple different sort of space generating things
22 for the spinal cord.  But all of these are cervical spine
23 surgeries.
24    Q   For a patient who has a brachial plexus traction
25 injury, what is your course of treatment?

Page 54

1        MR. BARLOW:  Form.  Foundation.
2        THE WITNESS:  That is also a very broad sort of
3  topic because when you have someone with a brachial plexus
4  injury, if they have what's called a pan plexus injury,
5  you have to use something called extra plexal donors and
6  transfer those into the brachial plexus to help re-get
7  thing get electrical activity within the nerves.  If you
8  have someone with what's called a T-1 hand, or where the
9  entire plexus was stretched and then the lower aspect
10 recovered, you can transfer into the upper trunk and
11 middle trunk to get the shoulder function to work.  So
12 there's a really broad spectrum of sort of brachial plexus
13 traction injury.  So one particular procedure is not
14 appropriate as a catch all.
15       MS. JAMERSON:  Okay.  I'm just going to
16 reference Dr. Luker's report.  I think this is Exhibit 8.
17 Correct me if I'm wrong, somebody.
18       THE REPORTER:  That is correct.
19       (Exhibit 8 marked for identification.)
20 BY MS. JAMERSON:
21    Q   Okay.  So this is a report from Dr. Luker dated
22 July 21, 2020.  I'm going to go to -- let's see.  It's his
23 report, page 5.  So Dr. Luker wrote that Mr. Harper almost
24 certainly has a left shoulder rotator cuff tear or at
25 least rotator cuff syndrome.  However, I think his current

Page 55

1  symptoms are nerve based in character and distribution.
2  He describes symptoms most consistent with an ulnar nerve
3  issue or a double crush syndrome.  I do not think that
4  rotator cuff surgery will address his current complaints
5  or nerve symptoms and may even make them worse due to
6  immobilization and with the elbow inflection.
7       Do you agree with Dr. Luker on his assessment of
8  this injury?
9    A   I agree that I do not think the rotator cuff
10 surgery will address his current complaints, nor do I
11 think that it would be a good idea to immobilize him with
12 the elbow inflection.  But, you know, his description as
13 the symptoms are mostly consistent with an ulnar nerve
14 issue, are based on the patient's descriptors of the pain.
15 And the reason why he included double crush, I would
16 assume is because of his known history of his neck
17 cervical spine probleMs.  So you know, the typical non
18 nerve or brachial plexus surgeon, orthopedic surgeon, when
19 they mentioned double crush, they are 99 times out of
20 10 -- out of 100 describing cervical spine pathology and
21 peripheral nerve pathology, such as cubital tunnel.
22    Q   Okay.  Do you agree that symptoms of electric
23 shock, numbness, and tingling are symptoms associated with
24 nerve injury?
25    A   Yes, ma'am.

Page 56

1    Q   Can you explain to me what symptoms you would
2  expect to present themselves with a patient with rotator
3  cuff tear?
4    A   Yes, ma'am.  Rotator cuff tear, depending on the
5  degree of tear, can range anywhere from just pain with
6  motion -- or pain with lifting an object to pain with just
7  motion to inability to move their arm from the shoulder.
8    Q   And what are the possible symptoms for a glenoid
9  labral tear?
10      MR. BARLOW:  Form.
11      THE WITNESS:  Pain is the typical presenting
12 complaint.  However, in a traumatic dislocation event, you
13 can also get instability with labral tears.  So where the
14 shoulder keeps dislocating.
15 BY MS. JAMERSON:
16    Q   Okay.  Have you had a chance to review
17 Dr. Price's reports?
18    A   Yes, ma'am.
19    Q   Dr. Price opined that there was a probable
20 worsening and aggravation of the left shoulder as a result
21 of this incident.  Do you recall that?
22    A   Yes, ma'am.
23    Q   Do you agree that there could have been a
24 worsening and aggravation of the left shoulder symptoms
25 from this incident?

Page 57

1       MR. BARLOW:  Form.
2       THE WITNESS:  No, ma'am.
3  BY MS. JAMERSON:
4    Q   And why not?
5    A   Because the mechanism does not make sense to
6  cause worsening of rotator cuff problems.
7    Q   And that's the mechanism of, as you understand
8  it, to be just a traumatic blow from an object?
9    A   The mechanism as the umbrella hitting him in the
10 neck region.
11    Q   If there had been an arm motion of his left arm,
12 would that have an impact on a worsening of left shoulder
13 symptoms?
14    A   Not typically.
15    Q   And why not?
16    A   Because when -- the normal human response when
17 something is coming at you is not to raise your arm using
18 your rotator cuff in such a forceful manner that you tear
19 your rotator cuff.
20    Q   Well, if somebody already had a rotator cuff
21 tear, could that type of mechanism that you just
22 described, raising your arm, could that worsen a rotator
23 cuff tear?
24      MR. BARLOW:  Form.
25      THE WITNESS:  Not usually by just raising your

Page 58

1  arm.  Usually there's a weight -- weight bearing component
2  involved.
3  BY MS. JAMERSON:
4    Q   And what type of weight bearing component are we
5  talking about?
6    A   Typical one would be revving a lawnmower.
7    Q   Dr. Price also opined that it's possible that
8  limitations in the range of motion of the ulnar nerve are
9  causing his ulnar nerve probleMs.  Do you remember seeing
10 that?
11      MR. BARLOW:  Form.
12      THE WITNESS:  No, ma'am.  Can you please show it
13 to me?
14      MS. JAMERSON:  Yeah.  We will mark this as 9.
15      (Exhibit 9 marked for identification.)
16 BY MS. JAMERSON:
17    Q   Okay.  So this is Dr. Ellen Price's report dated
18 December 21, 2023.  I'm going to go to page 2 of the
19 report.  So Dr. Price writes -- she's responding -- just
20 for context, she's reviewing your report, so she's
21 responding here.  I do agree with Dr. Delarosa that it
22 should be a lower trunk injury to be an ulnar nerve
23 problem.  However, it is possible because the exacerbation
24 of the left shoulder impingement from the trauma may have
25 caused him to be splinting his arm and potentially causing

Page 59

1 limitations in range of motion of the ulnar nerve, which
2 could have caused the ulnar nerve issue. So I'm asking
3 what your opinion is on that, on her comment there on the
4 ulnar nerve issue.
5     A   So I disagree with the assumption that the left
6 shoulder impingement was made worse by trauma. And so I
7 don't think that the splinting of his arm was in any way
8 related to the injury that happened from the mechanism of
9 the umbrella hitting his neck. However, I do think that
10 when an elbow is being held in flexion for an extended
11 period of time, it can irritate the ulnar nerve.
12     Q   And that would result from, you know, splinting
13 his arm being held in flexion?
14     A   So he was never splinted.
15     Q   Okay.
16     A   He had a sling on.
17     Q   What's the difference between --
18     A   But I do think that splinting the arm would be a
19 cause of concern for the ulnar nerve, but a splint is
20 historically something you don't remove. A sling can be
21 removed.
22     Q   Okay. So to your knowledge, he never actually
23 had a splint.
24     A   At no point in the records did it mention he was
25 splinted, nor did he ever have an injury that would

Page 60

1 require splinting.
2     Q   But you do recall him having a sling?
3     A   I don't know that. I just was offering that a
4 sling was sometimes used for a shoulder impingement or a
5 rotator cuff tear.
6     Q   Okay. Okay. And I think we may have already
7 covered this, but I'll just. Since we're in a report,
8 Dr. Price goes on to say, I do feel the patient probably
9 had some left shoulder injury in 2015 and likely hasn't
10 had an exacerbation of his previous left shoulder problem
11 as a result of the trauma. You disagree with that
12 statement?
13     MR. BARLOW: Form. Form, asked and answered.
14     THE WITNESS: I disagree.
15 BY MS. JAMERSON:
16     Q   And that's because of the -- he would require
17 some type of weight to worsen the rotator cuff
18 tear -- some motion?
19     A   I think his -- so in no point in the entire
20 records does he mention raising his arm. So I don't think
21 it's fair to assume that he raised his arm at all. On top
22 of that, I don't think that raising your arm is going to
23 necessarily worsen your shoulder problem.
24     So there's too many assumptions for me to feel
25 that it's reasonable by 51 percent that this umbrella

Page 61

1 incident caused worsening of his shoulder pain or his
2 shoulder injury.
3     Q   Okay. Have you had a chance to look at
4 Dr. Price's impairment rating report?
5     A   Yes, ma'am.
6     MS. JAMERSON: Okay. And I will pull that up
7 here. And I think this is Exhibit 10.
8     MR. BARLOW: That's correct.
9     THE REPORTER: Correct.
10     (Exhibit 10 marked for identification.)
11 BY MS. JAMERSON:
12     Q   And we'll go to her page 5 of the report. So
13 this is number 13 on page 5 of her report. Do you have
14 any opinion on whether Dr. Price's impairment rating is
15 accurate using the measurements she took?
16     MR. BARLOW: Form.
17     THE WITNESS: The numbers appear appropriate,
18 but are based on the physical exam findings that she sees
19 at the moment. I don't think that the impairment rating
20 is abnormally -- or not representative of what's going
21 on. But I think that the cause of this impairment rating
22 is being inappropriately assigned.
23 BY MS. JAMERSON:
24     Q   Yeah. And I understand that your opinion
25 on causation is not in alignment with Dr. Price's. You

Page 62

1 disagree with Dr. Price's opinion on causation, correct?
2     A   I do.
3     Q   You know, aside from causation, my question is
4 really just based on the range of motion measurements that
5 she took and based on his condition, I know you said these
6 are based on the range of motion that day, but the numbers
7 appear accurate to you?
8     A   I don't have the, you know, the Fifth Edition
9 tables in front of me, but, yes, they do appear within
10 reason.
11     Q   Okay. Nothing stands out to you as glaringly
12 inaccurate with her calculations.
13     A   The only one I would sort of give pause on is
14 the sensory components. I don't see listed what she
15 utilized as the sensory -- the measurement data. So the
16 way you typically do this is you have the guide in front
17 of you, basically open up to the page that's sensory. And
18 then they have sort of this rubric of, you know, at this
19 level, this is this percentage, and then you can convert
20 it, as she's done, to upper extremity and then whole body.
21 But it doesn't -- that's the only one I can't like sort of
22 eyeball and say yes or no. But wholly, this looks like
23 she used the guidelines as they're intended.
24     Q   Okay. Do you agree with Dr. Luker that there's
25 no treatment available to Mr. Harper for shoulder



Page 63

1  rehabilitation?
2      MR. BARLOW:  Asked and answered.
3      THE WITNESS:  I don't know, because the totality
4  of non-operative treatment has not been documented for me
5  to review his therapy notes.  If he's had injections, if
6  he hasn't had injections, what those responses have been.
7  So it's hard for me to assess that there's nothing that
8  can be done, but so I'm uncertain.
9  BY MS. JAMERSON:
10     Q   Okay.  So it's hard for you to give an opinion
11 on that because you don't have all of his prior medical
12 records?
13     MR. BARLOW:  Form.
14     THE WITNESS:  It's hard for me to give an
15 opinion as it relates to if there's nothing more that can
16 be done.
17 BY MS. JAMERSON:
18     Q   And that's because you don't have all -- his
19 full history of treatment records.
20     MR. BARLOW:  Form.
21     THE WITNESS:  I don't -- I don't know the
22 history from even before the accident itself.  You know,
23 besides what was given to me, I don't know what therapy he
24 did then.  So there's -- there's some incomplete shoulder
25 history from previous as well.

Page 64

1  BY MS. JAMERSON:
2      Q   If there isn't a way to rehabilitate his
3  shoulder, will Mr. Harper continue to have the same
4  weakness regarding his rotator cuff?
5      MR. BARLOW:  Form.  Foundation.
6      THE WITNESS:  Likely.
7  BY MS. JAMERSON:
8      Q   Given Mr. Harper's -- and what you have, all the
9  records that you've reviewed, is it your opinion that
10 Mr. Harper does have permanent impairment.
11     A   As it relates to which injury?
12     Q   As it just regarding his left upper extremity,
13 does he have permanent impairment in the left upper
14 extremity?
15     A   Possibly.
16     Q   Can you expand on that?  Does he have permanent
17 impairment to the shoulder?
18     A   So again, if the patient doesn't seek additional
19 treatment for the shoulder, I think that his current
20 condition likely is going to remain.  So that would be
21 permanent by definition.  However, if he seeks treatment
22 and there's a possibility that someone takes on the case
23 to do a rotator cuff repair, his function could improve.
24 So it's not fair for me to say that he definitely is
25 permanently impaired, but I think with no additional

Page 65

1  treatment, the function of his shoulder likely will remain
2  the same.
3      Q   Okay.  Well, earlier I thought we were talking
4  about Dr. Luker's opinion that a rotator cuffed hair would
5  not be recommended in this case.  Do you remember that?
6      A   I do remember that.
7      Q   So do you have an opinion then on performing a
8  rotator cuff tear repair on Mr. Harper?
9      MR. BARLOW:  Asked and answered.
10     THE WITNESS:  I think given at that time and
11 that visit, I would agree with him.  But there's
12 possibility to continue therapy.  I don't know if his
13 range of motion was due to an active or passive deficit.
14 I don't know if he's been actively trying on his own to do
15 therapy to improve his motion.  That could potentially
16 change Dr. Luker's opinion on if it can be fixed or not.
17 But based on the note in that particular visit, I would
18 agree with Dr. Luker.
19 BY MS. JAMERSON:
20     Q   Okay.  And now regarding the cubital tunnel and
21 the ulnar nerve issue, do you have an opinion on whether
22 Mr. Harper has -- will have permanent impairment for that
23 condition?
24     A   I believe that the damage done to the cubital
25 tunnel is challenging to overcome, and so I would not

Page 66

1  recommend an additional surgery for that.  And so I think
2  that that component is likely permanent.
3      Q   When you say you would not recommend an
4  additional procedure for that, is that because there's a
5  risk of further damage, or what is your concern?
6      A   I think it's twofold.  One, he has what sounds
7  like a tremendous amount of hypersensitivity within the
8  ulnar distribution itself.  If we were to operate on the
9  ulnar nerve in the face of hypersensitivity without some
10 desensitization therapy being done, I think that
11 you're -- in Dr. Luker's words, that's a recipe for
12 disaster.  I think that the pain would increase.  I think
13 his dysfunction would increase.  That's number one.
14     And number two, his ulnar nerve has been
15 transposed.  And I don't see anything that I would
16 necessarily be doing different by doing a neurolysis and
17 releasing it further.  And so I don't think that I have
18 something to offer him that would drastically change his
19 current situation as it relates to his ulnar nerve.
20     MS. JAMERSON:  Okay.  I'm going to show
21 you -- this is Exhibit 11.
22     (Exhibit 11 marked for identification.)
23 BY MS. JAMERSON:
24     Q   This is a report from Dr. Joel Dean from
25 February 2, 2022.  And we'll go to, I believe, the last

Page 67

1  page of his report under discussion.  Notes.  Dr. Dean
2  states -- he opines, the first point to make is that
3  careful electrical evaluation of the brachial plexus is
4  difficult.  Do you agree with that?
5      A    I believe that a well-trained neurologist or
6  physiatrist can perform a good nerve conduction study.
7  But if you are not comfortable on doing nerve conduction
8  studies around the brachial plexus, it can be challenging.
9      Q    Why is it challenging?
10      A    Some of the muscles that you need to do an EMG
11  on are relatively small, and you need to be confident as
12  to where you have your needle.
13      Q    Okay.  Dr. Dean goes on to say, that being said,
14  I find no evidence of clear brachial plexus injury.  I do
15  think he is still suffering from brachial plexus -- sorry.
16  I do think he is still suffering from brachial plexus
17  irritation, given the electrical jolts that he experiences
18  from time to time.  Can you tell me what is the difference
19  between brachial plexus injury and brachial plexus
20  irritation?
21      A    So I think, again, it's a spectrum irritation is
22  a term to describe inflammation or like -- yeah, I guess
23  inflammation would be the best sort of synonym.  And that
24  can be considered a mild injury.
25      Q    Is that something that would show up on a nerve

Page 68

1  conduction study -- sorry.
2      Is a brachial plexus irritation something that
3  would show up on a nerve conduction study?
4      A    Yes, ma'am.  In the context of traumatic
5  brachial plexus injury, it should.
6      Q    If it was just an irritation, because I think
7  here Dr. Dean is distinguishing between injury and
8  irritation.  Are those two different things to you?
9      A    No, ma'am.  They're a spectrum.
10      Q    Okay.  But irritation is lower on the spectrum
11  of injury than -- sorry, lower on the spectrum than an
12  injury would be.  Is that correct?
13      A    So I think irritation describes a very mild
14  problem with the anatomy, whereas a -- you know, a severe
15  injury would describe a much more significant problem with
16  the structures.
17      Q    So are there certain mild problems for the
18  brachial plexus irritation that would be mild enough that
19  they'd be hard to see on a nerve conduction study?
20      MR. BARLOW:  Form.
21      THE WITNESS:  I think in the context of trauma
22  coming from above, no.  I think in the context of, you
23  know, there are certain patients with postural changes, or
24  even, it's historically in younger females or someone with
25  a tumor in the apex of their lung, those type of things

Page 69

1  can irritate the lower trunk of the brachial plexus
2  without necessarily showing up on nerve conduction study,
3  but not as it relates to trauma.
4      Q    Okay.  So you would expect a traumatic brachial
5  plexus irritation to show up on a nerve conduction study.
6      A    In this case, to irritate the lower trunk, you
7  would have to have increasing amount of force with each
8  level that you've gone through, because we -- since
9  the -- whatever happened didn't break his skin.  So
10  everything on top of the structure we're talking about saw
11  a greater amount of force than the structure deeper than
12  the one above it.
13      So I think that in order to have brachial plexus
14  irritation of the lower trunk, you -- from this particular
15  mechanism, you cannot ignore the fact that the upper and
16  middle trunk were normal.
17      Q    But there are types of brachial plexus
18  irritations that would be difficult to see on nerve
19  conduction study.  Is that true?
20      MR. BARLOW:  Form.  Foundation.
21      THE WITNESS:  Non traumatic ones, yes.
22  BY MS. JAMERSON:
23      Q    Okay.  Regardless of causation to this incident,
24  can you give me a list of what you believe Mr. Harper's
25  current diagnoses are?

Page 70

1      MR. BARLOW:  Improper form, foundation, and
2  improper hypothetical.
3      THE WITNESS:  I think --
4  BY MS. JAMERSON:
5      Q    You can answer.
6      A    He likely has some sort of cervical spine
7  pathology.  He has a rotator cuff problem, whether it be a
8  complete tear or a partial tear.  He has ulnar nerve
9  compromise at the elbow.  And I believe that that's it.
10      Q    Okay.  And is it your opinion that none of these
11  diagnoses are related to the Starbucks incident?
12      A    Yes, ma'am.
13      Q    Okay.  Do you agree that it's possible that any
14  of these preexisting conditions, his rotator cuff tear,
15  could have been exacerbated by the Starbucks incident?
16      MR. BARLOW:  Form.  Opinions need to be to a
17  reasonable degree of probability, not possibility.
18      THE WITNESS:  I just think it's very improbable
19  that an umbrella hitting you in the neck is going to
20  exacerbate a rotator cuff tear.  And I certainly do not
21  think it does anything to the cubital tunnel.
22      MS. JAMERSON:  Okay.  I don't think I have
23  anything further for you, Doctor.  So I don't know if
24  anyone else has questions.
25      MR. BARLOW:  This is the rare case where I am



Page 71

1  going to have questions.  But I think we should take a
2  five-minute break since we're about 40 minutes in.  I
3  think it won't be more than 10 minutes.
4       MS. JAMERSON:  Okay.  Sounds great.
5       MR. BARLOW:  Thanks.
6       MS. JAMERSON:  Let's off the record for a few
7  minutes.  Five minutes.
8       THE VIDEOGRAPHER:  Okay.  The time is 1:46 p.m.
9  We're off record.
10       (Off the record.)
11       THE VIDEOGRAPHER:  All right.  The time is 1:50
12  p.m.  We're back on record.
13              EXAMINATION
14  BY MR. BARLOW:
15   Q   Dr. Delarosa, I have a few questions for you on
16  behalf of Starbucks.  Okay?
17   A   Yes, sir.
18   Q   There were a lot of questions during
19  Ms. Jamerson's examination of you that involved things
20  that are possible.  What I want to talk about is things
21  that are probable.  That is, things that are more likely
22  than not to a reasonable degree of medical certainty.
23  Okay?
24   A   Yes, sir.
25   Q   All your opinions moving forward during my

Page 72

1  examination will be to that higher standard.  That is, to
2  a reasonable degree of medical probability.
3   A   Yes, sir.
4   Q   All right.  First off, to a reasonable degree of
5  medical probability, does this patient, Mr. Harper, have a
6  brachial plexus injury?
7   A   No, sir.
8   Q   Let's talk about your reasons for that.  First
9  would be the angle of injury.  Is that correct?
10   A   Yes, sir.
11   Q   Why is the angle important?
12   A   The angle is important because the bony
13  structures block the lower trunk from any other angle
14  besides directly superior.  The intimate relationship of
15  the upper and middle trunk as they relate to where the
16  lower trunk is make it impossible to have an isolated
17  lower trunk injury from a compressive force coming down
18  from above without damaging the middle or lower -- middle
19  or upper trunk.
20   Q   But differently, is it fair to say that you
21  would expect a upper or middle trunk brachial plexus
22  injury in a patient with this mechanism of injury?
23   A   Yes.
24   Q   Did you see any injury to the upper or middle
25  trunk of the brachial plexus in this patient?

Page 73

1   A   No, sir.
2   Q   Is another reason for your opinion that he did
3  not suffer a brachial plexus injury, is that based on the
4  objective imaging?
5   A   Yes, sir.
6   Q   The objective imaging or diagnostic testing in
7  the form of an EMG, did that show any injury in this
8  patient to his brachial plexus?
9   A   No, sir.
10   Q   And the objective imaging or diagnostic testing
11  in the form of an MRI, did that show any objective injury
12  to the brachial plexus?
13   A   No, sir.
14   Q   You were asked a question about irritation by
15  Ms. Jamerson, and I want to elaborate.  That was related
16  to EMG.  Would irritation be seen on MRI of the brachial
17  plexus?
18   A   Yes, sir.
19   Q   And so the fact that no irritation was seen on
20  Mr. Harper's brachial plexus imaging demonstrates that he
21  did not suffer irritation to the brachial plexus.  Is that
22  correct?
23   A   Yes, sir.
24   Q   Dr. Dean did say that the irritation that he
25  believed that Mr. Harper may have was based on

Page 74

1  Mr. Harper's subjective reporting, correct?
2   A   Yes, sir.  In his note, he mentioned that the
3  objective data that he has, including his physical exam,
4  point him away from brachial plexus injury.  But based on
5  the story presented by Mr. Harper, that maybe there is
6  some irritation.
7   Q   And so there's no objective imaging supporting
8  the conclusion that Mr. Harper suffered irritation to the
9  brachial plexus.  Is that correct?
10   A   Correct.
11   Q   You made an interesting statement during
12  Ms. Jamerson's examination about how you've never
13  performed a surgery on someone with negative objective
14  brachial plexus imaging or diagnostic studies.  Why
15  wouldn't you perform a surgery on someone with negative
16  objective testing?
17   A   So in the context of trauma, objective testing
18  needs to support your physical exam that ultimately guides
19  you on your surgical decision making.  With a lack of
20  objective data, you're not -- you can't be confident that
21  you're addressing the issue, and you likely have no plan
22  to address the issue, because you need to have the story,
23  the physical exam, the objective diagnostic data all
24  corroborate each other to eventually support your
25  decision-making.

Page 75

1    Q   In other words, you wouldn't perform a surgery
2 unless there was a patient providing a history, clinical
3 findings after that history, and objective imaging or
4 diagnostic study that supports the history, the clinical
5 exam, that all has to link up.  Is that fair?
6    A   Yes, sir.
7    Q   And in this case, was any of that true for
8 brachial plexus or for a cubital tunnel?
9    A   No, sir.
10   Q   I want to move on to the ulnar nerve issue or
11 ulnar entrapment or tunnel injury.  Did you have an
12 opinion about whether Mr. Harper has a cubital tunnel or
13 ulnar nerve or ulnar enchantment problem?
14   A   I do have an opinion.
15   Q   And what is that opinion?
16   A   So he -- our objective information is showing
17 that he doesn't have any electrodiagnostic data supporting
18 cubital tunnel.  This test was done after his injury,
19 before his surgery.  The only positive findings found on
20 neurodiagnostics are found after his surgery on his
21 cubital tunnel.
22   Q   Okay.  But you agree that that August 12, 2020
23 clinical exam does show findings consistent with cubital
24 tunnel, correct?
25   A   What was the date of it?

Page 76

1    Q   August 12, 2020.
2    A   That was after his surgery.  Yes.
3    Q   Okay.  You're not disputing that he has a
4 cubital tunnel issue, correct?
5    A   No, sir.
6    Q   Okay.  Do you have anything about whether the
7 cubital tunnel was related to the umbrella incident?
8    A   I feel the cubital tunnel was not.  The
9 likelihood or probability within a reasonable degree of
10 certainty is that it's not related to the umbrella
11 incident.
12   Q   Okay.  Can you talk about the timeline?  Would
13 that help explain your opinion?
14   A   Sure.
15   Q   The incident occurred on August 23, 2019.  Is
16 that correct?
17   A   Yes, sir.
18   Q   And a month and a half later, on October 10,
19 2019, did he have a normal upper left extremity EMG?
20   A   Yes, sir.
21   Q   Does that mean that the cubital tunnel or ulnar
22 nerve at that point, more likely than not, did not have an
23 injury?
24   A   Correct.
25   Q   Okay.  And then later on, did he develop a

Page 77

1 cubital tunnel injury clinically and also seen in later
2 EMGs?
3    A   Yes.  I think his ulnar nerve became compromised
4 after the fact.
5    Q   Okay.  But 40 days after the umbrella incident,
6 the cubital tunnel was normal per imaging, correct?
7    A   Per electrodiagnostic studies.
8    Q   Okay.  Right.  A nerve conduction study is
9 different than imaging, correct?
10   A   Yes, sir.
11   Q   Okay.  That's the distinction.
12   A   Yes, sir.
13   Q   So you're saying the injury to the cubital
14 tunnel is not related to the umbrella incident.  Is that
15 correct?
16   A   Correct.
17   Q   And then if that's true with the surgery to
18 release the ulnar nerve or cubital tunnel syndrome, would
19 that be related, the umbrella incident?
20   A   No, sir.
21   Q   The trigger thumb, I think.  I don't know that
22 we talked about this, but this patient had some care for a
23 trigger thumb.  Do you recall that?
24   A   Yes.
25   Q   Was the trigger thumb related to this incident?

Page 78

1    A   No, sir.
2    Q   Can you explain why?
3    A   Trigger thumb is a very common problem as it
4 relates to swelling within the tendon sheath of the tendon
5 that moves the thumb.  That can be caused by repetitive
6 motion, vibratory things, and ultimately has no
7 correlation with the upper neck or the brachial plexus
8 itself, and was treated what sounds like successfully, but
9 was unrelated to the umbrella incident.
10   Q   There were questions about mechanisms that could
11 cause a cubital tunnel syndrome.  Do you recall those
12 questions?
13   A   Yes, sir.
14   Q   And your answer was repetitive motion or
15 position.  Do you recall that?
16   A   Yes, sir.
17   Q   Are there any other causes that are probable
18 causes of cubital tunnel syndrome?
19   A   Yes, sir.
20   Q   What would those be?
21   A   So there's very clear peer reviewed literature
22 supporting vibratory insult as causing compressive
23 neuropathy such as carpal and cubital tunnel.  And one of
24 the primary sort of frequencies of vibration is road noise
25 from motor vehicles.

Page 79

1  Q   Okay. When you say road noise from motor
2  vehicles, would that be holding the steering wheel?
3  A   Yes, sir.
4  Q   Would that be the same mechanism for holding a
5  motorbike?
6  A   Yes, sir.
7  Q   Motorcycle. Going back to repetitive motions.
8  Can you give an example that the literature demonstrates
9  that relates to repetitive motions?
10 A   So historically it would be significant flexion,
11 extension, repetition that can cause it. You can have
12 also something called an unstable ulnar nerve, of which
13 it's flipping above -- back and forth above the medial
14 epicondyle. However, in those cases, you typically don't
15 have compression. You actually have irritation of the
16 ulnar nerve as it keeps flipping back and forth. So I
17 don't think that was going on either. I think that he was
18 mostly vibratory or positional.
19 Q   Would playing an instrument fall under vibratory
20 or repetitive motion or positioning?
21 A   It could potentially be all three. You know,
22 sort of playing a guitar, your elbow is flexed on -- if
23 you play right handed, on the left side, and then the sort
24 of the strumming mechanism on the right side can be the
25 repetitive motion, and then there also is some vibration.

Page 80

1  I just don't know what the frequency of vibration is
2  coming from a guitar.
3  Q   To a reasonable degree of medical probability,
4  did Mr. Harper suffer a double crush related to the
5  umbrella incident?
6  A   No, sir.
7  Q   Why is that not related in your opinion?
8  A   Because as described, the double crush is likely
9  located in the cervical spine and in the peripheral nerve,
10 say in his cubital tunnel. And he has the propensity to
11 have this problem. The more probable situation is due to
12 his prior injuries and surgeries of his neck, in
13 particular, in his predisposing factor for his elbow. But
14 the umbrella did not impact either of those locations. So
15 I think it's highly unprobable (sic) that that impact from
16 the umbrella really exacerbated either of those problems.
17 Q   Double crush requires an injury along the nerve
18 at two locations, correct?
19 A   Yes, sir.
20 Q   So I want to talk about the relatedness of the
21 patella potential locations. So the cervical spine, which
22 has a C-5 through C-7 fusion, is that related to the
23 umbrella incident?
24 A   No, sir.
25 Q   Why not?

Page 81

1  A   That was done before. He got into a car
2  accident one time, and fell off of a roof at another time.
3  And I believe the fusion was due to the car accident and
4  then potentially some exacerbation when he fell off of the
5  roof. And that -- that's preexisting. It is what it is
6  and was not -- you know, the impact from the umbrella
7  would have had to have hit his cervical spine to impact
8  that component.
9  Q   Okay. So the fusion and the potential cervical
10 injury predated the umbrella incident. Is that fair?
11 A   Yes, sir.
12 Q   So it's not related?
13 A   Yes, sir. Correct.
14 Q   The cubital tunnel injury, I know you've
15 previously opined, but just to wrap this up, was that
16 related to the umbrella incident?
17 A   No, sir.
18 Q   There were questions about hyper-reduction and
19 traction. Traction is like a pulling the opposite
20 direction that you're going, right?
21 A   Yes, sir.
22 Q   And without him being able to grab onto
23 something with his hands in the air, there is no traction;
24 is that correct?
25 A   Correct.

Page 82

1  Q   Would falling off of a roof and grabbing, let's
2  say a part of the ladder, provide that traction effect?
3  A   Yes, sir, it could.
4  Q   Would falling off of the roof and grabbing the
5  gutter provide that traction effect?
6  A   Yes, sir, it could.
7  Q   If there were a traction injury, would you
8  expect the length of the injury along the nerve to be
9  greater?
10 A   Yes, sir.
11 Q   Do you see that longer or extended injury in
12 Mr. Harper?
13 A   No, sir.
14 Q   How would you identify that longer type of
15 injury?
16 A   Well, mechanism number one, but then again, it
17 sort of alludes to the fact that the lower trunk being
18 damaged in isolation is the crux in the sense that even
19 with a traction injury, you would expect the rest of the
20 brachial plexus to be damaged as well. Now, the traction
21 injury that we've described can sort of preferentially
22 target the lower trunk.
23      However, these are usually substantial injuries
24 that, say on MRI, you also have avulsions. Avulsions are
25 where the brachial plexus is ripped from the spinal cord.

Page 83

1  All of those things are substantial trauma that show up on
2  MRI, that show up on conduction studies that show up very
3  clearly on physical exam. And so, yeah.
4     Q   And on the objective imaging that is the MRI of
5  Mr. Harper, there's no avulsions to the brachial plexus,
6  correct?
7     A   Correct.
8     Q   There's no effusion to the brachial plexus, is
9  that correct?
10    A   No fusion or edema to the brachial plexus.
11    Q   So no swelling?
12    A   Correct.
13    Q   There was a question from Ms. Jamerson about
14 someone who has a chronic asymptomatic, essentially
15 impingement in the cubital tunnel, but trauma causes it to
16 be symptomatic. Do you recall that question?
17    A   Yes, sir.
18    Q   And you said it was possible if there was a blow
19 to the elbow, correct?
20    A   Yes, sir.
21    Q   Your understanding of the mechanism of injury
22 here, did it involve a blow to the elbow?
23    A   No, sir.
24    Q   Could a blow to the brachial plexus up here
25 cause that sort of change in making a chronic asymptomatic

Page 84

1  cubital tunnel suddenly symptomatic?
2     A   No, sir.
3     Q   There's a question about the grossly
4  dysfunctional left hand and no grip power seen in
5  Mr. Harper more recently. Do you have an opinion about
6  whether that's related to the umbrella incident?
7     A   I do, and I don't think it's related.
8     Q   That's to a reasonable degree of medical
9  probability?
10    A   Yes, sir.
11    Q   There are questions about a worsened shoulder
12 problem. Do you believe that that is related to the
13 umbrella incident?
14    A   No, sir.
15    Q   And why not?
16    A   Again, the mechanism doesn't really fit the
17 mechanism that would be required to worsen these
18 probleMs. We -- even if we assume that he raised his arm
19 up in surprise or whatever happened, he would be
20 complaining, number one, of horrible shoulder pain
21 immediately afterwards. He wouldn't ignore it. And I
22 think that even raising your arm up is not the typical
23 mechanism that you would have to worsen these issues.
24    MR. BARLOW:  Okay. Ms. Jamerson, can you put up
25 Exhibit 9?

Page 85

1     MS. JAMERSON:  Which one is that?
2     MR. BARLOW:  Dr. Price's impairment ratings.
3  Well, actually, Dr. Price's -- I think it was her rebuttal
4  report.
5     MS. JAMERSON:  So not the impairment rating?
6     MR. BARLOW:  Not the impairment -- Yeah. My
7  brain's going too fast for my mouth. Or my mouth is going
8  too fast for my brain.
9     MS. JAMERSON:  Yeah. Here we go.
10 BY MR. BARLOW:
11    Q   All right. I'm going to read a sentence to you
12 that was discussed with Ms. Jamerson. However, it is
13 possible, because the exacerbation of the left shoulder
14 impingement from the trauma may have caused him to be
15 splinting his arm and potentially causing limitations in
16 range of motion of the ulnar nerve, which could have
17 caused the ulnar nerve issue. That sentence, is anything
18 about that sentence more likely than not?
19    A   No, sir.
20    Q   Is that a probable concept that Dr. Price is
21 putting forth?
22    MS. JAMERSON:  Object to form and foundation.
23 You can answer.
24    THE WITNESS:  No, sir.
25 //

Page 86

1  BY MR. BARLOW:
2     Q   Is the word possible, is that probable at the
3  beginning of that sentence?
4     A   No, sir.
5     Q   Is the word potentially probable?
6     A   No, sir.
7     Q   Is the word could have probable?
8     A   No, sir.
9     Q   So that's triple possible?
10    A   Yes, sir.
11    Q   I want to talk about the permanent impairment
12 rating. You saw those permanent impairment ratings. Were
13 those permanent impairment ratings, if true, caused by the
14 umbrella incident?
15    A   No, sir.
16    Q   Are they related to the umbrella incident?
17    A   No, sir.
18    Q   In your opinion, does Mr. Harper have any
19 permanent impairment as a result of the umbrella incident?
20    A   No, sir.
21    Q   Is it fair to say that you believe that the
22 percentage of permanent impairment that Mr. Harper has as
23 a result of the umbrella incident is 0 percent?
24    A   Yes, sir.
25    MR. BARLOW:  Those are all my questions.

Page 87

1    MS. JAMERSON:  Okay.  I just had one follow up
2  question on that.
3              EXAMINATION
4  BY MS. JAMERSON:
5    Q   Dr. Delarosa, you just testified about the fact
6  that the cubital tunnel syndrome was not related, in your
7  opinion, is that correct?
8    A   Yes, ma'am.
9    Q   And you found -- you saw that the EMG reports
10  did not show any damage to the nerve prior to his surgery.
11  Is that correct?
12    A   Correct.
13    Q   Dr. Treadwell testified yesterday that,
14  regarding cubital tunnel, that EMG nerve conduction
15  studies are falsely negative approximately 50 percent of
16  the time.  Do you agree with that statistic?
17    MR. BARLOW:  Form.  Foundation.
18    THE WITNESS:  No.
19  BY MS. JAMERSON:
20    Q   What is your understanding of the reliability of
21  EMG NCS testing regarding cubital tunnel syndrome?
22    A   I don't think it's infallible, and I do think
23  that it's less reliable than, say, EMG testing for carpal
24  tunnel.  But I think the number of 50 percent is very
25  high.  And historically, the ones that are negative, or

Page 88

1  false negatives, are due to an unstable ulnar nerve.  I do
2  see that in my practice very regularly, in which the nerve
3  is translocating or flipping back and forth over the
4  medial elbow.  And the reason why that is negative is
5  because it's a dynamic problem.  So as they're moving
6  their arm, they're getting more of those symptoms and more
7  of the problem.
8         The test is a static test, and so when you do a
9  static test for a dynamic problem, you tend to miss it.
10  And so I would agree that there is some negative nerve
11  conduction studies which still cause ulnar nerve
12  probleMs.  However, in the context of this case, there's
13  not been a single point where it was documented that the
14  ulnar nerve was unstable.  And in fact, Dr. Treadwell's
15  operative report says there was compression.  So by
16  definition, it wasn't unstable intraoperatively.  After he
17  released it, it then was unstable, and he transposed it.
18    MS. JAMERSON:  Okay.  That was my only question.
19  Thank you.
20    MR. BARLOW:  I do have a follow up on the false
21  positive rate.  So Ms. Jamerson, how many exhibits did you
22  have?
23    MS. JAMERSON:  I thought we had 11.
24    MR. BARLOW:  Okay.  We'll just make this 12
25  to -- real quick.

Page 89

1         (Exhibit 12 marked for identification.)
2              EXAMINATION
3  BY MR. BARLOW:
4    Q   I'm going to share my screen, doctor.  Hopefully
5  it works.  There we go.  So this is an article called
6  Cubital Tunnel Syndrome.  Okay.  And I'm going to jump to
7  a specific page.  Okay.  do you see Neurophysiological
8  Studies, the heading?
9    A   Yes, sir.
10    Q   Do you see where it talks about the diagnosis of
11  CUTS?  What's CUTS?
12    A   Cubital tunnel syndrome.
13    Q   Okay.  Do you see here where it says there is a
14  10 percent false negative rate?
15    A   Yes, sir.
16    Q   Is that more in line with your understanding of
17  what the false positive rate is for EMG of the ulnar nerve
18  in relation to cubital tunnel syndrome?
19    A   Yes, sir.
20    Q   And so the flip side, if there's a false
21  negative rate of 10 percent, that means 90 percent of this
22  test is accurate, correct?
23    A   Yes, sir.
24    Q   So more likely than not, a nerve EMG of the
25  ulnar nerve is accurate to diagnose cubital tunnel

Page 90

1  syndrome, correct?
2    A   Yes, sir.
3    Q   And if it wasn't an accurate or reliable test,
4  medical professionals wouldn't use it before performing
5  surgeries, correct?
6    A   Correct.
7    MR. BARLOW:  Those are all my questions.
8    MS. JAMERSON:  I have nothing in response.
9    MR. BARLOW:  Great.
10    THE VIDEOGRAPHER:  All right.  The time is 2:13
11  pm.  We're off record.
12    THE REPORTER:  Mr. Barlow, will you be handling
13  the read and sign?
14    MR. BARLOW:  Yeah, I'll order an e trans,
15  please.
16    THE REPORTER:  Okay.  And Ms. Jamerson, will you
17  be emailing the exhibits?
18    MS. JAMERSON:  Yeah, I think you gave me your
19  email address.  So I should just send them to
20  Leslie.corbett24@gmail.com?
21    THE REPORTER:  Yes, please.
22    MS. JAMERSON:  Okay.
23    THE REPORTER:  That way I can attach.  Okay.
24  Marked on record.
25    MR. BARLOW:  And Ms. Corbett, what's your email

Page 91

1  address so I can send you Exhibit 12?
2        THE REPORTER:  It's in the chat.  It's
3  Leslie.corbett24@gmail.com
4        MR. BARLOW:  Great.  Sorry about that.
5        THE REPORTER:  No, appreciate that, Mr. Barlow.
6  And then would you like to order the transcript today,
7  Ms. Jamerson?
8        MS. JAMERSON:  Yes, we'll do an e transfer.
9        THE REPORTER:  E trans.  And Mr. Barlow?
10       MR. BARLOW:  E trans please.
11       THE REPORTER:  Okay.  And is 10 business days
12  acceptable, or would you like it expedited?
13       MR. BARLOW:  No rush.
14       MS. JAMERSON:  I think -- yeah, no rush for us
15  either.
16       THE REPORTER:  Deandre, I'm not sure if I spoke
17  over you, sorry.
18       THE VIDEOGRAPHER:  No, that's all right.  Any
19  video orders?
20       MR. BARLOW:  No video for us.
21       MS. JAMERSON:  Not at this time.
22       THE VIDEOGRAPHER:  All right.  Thank you very
23  much.
24       (Signature Reserved.)
25       (Whereupon, at 2:13 p.m., the proceeding was

Page 92

1  concluded.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 93

1        CERTIFICATE OF NOTARY PUBLIC
2        I, Leslie Corbett, a Notary of the State of
3  California, duly authorized to administer oaths, do hereby
4  certify:
5        That I am a disinterested person herein; that
6  the witness named in the foregoing deposition was, by me,
7  duly sworn to testify the truth, the whole truth, and
8  nothing but the truth; that the deposition was reported by
9  me and is a true and correct record of the testimony so
10  given.
11       IN WITNESS WHEREOF, I hereby certify this
12  transcript at my office in the State of Colorado this 20th
13  day of June 2024.
14
15
16            LESLIE CORBETT
17         Notary Public in and for the
18            State of Colorado
19
20
21
22
23
24
25

Page 94

1        CERTIFICATE OF TRANSCRIBER
2        I, Elizabeth Knittle, do hereby certify that
3  this transcript was prepared from the digital audio
4  recording of the foregoing proceeding, that said
5  transcript is a true and accurate record of the
6  proceedings to the best of my knowledge, skills, and
7  ability; that I am neither counsel for, related to, nor
8  employed by any of the parties to the action in which this
9  was taken; and, further, that I am not a relative or
10  employee of any counsel or attorney employed by the
11  parties hereto, nor financially or otherwise interested in
12  the outcome of this action.
13
14
15            Elizabeth Knittle
16
17
18
19
20
21
22
23
24
25

Case No. 1:21-cv-03295-GPG-KAS    Document 101-17    filed 05/23/25    USDC Colorado
pg 26 of 52

                              Notice Date: Friday, 21. June 2024


Attention:  Matthew R. Delarosa, M.D.




Re:Harper v. Starbucks
   Deposition of  Matthew R. Delarosa, M.D. (6/6/2024)


        NOTICE REGARDING SIGNING DEPOSITION TRANSCRIPT

The above referenced transcript is available for review.
Within 30 days, or the applicable timeframe of your legal
jurisdiction, the witness may read the testimony to verify
its accuracy. Any changes can be noted on the following
errata page.

Once the transcript has been reviewed, the witness should
sign and date the certificate of deponent page. The signed
certificate, errata, and original transcript (if provided)
must be returned to TP.One per the rules of civil procedure.

If the transcript and errata are not returned within the
allotted time, the unsigned transcript may be used as if
signed by the witness.


Thank you,

TP.One Production Department
Production@tp.one



Deponent Errata Page

Notice Date: 06/21/2024

Deposition Date: 6/6/2024

Deponent:  Matthew R. Delarosa, M.D.

Case Name: Harper v. Starbucks

Page:Line              Now Reads                Should Read

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20__, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

## WORD INDEX

< 0 >
**0**  86:*23*

< 1 >
**1**  4:*10*  11:*4, 7*
**1:21-CV-03295-DDD-GPG**  2:*5*
**1:46**  71:*8*
**1:50**  71:*11*
**10**  4:*10, 19*
16:*20*  55:*20*
61:*7, 10*  71:*3*
76:*18*  89:*14, 21*
91:*11*
**100**  55:*20*
**106**  19:*8*  20:*6, 13*
**11**  4:*20*  66:*21, 22*  88:*23*
**110**  3:*5*
**12**  4:*21*  14:*11*
22:*11*  75:*22*
76:*1*  88:*24*
89:*1*  91:*1*
**12:00**  2:*13*
**12:02**  5:*4*
**12:57**  44:*17*
**13**  61:*13*
**14**  14:*11, 16*
**142562**  2:*16*
**15**  16:*20*  26:*15*
47:*1*
**1512**  3:*14*
**160**  19:*4*  46:*2*
**17**  4:*11*  18:*11*
**18**  18:*21, 25*
**1st**  4:*11*

< 2 >

**2**  4:*11*  17:*18, 19*  43:*5*  46:*7*
58:*18*  66:*25*
**2:13**  90:*10*
91:*25*
**2015**  60:*9*
**2017**  18:*11, 21, 25*
**2018**  19:*3, 7*
**2019**  8:*11*
14:*10*  76:*15, 19*
**2020**  22:*12*
54:*22*  75:*22*
76:*1*
**2022**  66:*25*
**2023**  13:*3*
17:*22*  41:*15*
58:*18*
**2024**  2:*12*  5:*4*
51:*3*  93:*13*
**20th**  93:*12*
**21**  19:*3, 7*  51:*3*
54:*22*  58:*18*
**23**  8:*11*  76:*15*

< 3 >

**3**  4:*12*  30:*3, 6*
**30**  4:*12, 13*  47:*1*
**303**  3:*8, 18*
**3457**  3:*5*
**36**  4:*14*

< 4 >

**4**  4:*13*  30:*24, 25*
**40**  45:*22*  71:*2*
77:*5*
**43**  4:*15*
**45**  4:*16*  39:*24*

< 5 >

**5**  4:*3, 14*  16:*11*
26:*14*  36:*22, 23*
38:*13*  54:*23*
61:*12, 13*
**50**  36:*5*  87:*15, 24*
**51**  60:*25*
**54**  4:*17*
**58**  4:*18*
**5th**  22:*10*

< 6 >

**6**  2:*12*  4:*15*
5:*4*  43:*2, 3*
44:*25*
**60**  45:*20, 21*
**61**  4:*19*
**66**  4:*20*

< 7 >

**7**  4:*16*  41:*15*
44:*25*  45:*1, 2, 3*
**71**  4:*4*
**747-4404**  3:*8*

< 8 >

**8**  4:*17*  17:*22*
54:*16, 19*
**80202**  3:*15*
**80216**  3:*6*
**87**  4:*3*
**89**  4:*4, 21*

< 9 >

**9**  4:*18*  58:*14, 15*  84:*25*
**90**  46:*14, 23, 24*
89:*21*
**95**  16:*12*
**950**  3:*14*

**99**  55:*19*
**991-3344**  3:*18*

< A >
**abduct**  46:*22, 24*
**abducted**  32:*9*
46:*14*
**abduction**  19:*15*
32:*5, 11*
**ability**  8:*4*
13:*15*  36:*7*  94:*7*
**able**  13:*18*
25:*16*  26:*1, 3*
30:*8*  81:*22*
**abnormally**
61:*20*
**absolutely**  7:*15*
**acceptable**  91:*12*
**accident**  8:*10*
19:*20*  20:*12, 20*
21:*8, 14, 18*
45:*11*  63:*22*
81:*2, 3*
**accidentally**
21:*2*
**accidents**  32:*17*
**accrued**  9:*2*
**accurate**  37:*2*
61:*15*  62:*7*
89:*22, 25*  90:*3*
94:*5*
**accurately**  37:*5*
**act**  53:*15*
**Action**  2:*4*
94:*8, 12*
**actionable**  10:*1*
**active**  45:*20, 21*
65:*13*
**actively**  65:*14*
**activity**  54:*7*

**actual** 16:*2*
35:*4*
**added** 8:*25*
**Addendum** 4:*11,
16* 41:*16* 44:*21*
50:*23* 51:*4, 9*
**adding** 10:*22*
**additional** 14:*20*
52:*23* 64:*18, 25*
66:*1, 4*
**address** 55:*4, 10*
74:*22* 90:*19*
91:*1*
**addressing**
15:*12* 74:*21*
**administer** 93:*3*
**advanced** 52:*18*
**affect** 8:*4*
31:*18* 38:*4, 13*
**afternoon** 5:*16*
**aggravation**
56:*20, 24*
**ago** 7:*3* 12:*14*
**agree** 19:*6*
21:*12, 16* 28:*13*
30:*14* 35:*19, 24*
37:*10* 41:*18*
43:*20* 51:*24, 25*
55:*7, 9, 22*
56:*23* 58:*21*
62:*24* 65:*11, 18*
67:*4* 70:*13*
75:*22* 87:*16*
88:*10*
**air** 42:*14* 81:*23*
**alcohol** 8:*3*
**alignment** 61:*25*
**allow** 7:*11*
**alludes** 82:*17*

**amount** 24:*21*
47:*2* 48:*20*
66:*7* 69:*7, 11*
**amputees** 13:*13*
**analyze** 29:*13*
**anatomy** 68:*14*
**ANDREW** 3:*12*
5:*12*
**andrew.garnett@
garnettlegalgrou
p.com** 3:*17*
**angle** 35:*13*
39:*18, 20, 22*
40:*4, 8* 72:*9, 11,
12, 13*
**answer** 7:*11*
19:*10, 22, 23, 25*
70:*5* 78:*14*
85:*23*
**answered** 60:*13*
63:*2* 65:*9*
**answering** 7:*17,
25* 8:*7*
**anterior** 35:*11*
38:*9* 48:*18*
**anteriorly** 48:*25*
**anybody** 29:*7*
**apex** 68:*25*
**appear** 61:*17*
62:*7, 9*

**APPEARANCES**
3:*1*
**appearing** 5:*10*
**appreciate** 91:*5*
**appropriate**
54:*14* 61:*17*
**approximately**
87:*15*
**area** 52:*12*
**arising** 24:*2*

**arm** 32:*9, 12, 14,
21* 35:*20* 40:*25*
41:*8* 42:*4, 13,
15* 46:*14* 56:*7*
57:*11, 17, 22*
58:*1, 25* 59:*7,
13, 18* 60:*20, 21,
22* 84:*18, 22*
85:*15* 88:*6*
**arose** 21:*14, 18*
**arthritis** 17:*1*
**Article** 4:*21*
89:*5*
**articles** 11:*14,
15, 21*
**aside** 14:*19*
15:*18* 62:*3*
**asked** 7:*18*
40:*11* 46:*19*
60:*13* 63:*2*
65:*9* 73:*14*
**asking** 7:*17*
59:*2*
**aspect** 54:*9*
**assess** 63:*7*
**assessment** 55:*7*
**assigned** 61:*22*
**associate** 37:*7*
**associated** 12:*1*
30:*13, 16, 21*
38:*3* 55:*23*
**association** 5:*7*
37:*12, 14*
**associations**
30:*11* 31:*3*
**assume** 50:*16*
51:*23* 55:*16*
60:*21* 84:*18*
**assumption** 59:*5*
**assumptions**
60:*24*

**asymptomatic**
43:*23* 44:*5*
83:*14, 25*
**attach** 90:*23*
**attended** 13:*22*
**attorney** 94:*10*
**audio** 29:*10*
94:*3*
**August** 8:*11*
19:*3, 7* 22:*11*
51:*2* 75:*22*
76:*1, 15*
**authorized** 93:*3*
**available** 62:*25*
**avoid** 41:*4*
**Avon** 12:*25*
**avulsing** 33:*3*
**avulsion** 33:*7*
**avulsions** 82:*24*
83:*5*
**aware** 9:*1*
12:*20*
**axillary** 38:*4*

**< B >**
**back** 18:*21*
19:*3* 22:*8* 26:*1*
35:*16* 42:*25*
45:*22* 46:*6, 20,
21* 50:*22* 51:*4*
71:*12* 79:*7, 13,
16* 88:*3*
**background**
14:*21*
**bag** 8:*20*
**BARLOW** 3:*11,
13* 4:*4* 5:*12*
8:*23* 9:*5* 10:*13*
15:*22* 18:*2, 6, 8*
19:*8, 21, 24*
20:*6, 8, 13, 21*

21:*3, 9, 19* 23:*8,
24* 27:*14, 19*
29:*8* 34:*9, 22*
35:*21* 37:*22*
38:*5* 41:*12*
42:*7, 10* 44:*9*
45:*1, 16* 49:*14,
16* 50:*24* 52:*10*
53:*3, 9* 54:*1*
56:*10* 57:*1, 24*
58:*11* 60:*13*
61:*8, 16* 63:*2,
13, 20* 64:*5*
65:*9* 68:*20*
69:*20* 70:*1, 16,
25* 71:*5, 14*
84:*24* 85:*2, 6,
10* 86:*1, 25*
87:*17* 88:*20, 24*
89:*3* 90:*7, 9, 12,
14, 25* 91:*4, 5, 9,
10, 13, 20*
**based** 20:*13*
27:*9* 38:*2*
39:*20* 40:*11*
43:*17* 50:*3, 18*
51:*24* 55:*1, 14*
61:*18* 62:*4, 5, 6*
65:*17* 73:*3, 25*
74:*4*
**basically** 26:*11*
62:*17*
**Bates** 22:*10*
**bearing** 58:*1, 4*
**beginning** 86:*3*
**BEHALF** 3:*2,
10* 5:*11, 13*
71:*16*
**believe** 12:*12,
14* 13:*2* 14:*11*
23:*16, 25* 27:*23*

28:*3, 8, 10* 35:*5,
6* 37:*4, 12, 23*
47:*16, 24* 48:*8*
52:*20* 65:*24*
66:*25* 67:*5*
69:*24* 70:*9*
81:*3* 84:*12*
86:*21*
**believed** 73:*25*
**bend** 46:*23, 24*
**benefit** 52:*20*
**bent** 33:*16*
**Bertelli** 13:*7, 19*
14:*2, 5, 10*
**best** 67:*23* 94:*6*
**better** 12:*20*
18:*7*
**big** 17:*18* 18:*5*
**bilaterally**
18:*15, 22*
**billing** 9:*1*
**bills** 8:*25* 9:*2*
**bit** 10:*9* 44:*21*
48:*14*
**blade** 34:*24*
**bleeding** 48:*20,
21*
**block** 72:*13*
**blood** 48:*13*
49:*3*
**blow** 44:*11*
57:*8* 83:*18, 22,
24*
**body** 22:*22*
32:*22* 40:*19, 22*
41:*11* 42:*14*
62:*20*
**bone** 15:*13, 15*
**bony** 35:*17*
39:*20* 72:*12*

**bottom** 39:*12,
13, 14, 17*
**boy** 17:*18*
**Brachial** 4:*14*
11:*15, 18, 24*
12:*4, 12, 17*
13:*8, 14, 18, 20,
23* 14:*3, 21, 23*
15:*1, 3, 17*
16:*15, 17, 22*
27:*24* 28:*4, 7,
11* 32:*4* 33:*1, 3,
5, 11* 34:*5, 8, 14,
15, 18, 21* 35:*9,
19, 25* 36:*3, 11,
13, 14* 37:*3, 5,
11, 16* 38:*10*
40:*15* 53:*24*
54:*3, 6, 12*
55:*18* 67:*3, 8,
14, 15, 16, 19*
68:*2, 5, 18* 69:*1,
4, 13, 17* 72:*6,
21, 25* 73:*3, 8,
12, 16, 20, 21*
74:*4, 9, 14* 75:*8*
78:*7* 82:*20, 25*
83:*5, 8, 10, 24*
**brain** 85:*8*
**brain's** 85:*7*
**branch** 31:*14, 15*
**branching** 11:*22*
**Brazil** 13:*7, 18*
14:*2*
**break** 7:*15, 18*
40:*13, 14* 44:*14*
69:*9* 71:*2*
**breakdown**
14:*13*

**bring** 8:*17*
26:*1* 42:*14*
43:*1* 44:*24*
**broad** 53:*5*
54:*2, 12*
**business** 91:*11*

**< C >**
**C-5** 37:*21, 25*
38:*2, 6, 16, 21*
51:*7* 80:*22*
**C-6** 37:*21, 25*
38:*2, 13, 16, 21*
51:*7*
**C-7** 80:*22*
**C-8** 29:*2* 37:*15*
**calculations**
62:*12*
**California** 93:*3*
**called** 6:*13*
51:*18* 54:*4, 5, 8*
79:*12* 89:*5*
**canal** 31:*4, 7, 8*
**capacity** 6:*3, 24*
**car** 81:*1, 3*
**care** 16:*23*
77:*22*
**careful** 67:*3*
**carefully** 43:*9*
50:*2*
**carpal** 78:*23*
87:*23*
**case** 17:*5* 24:*10*
25:*1* 27:*13*
29:*20* 31:*24*
40:*6* 41:*22*
52:*13* 64:*22*
65:*5* 69:*6*
70:*25* 75:*7*
88:*12*

**cases** 15:*8*
33:*22, 24* 79:*14*
**catch** 54:*14*
**causation** 61:*25*
62:*1, 3* 69:*23*
**cause** 29:*4*
32:*25* 33:*10, 11*
34:*2, 20* 35:*14*
41:*18* 44:*7*
48:*11* 57:*6*
59:*19* 61:*21*
78:*11* 79:*11*
83:*25* 88:*11*
**caused** 49:*2, 3*
58:*25* 59:*2*
61:*1* 78:*5*
85:*14, 17* 86:*13*
**causes** 24:*23*
33:*2, 18* 78:*17,
18* 83:*15*
**causing** 28:*7*
34:*18* 53:*11*
58:*9, 25* 78:*22*
85:*15*
**certain** 52:*18*
68:*17, 23*
**certainly** 33:*10*
54:*24* 70:*20*
**certainty** 71:*22*
76:*10*
**CERTIFICATE**
93:*1* 94:*1*
**certify** 93:*4, 11*
94:*2*
**cervical** 12:*16*
28:*25* 29:*3, 24*
30:*17* 53:*11, 19,
22* 55:*17, 20*
70:*6* 80:*9, 21*
81:*7, 9*

**challenging**
26:*1* 65:*25*
67:*8, 9*
**chance** 42:*18*
56:*16* 61:*3*
**change** 65:*16*
66:*18* 83:*25*
**changes** 47:*23*
68:*23*
**character** 55:*1*
**chat** 91:*2*
**choose** 10:*24*
**chronic** 43:*12*
44:*2, 4* 83:*14, 25*
**Civil** 2:*4*
**claiming** 40:*15*
**clarification**
30:*2*
**clarify** 7:*24*
**classic** 43:*13*
**clavicle** 35:*15*
39:*21, 25* 40:*5,
10, 13*
**clear** 7:*12, 20*
45:*10* 67:*14*
78:*21*
**clearly** 83:*3*
**cliff** 32:*21, 24*
42:*13*
**clinic** 13:*11, 21,
23* 14:*13, 23, 24*
16:*22* 45:*7* 47:*4*
**clinical** 13:*21*
14:*3, 11, 12, 16*
75:*2, 4, 23*
**clinically** 77:*1*
**clinics** 13:*12*
**collarbone** 38:*25*
**COLORADO**
2:*2* 3:*6, 15*

93:*12, 18*
**column** 37:*7*
**come** 7:*22* 40:*8*
**comfortable**
67:*7*
**coming** 22:*17*
23:*15, 23* 57:*17*
68:*22* 72:*17*
80:*2*
**comment** 59:*3*
**common** 30:*10*
31:*3* 78:*3*
**commonly**
30:*13, 15*
**communications**
17:*11*
**compensate**
25:*14*
**complaining**
20:*18* 21:*1*
23:*1* 27:*25*
28:*5* 31:*25*
84:*20*
**complaint** 56:*12*
**complaints**
19:*18* 21:*7, 12,
16, 22* 22:*5*
23:*4* 55:*4, 10*
**complete** 70:*8*
**Completeness**
20:*8, 13*
**complications**
35:*20*
**component** 14:*2*
15:*16* 31:*12, 13,
16* 39:*17* 58:*1,
4* 66:*2* 81:*8*
**components**
62:*14*
**compressed**
42:*22* 50:*4, 13*

**compression**
24:*18* 28:*25*
29:*1, 2* 33:*1, 14,
18* 34:*5, 8, 17*
41:*25* 43:*8, 18*
49:*2, 12, 25*
50:*6, 16, 19*
52:*12* 53:*11*
79:*15* 88:*15*
**compressive**
43:*12* 72:*17*
78:*22*
**compromise**
70:*9*
**compromised**
77:*3*
**concept** 85:*20*
**concern** 59:*19*
66:*5*
**concluded** 92:*1*
**conclusion** 74:*8*
**condition** 21:*21*
22:*2* 37:*19*
43:*21* 44:*8*
62:*5* 64:*20*
65:*23*
**conditions** 70:*14*
**conducted** 10:*3*
**conduction**
47:*17, 23* 67:*6,
7* 68:*1, 3, 19*
69:*2, 5, 19* 77:*8*
83:*2* 87:*14*
88:*11*
**confident** 67:*11*
74:*20*
**connection**
17:*13*
**consider** 15:*23*
33:*6* 46:*6*

considered
67:*24*
consist 16:*25*
consistent 42:*4*
55:*2, 13* 75:*23*
context 53:*4, 7*
58:*20* 68:*4, 21,*
*22* 74:*17* 88:*12*
continue 64:*3*
65:*12*
continuous 14:*6,*
*16*
contributing
48:*1*
convert 62:*19*
copy 17:*21*
Corbett 2:*15*
90:*25* 93:*2, 16*
cord 53:*22*
82:*25*
Corporation 2:*7*
5:*13*
correct 11:*16*
14:*8* 15:*6*
17:*15* 31:*7, 11,*
*19* 32:*16* 37:*8,*
*19* 40:*6* 41:*1, 2,*
*7* 45:*12* 47:*6*
54:*17, 18* 61:*8,*
*9* 62:*1* 68:*12*
72:*9* 73:*22*
74:*1, 9, 10*
75:*24* 76:*4, 16,*
*24* 77:*6, 9, 15,*
*16* 80:*18* 81:*13,*
*24, 25* 83:*6, 7, 9,*
*12, 19* 87:*7, 11,*
*12* 89:*22* 90:*1,*
*5, 6* 93:*9*
correlate 38:*16*
51:*7*

correlating
38:*20*
correlation 78:*7*
corroborate
74:*24*
Counsel 5:*7*
9:*19* 18:*2* 94:*7,*
*10*
couple 30:*1*
53:*21*
course 53:*25*
COURT 2:*1*
3:*5* 5:*8* 7:*8*
covered 60:*7*
Crush 4:*12, 13*
28:*20, 24* 29:*13,*
*15, 18, 19, 23*
30:*11, 13, 16, 19,*
*21* 31:*3* 33:*6, 8*
34:*25* 52:*9*
53:*2, 5, 8, 10*
55:*3, 15, 19*
80:*4, 8, 17*
crux 82:*18*
CT 52:*20*
cubital 26:*25*
28:*4, 12, 17*
29:*3, 24* 30:*12,*
*18, 20* 31:*3*
33:*15, 19, 23, 25*
42:*17, 22* 43:*8,*
*13, 15, 18, 23*
47:*11, 13* 48:*1,*
*9* 49:*12* 50:*1*
53:*12, 18* 55:*21*
65:*20, 24* 70:*21*
75:*8, 12, 18, 21,*
*23* 76:*4, 7, 8, 21*
77:*1, 6, 13, 18*
78:*11, 18, 23*
80:*10* 81:*14*

83:*15* 84:*1*
87:*6, 14, 21*
89:*6, 12, 18, 25*
cuff 18:*13, 24,*
*25* 19:*7, 13*
21:*25* 47:*9*
51:*11, 15, 21*
52:*1, 4* 54:*24,*
*25* 55:*4, 9* 56:*3,*
*4* 57:*6, 18, 19,*
*20, 23* 60:*5, 17*
64:*4, 23* 65:*8*
70:*7, 14, 20*
cuffed 65:*4*
current 51:*11,*
*22* 54:*25* 55:*4,*
*10* 64:*19* 66:*19*
69:*25*
curves 31:*16*
CUTS 89:*11*
CV 4:*10, 11*
10:*9* 12:*10, 11*

< D >
damage 33:*11*
35:*13* 65:*24*
66:*5* 87:*10*
damaged 48:*16,*
*22* 50:*9* 82:*18,*
*20*
damaging 72:*18*
Darrell 18:*21*
19:*3*
data 53:*14, 15*
62:*15* 74:*3, 20,*
*23* 75:*17*
Date 2:*12* 5:*4*
16:*5* 51:*3* 75:*25*
dated 17:*22*
54:*21* 58:*17*

day 14:*24, 25*
62:*6* 93:*13*
days 14:*1, 11,*
*12, 16* 16:*18, 21*
77:*5* 91:*11*
deals 16:*16*
Dean 4:*20*
66:*24* 67:*1, 13*
68:*7* 73:*24*
Deandre 3:*21*
5:*6* 91:*16*
December 41:*15*
58:*18*
decision 74:*19*
decision-making
74:*25*
decompressed
43:*9* 49:*13* 50:*2*
decreases 46:*6*
dedicated 16:*18*
deeper 69:*11*
Defendant 2:*8*
3:*10*
deficit 65:*13*
definitely 64:*24*
definition 34:*16*
64:*21* 88:*16*
degree 46:*14*
47:*1* 56:*5*
70:*17* 71:*22*
72:*2, 4* 76:*9*
80:*3* 84:*8*
degrees 19:*4*
39:*24* 45:*20, 21*
46:*5, 15, 23, 24,*
*25* 47:*1*
DELAROSA
2:*10* 4:*10, 11,*
*16* 5:*6, 16* 6:*10,*
*12, 19* 9:*9*
10:*16* 11:*11*

37:*2*  44:*20*
58:*21*  71:*15*
87:*5*
**demonstrate**
32:*18*
**demonstrates**
73:*20*  79:*8*
**demonstratives**
11:*1*
**Denver**  3:*6, 15*
**depending**  56:*4*
**depends**  53:*4*
**depiction**  37:*2*
**deposed**  5:*23*
6:*1, 19, 22*  7:*2*
**DEPOSITION**
2:*10*  5:*5, 20*
8:*15, 16, 18*
9:*10, 20, 25*
10:*2, 6*  16:*3*
93:*6, 8*
**describe**  13:*8*
22:*24*  24:*19*
25:*10, 22*  26:*9*
41:*5, 8*  46:*10*
67:*22*  68:*15*
**described**  28:*24*
41:*13*  53:*5*
57:*22*  80:*8*
82:*21*
**describes**  55:*2*
68:*13*
**describing**  55:*20*
**DESCRIPTION**
4:*9*  21:*20*
47:*19*  55:*12*
**descriptors**
55:*14*
**desensitization**
66:*10*
**desire**  13:*17*

**details**  39:*3*
42:*24*
**detect**  35:*24*
**detection**  36:*2*
**determine**  46:*9*
**develop**  51:*18*
76:*25*
**diagnose**  89:*25*
**diagnoses**  53:*14*
69:*25*  70:*11*
**diagnosis**  28:*13,*
*15*  33:*6*  51:*20*
52:*9*  89:*10*
**diagnostic**  52:*23*
73:*6, 10*  74:*14,*
*23*  75:*4*
**diagram**  38:*2*
**difference**  59:*17*
67:*18*
**different**  12:*12*
37:*7*  38:*9*
46:*17*  52:*21*
53:*19, 21*  66:*16*
68:*8*  77:*9*
**differently**  72:*20*
**difficult**  67:*4*
69:*18*
**difficulty**  8:*6*
**digital**  94:*3*
**diminished**
26:*19*
**direct**  19:*24*
44:*11*
**directed**  36:*15*
**direction**  32:*14*
81:*20*
**directions**  18:*14*
**directly**  72:*14*
**disability**  51:*12*

**disagree**  30:*15*
59:*5*  60:*11, 14*
62:*1*
**disaster**  51:*13*
66:*12*
**discectomies**
53:*20*
**discover**  36:*12*
**discrimination**
26:*9, 11*
**discuss**  9:*24*
10:*9*  11:*23*
29:*15, 16*
**discussed**  9:*25*
14:*22*  85:*12*
**discussion**  67:*1*
**disinterested**
93:*5*
**dislocating**
56:*14*
**dislocation**
56:*12*
**disputing**  76:*3*
**dissected**  49:*24*
**distal**  31:*17*
38:*8*  49:*24*
52:*13*
**distance**  26:*13*
**distinction**  77:*11*
**distinguishing**
68:*7*
**distribution**
24:*10*  55:*1*  66:*8*
**DISTRICT**  2:*1,*
*2*
**divided**  49:*23*
**divisions**  38:*9*
**Doctor**  70:*23*
89:*4*
**document**  10:*12*
11:*10*

**documented**
20:*11*  27:*12, 17*
36:*6*  63:*4*  88:*13*
**documenting**
21:*6*
**documents**  8:*17,*
*19, 24*
**doing**  16:*9*
32:*8*  36:*8*  50:*6*
66:*16*  67:*7*
**Donald**  2:*4*
5:*11*
**donors**  54:*5*
**Dormer**  3:*4*
**Double**  4:*12, 13*
28:*20, 24*  29:*13,*
*15, 17, 19, 23*
30:*10, 13, 16, 19,*
*21*  31:*3*  33:*6*
52:*9*  53:*1, 4, 8,*
*10*  55:*3, 15, 19*
80:*4, 8, 17*
**Dr**  4:*17, 18, 19*
5:*6, 16*  6:*10, 12,*
*19*  9:*9*  10:*16*
11:*11*  13:*7*
14:*5, 10*  22:*13*
24:*4*  26:*21*
37:*2*  42:*19, 21*
43:*7*  44:*20*
49:*4, 22*  50:*3,*
*18*  51:*9, 10*
54:*16, 21, 23*
55:*7*  56:*17, 19*
58:*7, 17, 19, 21*
60:*8*  61:*4, 14,*
*25*  62:*1, 24*
65:*4, 16, 18*
66:*11, 24*  67:*1,*
*13*  68:*7*  71:*15*
73:*24*  85:*2, 3,*

*20* 87:*5, 13*
88:*14*
**drastically** 66:*18*
**drugs** 8:*3*
**due** 34:*5, 8*
55:*5* 65:*13*
80:*11* 81:*3* 88:*1*
**duly** 6:*13* 93:*3,*
*7*
**dynamic** 88:*5, 9*
**dysfunction**
66:*13*
**dysfunctional**
47:*4* 48:*2* 51:*5*
84:*4*

**< E >**
**Earlier** 49:*4*
65:*3*
**ecchymosis**
47:*20*
**edema** 83:*10*
**edge** 39:*13*
**Edition** 62:*8*
**education** 13:*6*
30:*2*
**effect** 82:*2, 5*
**effective** 16:*18*
**Effectively** 9:*18*
**efforts** 27:*5*
**effusion** 83:*8*
**either** 35:*17*
41:*6* 47:*25*
79:*17* 80:*14, 16*
91:*15*
**ekj@denvertrial.**
**com** 3:*7*
**elaborate** 73:*15*
**Elbow** 12:*25*
20:*4* 24:*6, 11,*
*14, 20, 22* 25:*2*

27:*24* 29:*4*
33:*15* 44:*11*
46:*14, 23, 24*
50:*17* 52:*14*
53:*19* 55:*6, 12*
59:*10* 70:*9*
79:*22* 80:*13*
83:*19, 22* 88:*4*
**electric** 21:*6*
55:*22*
**electrical** 54:*7*
67:*3, 17*
**electrodiagnostic**
50:*14* 75:*17*
77:*7*
**elevation** 45:*20,*
*21*
**Elizabeth** 94:*2,*
*15*
**Ellen** 58:*17*
**email** 10:*24*
90:*19, 25*
**emailing** 90:*17*
**EMG** 47:*22*
67:*10* 73:*7, 16*
76:*19* 87:*9, 14,*
*21, 23* 89:*17, 24*
**EMGs** 77:*2*
**EMMA** 3:*3*
5:*10*
**employed** 94:*8,*
*10*
**employee** 94:*10*
**enchantment**
75:*13*
**encompass**
12:*15*
**energy** 32:*16*
**entail** 52:*17*
**enters** 31:*6*

**entire** 54:*9*
60:*19*
**entirety** 38:*7*
**entrapment**
33:*22, 25* 34:*16,*
*18* 75:*11*
**entrapped** 34:*5,*
*8*
**epicondyle**
48:*18* 79:*14*
**ESQUIRE** 3:*3,*
*11, 12*
**essentially** 83:*14*
**evaluate** 17:*6*
29:*6, 12*
**evaluation**
45:*19* 67:*3*
**event** 56:*12*
**eventually** 74:*24*
**everybody**
10:*11* 36:*22*
**everything's**
10:*25*
**evidence** 67:*14*
**exacerbate**
70:*20*
**exacerbated**
70:*15* 80:*16*
**exacerbation**
58:*23* 60:*10*
81:*4* 85:*13*
**exact** 14:*13*
37:*24* 42:*24*
**exam** 26:*21*
28:*14* 45:*19*
48:*3* 61:*18*
74:*3, 18, 23*
75:*5, 23* 83:*3*

**EXAMINATION**
4:*2* 5:*14* 6:*17*

71:*13, 19* 72:*1*
74:*12* 87:*3* 89:*2*
**examined** 6:*15*
**example** 79:*8*
**excuse** 46:*23*
**Exhibit** 4:*20*
10:*24* 11:*4, 7*
17:*18, 19* 30:*3,*
*6, 24, 25* 36:*22,*
*23* 43:*2, 3* 45:*3*
54:*16, 19* 58:*15*
61:*7, 10* 66:*21,*
*22* 84:*25* 89:*1*
91:*1*
**EXHIBITS** 4:*8*
10:*18, 21, 25*
88:*21* 90:*17*
**expand** 64:*16*
**expect** 38:*15*
45:*25* 56:*2*
69:*4* 72:*21*
82:*8, 19*
**expedited** 91:*12*
**experience**
11:*10, 13* 44:*7*
**experiences**
67:*17*
**experiencing**
27:*23* 28:*3, 8, 10*
**Expert** 4:*19*
6:*3, 24* 15:*2, 6,*
*21, 24* 16:*9*
**expertise** 15:*9*
**explain** 23:*10*
28:*23* 40:*2*
45:*23* 46:*16*
51:*13* 56:*1*
76:*13* 78:*2*
**extended** 32:*10*
33:*21* 59:*10*

82:*11*

**extension** 79:*11*

**extensors** 25:*25*

**extent** 11:*24*
34:*13* 52:*13*

**external** 18:*14*
19:*5, 15* 45:*20,
21* 46:*2*

**extra** 54:*5*

**extremities**
19:*19* 20:*19*
21:*1*

**extremity** 17:*1*
20:*11* 21:*14, 18*
51:*12* 62:*20*
64:*12, 14* 76:*19*

**eyeball** 62:*22*

< F >

**face** 66:*9*

**facilitate** 16:*23*

**fact** 69:*15*
73:*19* 77:*4*
82:*17* 87:*5*
88:*14*

**factor** 80:*13*

**fail** 53:*1*

**fair** 60:*21*
64:*24* 72:*20*
75:*5* 81:*10*
86:*21*

**fairly** 35:*1*

**fall** 79:*19*

**falling** 32:*20*
42:*12* 82:*1, 4*

**false** 88:*1, 20*
89:*14, 17, 20*

**falsely** 87:*15*

**familiar** 11:*10*
17:*22* 28:*20*

**far** 14:*13* 46:*25*

**Farbes** 3:*13*

**fascia** 49:*23*

**fast** 85:*7, 8*

**favored** 14:*15*

**February** 66:*25*

**feel** 40:*15*
51:*20* 60:*8, 24*
76:*8*

**fell** 81:*2, 4*

**fellowship** 13:*10,
23*

**felt** 47:*20* 51:*10*

**females** 68:*24*

**Fifth** 62:*8*

**finally** 26:*8*

**financially** 94:*11*

**find** 53:*14*
67:*14*

**finding** 26:*17*
36:*17* 47:*17*
50:*22*

**findings** 26:*20,
21* 27:*10, 12, 17*
28:*14* 36:*15, 16*
45:*23, 25* 49:*7*
61:*18* 75:*3, 19,
23*

**fine** 7:*16*

**finger** 22:*14*
23:*18, 19, 23*
24:*1, 12, 25*
25:*25* 26:*1, 12*
31:*10, 17, 21*
38:*20* 51:*6*

**fingers** 26:*2*
47:*6*

**fingertips** 12:*17*

**finish** 7:*10, 11,
17*

**first** 6:*13* 13:*6*
36:*15* 67:*2*
72:*4, 8*

**fit** 84:*16*

**five** 18:*13, 17,
23, 24* 19:*5* 71:*7*

**five-minute**
44:*13* 71:*2*

**fixed** 65:*16*

**flat** 25:*17*

**flex** 24:*20*

**flexed** 46:*14*
79:*22*

**flexion** 19:*4, 15*
24:*18, 21* 25:*15*
46:*2* 59:*10, 13*
79:*10*

**flexor** 25:*14*

**flip** 89:*20*

**flipping** 79:*13,
16* 88:*3*

**follow** 87:*1*
88:*20*

**follows** 6:*15*

**force** 36:*15*
40:*12, 14* 69:*7,
11* 72:*17*

**forceful** 57:*18*

**forcefully** 32:*22*

**forearm** 34:*1*
46:*25*

**foregoing** 93:*6*
94:*4*

**Form** 15:*22*
19:*8, 21* 20:*6,
13* 21:*19* 23:*8,
24* 27:*14, 19*
30:*19* 34:*8, 9,
22* 35:*21* 37:*22*
38:*5* 41:*12*
44:*9, 10* 45:*16*

52:*10* 53:*3, 9*
54:*1* 56:*10*
57:*1, 24* 58:*11*
60:*13* 61:*16*
63:*13, 20* 64:*5*
68:*20* 69:*20*
70:*1, 16* 73:*7,
11* 85:*22* 87:*17*

**forth** 79:*13, 16*
85:*21* 88:*3*

**forthcoming**
45:*15*

**forward** 19:*4,
15* 46:*2* 71:*25*

**found** 26:*21*
38:*6* 75:*19, 20*
87:*9*

**Foundation**
52:*10* 53:*2, 3, 9*
54:*1* 64:*5*
69:*20* 70:*1*
85:*22* 87:*17*

**four** 43:*6*

**fourth** 49:*21*

**fracture** 39:*25*
40:*1, 5*

**frequencies**
78:*24*

**frequency** 80:*1*

**Froment** 25:*9,
11, 18*

**front** 8:*19, 20*
9:*14* 35:*16*
62:*9, 16*

**frozen** 51:*18*

**full** 18:*17, 24*
19:*6* 45:*25*
63:*19*

**function** 54:*11*
64:*23* 65:*1*

**further** 13:*15*
48:*22* 50:*9*
52:*22, 23* 66:*5,
17* 70:*23* 94:*9*
**fusion** 80:*22*
81:*3, 9* 83:*10*
**fusions** 37:*24*
53:*20*

**< G >**
**GARNETT**
3:*12, 13* 5:*12*
9:*2, 4*
**general** 52:*8*
**generating** 53:*21*
**getting** 16:*23*
88:*6*
**give** 62:*13*
63:*10, 14* 69:*24*
79:*8*
**given** 5:*19* 12:*4,
11* 15:*21* 51:*22*
63:*23* 64:*8*
65:*10* 67:*17*
93:*10*
**giving** 27:*4*
**glaringly** 62:*11*
**glenoid** 56:*8*
**go** 10:*9* 17:*25*
18:*10* 22:*8*
24:*5* 30:*23*
31:*5* 35:*15*
37:*15* 46:*25*
54:*22* 58:*18*
61:*12* 66:*25*
85:*9* 89:*5*
**God** 51:*3*
**goes** 9:*25*
31:*10, 17* 60:*8*
67:*13*

**going** 7:*5, 22*
8:*10* 10:*8*
17:*17* 22:*8*
30:*1, 3* 32:*20*
36:*21* 43:*5*
44:*12* 50:*22*
51:*4, 17* 54:*15,
22* 58:*18* 60:*22*
61:*20* 64:*20*
66:*20* 70:*19*
71:*1* 79:*7, 17*
81:*20* 85:*7, 11*
89:*4, 6*
**gonna** 18:*10*
**Good** 5:*16, 18,
19* 18:*22* 26:*5*
46:*4* 51:*21*
55:*11* 67:*6*
**grab** 32:*21*
81:*22*
**grabbing** 42:*13*
82:*1, 4*
**graduately** 13:*7*
**gravity** 32:*23*
**Great** 9:*7* 71:*4*
90:*9* 91:*4*
**Greater** 46:*2*
69:*11* 82:*9*
**grip** 47:*5* 51:*5*
84:*4*
**groove** 49:*25*
**grossly** 47:*4*
51:*4* 84:*3*
**ground** 7:*5*
**guess** 31:*2*
32:*18* 33:*25*
38:*12* 43:*2*
53:*7* 67:*22*
**guide** 62:*16*
**guided** 52:*21*

**guidelines** 62:*23*
**guides** 74:*18*
**guitar** 79:*22*
80:*2*
**gunshot** 34:*23*
35:*1*
**gust** 38:*24*
**gutter** 82:*5*
**Guyon's** 31:*4, 7,
8, 9*

**< H >**
**Haan** 18:*21*
19:*3*
**hair** 65:*4*
**half** 14:*1* 76:*18*
**hamate** 31:*15*
**hand** 6:*10*
15:*10, 14* 20:*4*
22:*14* 23:*1, 2, 6,
18, 20, 22* 25:*13,
24* 26:*7* 31:*5,
10, 19, 20, 22, 25*
42:*12* 46:*20*
47:*5* 48:*2* 51:*5,
22* 54:*8* 84:*4*
**handed** 79:*23*
**handling** 90:*12*
**hands** 81:*23*
**happen** 48:*11*
**happened** 48:*8*
59:*8* 69:*9* 84:*19*
**happens** 10:*1*
32:*16*
**hard** 18:*3*
48:*25* 63:*7, 10,
14* 68:*19*
**hardware** 52:*19*
**Harper** 2:*4* 5:*3,
11* 8:*12* 17:*5, 6,
8, 11* 18:*13, 21*

19:*18* 20:*18, 25*
26:*25* 27:*4, 23*
28:*3* 37:*18*
38:*25* 39:*11, 18*
42:*3* 45:*14*
54:*23* 62:*25*
64:*3, 10* 65:*8,
22* 72:*5* 73:*25*
74:*5, 8* 75:*12*
80:*4* 82:*12*
83:*5* 84:*5*
86:*18, 22*
**Harper's** 20:*3,
10* 21:*12, 16*
25:*2* 31:*24*
40:*19* 41:*17*
51:*25* 64:*8*
69:*24* 73:*20*
74:*1*
**Harpring** 3:*4*
**head** 7:*21*
32:*12, 22* 40:*2*
41:*3* 42:*3*
**heading** 89:*8*
**hear** 29:*7*
**heavily** 14:*15*
**held** 59:*10, 13*
**help** 12:*20*
16:*23* 46:*9*
54:*6* 76:*13*
**helpful** 49:*16*
**hematoma**
47:*19* 49:*1*
**hereto** 94:*11*
**high** 32:*16*
87:*25*
**higher** 72:*1*
**highly** 80:*15*
**historically**
28:*24* 33:*2, 17*
34:*3* 38:*14, 15*

43:*14*  59:*20*
68:*24*  79:*10*
87:*25*
**history**  39:*1*
51:*25*  55:*16*
63:*19, 22, 25*
75:*2, 3, 4*
**hit**  39:*10, 15, 18*
40:*10, 16, 17, 20*
41:*9*  81:*7*
**hitting**  57:*9*
59:*9*  70:*19*
**hold**  25:*16*
48:*24*
**holding**  79:*2, 4*
**honestly**  43:*11*
**hook**  31:*15*
**Hopefully**  89:*4*
**horrible**  84:*20*
**hour**  44:*13*
**human**  57:*16*
**hyper**  32:*11*
**hyperflexion**
24:*21*
**hyper-reduction**
81:*18*
**hypersensitivity**
66:*7, 9*
**hypothetical**
42:*7*  70:*2*
**hypothetically**
42:*2*

**< I >**
**idea**  51:*21*
55:*11*
**identification**
11:*7*  17:*19*
30:*6, 25*  36:*23*
43:*3*  45:*3*
54:*19*  58:*15*

61:*10*  66:*22*
89:*1*
**identified**  43:*8*
49:*22*  50:*1, 19*
**identify**  36:*8*
49:*11*  82:*14*
**ignore**  69:*15*
84:*21*
**image**  30:*8, 10*
31:*2*
**imaging**  36:*19,
20*  52:*18*  73:*4,
6, 10, 20*  74:*7,
14*  75:*3*  77:*6, 9*
83:*4*
**immediately**
84:*21*
**immobilization**
55:*6*
**immobilize**
55:*11*
**impact**  39:*23*
40:*23*  41:*4*
57:*12*  80:*14, 15*
81:*6, 7*
**impacted**  40:*1,
13*
**impacting**  31:*4*
42:*14*
**impaired**  64:*25*
**impairment**
46:*9, 11, 12, 21*
61:*4, 14, 19, 21*
64:*10, 13, 17*
65:*22*  85:*2, 5, 6*
86:*11, 12, 13, 19,
22*
**impingement**
58:*24*  59:*6*
60:*4*  83:*15*
85:*14*

**important**  7:*10*
72:*11, 12*
**impossible**  36:*9*
72:*16*
**improbable**
70:*18*
**Improper**  42:*7*
70:*1, 2*
**improve**  64:*23*
65:*15*
**inability**  56:*7*
**inaccurate**  62:*12*
**inappropriately**
61:*22*
**incident**  8:*10,
11*  17:*15*  20:*5*
21:*23*  22:*6*
27:*1*  56:*21, 25*
61:*1*  69:*23*
70:*11, 15*  76:*7,
11, 15*  77:*5, 14,
19, 25*  78:*9*
80:*5, 23*  81:*10,
16*  84:*6, 13*
86:*14, 16, 19, 23*
**include**  46:*11*
**included**  37:*25*
55:*15*
**including**  12:*20*
16:*9*  74:*3*
**inclusive**  11:*18*
**incomplete**
63:*24*
**increase**  66:*12,
13*
**increased**  24:*12*
26:*18*
**increases**  24:*23*
**increasing**  69:*7*

**indicate**  22:*16*
23:*14, 16*  24:*13*
25:*19*  26:*21*
**indicates**  27:*4*
**indicating**  30:*11*
**indicative**  44:*1*
**Indiscernible**
40:*9*
**individual's**
51:*15*
**infallible**  87:*22*
**infer**  39:*20*
**inference**  39:*22*
**inflammation**
67:*22, 23*
**inflection**  55:*6,
12*
**information**
19:*18*  20:*3, 10*
26:*24*  42:*1*
75:*16*
**Initial**  4:*11, 19*
17:*21*  22:*8*
38:*23*
**injections**  52:*21,
25*  63:*5, 6*
**injured**  35:*6*
**injuries**  11:*17*
12:*16, 17*  13:*12*
15:*3*  16:*17*
35:*25*  37:*19*
38:*12*  80:*12*
82:*23*
**injury**  13:*13*
15:*10, 11*  17:*1*
28:*11*  32:*4, 8,
25*  33:*3, 8, 12,
18*  34:*17, 25*
35:*1, 3, 14*  36:*3,
12, 13*  37:*11*
38:*16, 20*  39:*4,*

20 40:15 41:16, 22 42:5 47:25 48:5, 6 51:3, 7 53:8, 10, 25 54:4, 13 55:8, 24 58:22 59:8, 25 60:9 61:2 64:11 67:14, 19, 24 68:5, 7, 11, 12, 15 72:6, 9, 17, 22, 24 73:3, 7, 11 74:4 75:11, 18 76:23 77:1, 13 80:17 81:10, 14 82:7, 8, 11, 15, 19, 21 83:21

**inner** 38:9

**innervated** 25:13

**instability** 56:13

**instance** 22:25 29:2

**instrument** 79:19

**insult** 78:22

**intended** 62:23

**interactions** 17:10

**interest** 13:17

**interested** 94:11

**interesting** 74:11

**internal** 19:16 45:22 46:3, 13, 19 47:2

**intimate** 72:14

**intraoperatively** 48:23 88:16

**intraplexal** 12:21

**intrinsic** 26:6

**intrinsics** 25:23

**introduce** 5:7

**invalid** 27:5

**involve** 83:22

**involved** 35:9 58:2 71:19

**involves** 22:13 23:19

**involving** 15:9

**IP** 25:15

**irritate** 59:11 69:1, 6

**irritates** 48:14

**irritation** 67:17, 20, 21 68:2, 6, 8, 10, 13, 18 69:5, 14 73:14, 16, 19, 21, 24 74:6, 8 79:15

**irritations** 69:18

**isolated** 72:16

**isolation** 35:14 82:18

**issue** 24:14 25:19 29:10 43:12 44:2 55:3, 14 59:2, 4 65:21 74:21, 22 75:10 76:4 85:17

**issues** 12:5 15:8, 12, 13 21:25 44:4 51:22 84:23

**items** 10:1

**< J >**

**JAMERSON** 3:3 4:3 5:10, 15 6:7, 18 8:23

9:3, 7, 8 10:11, 14, 15, 20, 23 11:5, 8 16:1 17:17, 20 18:4, 7, 9 19:9, 23 20:2, 9, 16, 23 21:5, 11, 24 23:9 24:3 27:16, 21 29:7, 10, 11 30:1, 5, 7, 23 31:1 34:11 35:2, 23 36:20 37:1 38:1, 11 41:14 42:8, 16 43:1, 4 44:12, 16, 20, 24 45:4, 18 49:14, 15, 18, 19 51:1 52:15 53:6, 16 54:15, 20 56:15 57:3 58:3, 14, 16 60:15 61:6, 11, 23 63:9, 17 64:1, 7 65:19 66:20, 23 69:22 70:4, 22 71:4, 6 73:15 83:13 84:24 85:1, 5, 9, 12, 22 87:1, 4, 19 88:18, 21, 23 90:8, 16, 18, 22 91:7, 8, 14, 21

**Jamerson's** 71:19 74:12

**Jayme** 13:7, 19 14:2

**Job** 2:16

**Joel** 4:20 66:24

**joint** 25:15

**jolts** 67:17

**July** 54:22

**jump** 89:6

**June** 2:12 5:4 93:13

**< K >**

**keep** 7:25

**keeps** 56:14 79:16

**kind** 46:6

**knife** 34:24

**Knittle** 94:2, 15

**know** 7:4, 8, 16 12:22 15:5 16:15 22:9 32:23 34:25 35:7 36:2, 5, 6 37:18 39:3, 6, 8, 10, 13, 14, 16, 18 40:19, 22, 25 41:3, 10, 11 42:1 53:13 55:12, 17 59:12 60:3 62:3, 5, 8, 18 63:3, 21, 22, 23 65:12, 14 68:14, 23 70:23 77:21 79:21 80:1 81:6, 14

**knowledge** 59:22 94:6

**known** 55:16

**< L >**

**L-1** 46:4

**L-3** 46:7

**labral** 56:9, 13

**lack** 23:21, 25 39:20 74:19

**ladder** 82:2

large 38:*24*
larger 47:*19*
Larimer 3:*14*
lasted 14:*9*
lateral 40:*2*
lawnmower 58:*6*
lay 7:*5*
lead 35:*20*
leading 13:*19*
19:*19*
lectures 12:*4, 9,*
*12, 15*
left 20:*4, 11*
21:*13, 17* 22:*1,*
*14* 23:*1, 2, 18,*
*20, 22* 31:*18, 25*
38:*25* 43:*8*
45:*9, 10, 15*
47:*4* 49:*12*
50:*1* 51:*5, 12*
54:*24* 56:*20, 24*
57:*11, 12* 58:*24*
59:*5* 60:*9, 10*
64:*12, 13* 76:*19*
79:*23* 84:*4*
85:*13*
length 82:*8*
Leslie 2:*15*
93:*2, 16*
Leslie.corbett24
@gmail.com
90:*20* 91:*3*
level 37:*11, 21,*
*23* 43:*10* 46:*13*
49:*13* 50:*2*
53:*11* 62:*19*
69:*8*
levels 35:*8*
37:*6, 24* 38:*3,*
*16, 21*

lifting 56:*6*
likelihood 76:*9*
limitations 58:*8*
59:*1* 85:*15*
limited 16:*21*
35:*1* 45:*24*
limits 51:*16*
line 89:*16*
lines 7:*20* 18:*22*
link 8:*24* 75:*5*
list 15:*5, 19*
16:*5* 69:*24*
listed 12:*10, 11*
15:*19* 62:*14*
literature 78:*21*
79:*8*
little 7:*5* 18:*3*
48:*25*
LLC 3:*4, 13*
localize 52:*22*
localized 34:*17*
located 80:*9*
Location 2:*14*
24:*8* 26:*19*
40:*16* 42:*12*
locations 40:*18*
80:*14, 18, 21*
long 14:*9*
longer 34:*15*
82:*11, 14*
longus 25:*14*
look 22:*11*
32:*19* 49:*5* 61:*3*
looked 49:*4, 7*
looking 33:*5*
looks 17:*23*
19:*2* 31:*9* 62:*22*
lot 71:*18*
lower 32:*3*
34:*20* 35:*5, 11,*
*13, 18* 37:*11, 13,*

*16* 54:*9* 58:*22*
68:*10, 11* 69:*1,*
*6, 14* 72:*13, 16,*
*17, 18* 82:*17, 22*
Luker 4:*17*
51:*9, 10* 54:*21,*
*23* 55:*7* 62:*24*
65:*18*
Luker's 54:*16*
65:*4, 16* 66:*11*
lung 68:*25*

< M >
M.D 2:*10* 6:*12*
ma'am 6:*21*
7:*6, 14, 19* 8:*2,*
*5, 8, 14* 9:*11, 21*
10:*4, 7, 10, 17*
11:*12, 20* 12:*3,*
*6* 13:*4, 10*
14:*18* 15:*4, 7*
16:*7, 14* 17:*4,*
*16, 24* 18:*16, 19*
19:*1, 11* 20:*1, 7,*
*15, 22* 21:*4, 10,*
*20* 22:*3, 7*
24:*15, 17, 20*
25:*8, 11, 20, 23*
26:*5, 23* 27:*2, 7,*
*11, 15, 20* 28:*19,*
*22* 29:*21* 30:*4,*
*9, 22* 31:*8, 23*
32:*2, 6* 33:*9, 13*
34:*10* 35:*22*
36:*1, 4, 24* 37:*9,*
*20* 38:*6, 18, 22*
39:*2, 7, 9, 16, 19*
40:*7, 24* 41:*20,*
*24* 42:*6* 43:*19,*
*22* 44:*3* 45:*8,*
*13, 17* 47:*7, 10,*

*14* 48:*7* 49:*6,*
*10* 50:*7, 11, 21*
51:*8* 52:*7*
55:*25* 56:*4, 18,*
*22* 57:*2* 58:*12*
61:*5* 68:*4, 9*
70:*12* 87:*8*
magnification
27:*18*
main 19:*16*
majority 30:*16*
making 74:*19*
83:*25*
malingering
27:*13*
maneuver 24:*7*
manner 57:*18*
March 13:*2, 3*
17:*22* 51:*2*
mark 11:*2*
17:*17* 58:*14*
marked 11:*7*
17:*19* 30:*6, 25*
36:*23* 43:*3*
45:*3* 54:*19*
58:*15* 61:*10*
66:*22* 89:*1*
90:*24*
marking 10:*23*
math 16:*19*
matter 5:*3*
MATTHEW
2:*10* 5:*6* 6:*12*
Maximon 3:*13*
mean 12:*8*
23:*22* 29:*14*
40:*4* 41:*5*
43:*10* 51:*13*
76:*21*
meaning 26:*18*

**means** 25:*5*
26:*3, 5, 10*
32:*10* 43:*11*
89:*21*
**measure** 46:*25*
**measurement**
46:*8, 10* 62:*15*
**measurements**
19:*13* 46:*12*
61:*15* 62:*4*
**mechanism** 32:*8,*
*24, 25* 33:*12*
39:*4* 41:*5, 22,*
*25* 57:*5, 7, 9, 21*
59:*8* 69:*15*
72:*22* 79:*4, 24*
82:*16* 83:*21*
84:*16, 17, 23*
**mechanisms**
32:*17* 34:*20*
78:*10*
**medial** 24:*11,*
*22* 44:*11* 48:*18*
50:*17* 53:*19*
79:*13* 88:*4*
**median** 11:*22,*
*23* 44:*11*
**medical** 9:*14*
39:*1* 51:*25*
63:*11* 71:*22*
72:*2, 5* 80:*3*
84:*8* 90:*4*
**medications** 8:*3*
**meet** 9:*19, 22*
**meeting** 9:*24*
12:*13, 23*
**meets** 40:*2*
**memory** 8:*4*
**mention** 59:*24*
60:*20*

**mentioned**
12:*22* 28:*16*
35:*7* 55:*19* 74:*2*
**middle** 35:*10,*
*14, 18* 54:*11*
69:*16* 72:*15, 18,*
*21, 24*
**mild** 67:*24*
68:*13, 17, 18*
**millimeters**
26:*14*
**mind** 7:*25*
**minds** 13:*20*
**Mine** 18:*4*
**minutes** 71:*2, 3,*
*7*
**mismatch** 34:*2*
**missed** 36:*7*
**Misstates** 37:*22*
**mm-hmm** 7:*23*
**mm-hmms** 7:*21*
**moment** 25:*15*
61:*19*
**momentum**
42:*14*
**month** 13:*24*
14:*1, 7, 24, 25*
16:*19* 76:*18*
**monthly** 13:*14,*
*22*
**months** 5:*25*
7:*3* 19:*19*
**motion** 18:*22*
33:*20* 45:*24*
46:*1, 5, 11, 18*
56:*6, 7* 57:*11*
58:*8* 59:*1*
60:*18* 62:*4, 6*
65:*13, 15* 78:*6,*
*14* 79:*20, 25*

85:*16*
**motions** 79:*7, 9*
**motor** 31:*14, 15*
78:*25* 79:*1*
**motorbike** 79:*5*
**motorcycle**
32:*17* 79:*7*
**Mountain** 5:*5*
45:*6* 47:*3*
**mouth** 85:*7*
**move** 51:*16*
56:*7* 75:*10*
**moved** 40:*22*
41:*3* 42:*3*
**moves** 78:*5*
**moving** 32:*14*
51:*17* 71:*25*
88:*5*
**MRI** 35:*24*
36:*2, 11* 52:*19*
73:*11, 16* 82:*24*
83:*2, 4*
**multiple** 40:*18*
**muscles** 26:*6*
67:*10*
**musculature**
25:*13* 34:*2*
**musculotaneous**
38:*3*
**myelogram**
52:*20*

**< N >**
**name** 5:*6*
**named** 93:*6*
**NCS** 87:*21*
**necessarily**
22:*19* 23:*13*
41:*10* 60:*23*
66:*16* 69:*2*
**necessary** 23:*11*

**neck** 15:*17*
32:*14* 34:*23*
37:*19* 41:*9*
42:*15* 52:*11, 16*
55:*16* 57:*10*
59:*9* 70:*19*
78:*7* 80:*12*
**need** 7:*15*
16:*23* 30:*24*
67:*10, 11* 70:*16*
74:*22*
**needle** 67:*12*
**needs** 46:*21*
74:*18*
**negative** 25:*21*
26:*3* 36:*11*
74:*13, 15* 87:*15,*
*25* 88:*4, 10*
89:*14, 21*
**negatives** 88:*1*
**neither** 94:*7*
**Nerve** 4:*13*
11:*17, 19, 22, 23,*
*25* 12:*1, 16, 18*
13:*8, 12, 13*
14:*21* 15:*12, 15*
24:*8, 9, 16, 22*
25:*13, 19, 23*
26:*6, 22* 28:*9,*
*25* 29:*1, 2*
30:*11, 17* 31:*5,*
*6, 10, 18* 32:*4*
33:*15, 19, 23*
34:*4, 7, 13, 14,*
*16, 19* 37:*10, 13,*
*15, 17* 38:*13, 17*
42:*22* 43:*9, 12*
44:*2, 4* 47:*17,*
*22, 24, 25* 48:*4,*
*6, 15, 22, 23*
49:*2, 3, 8, 13, 22,*

*24* 50:*2, 4, 7, 9, 12, 17, 20* 51:*7*
53:*12* 55:*1, 2, 5, 13, 18, 21, 24*
58:*8, 9, 22* 59:*1, 2, 4, 11, 19*
65:*21* 66:*9, 14, 19* 67:*6, 7, 25*
68:*3, 19* 69:*2, 5, 18* 70:*8* 75:*10, 13* 76:*22* 77:*3, 8, 18* 79:*12, 16*
80:*9, 17* 82:*8*
85:*16, 17* 87:*10, 14* 88:*1, 2, 10, 11, 14* 89:*17, 24, 25*

**nerves** 11:*23*
37:*7* 38:*8*
41:*18* 48:*13, 14*
54:*7*

**neurodiagnostics**
75:*20*

**neurologist** 67:*5*

**neurolysis** 66:*16*

**neuropathy**
78:*23*

**Neurophysiologic al** 89:*7*

**never** 36:*14*
59:*14, 22* 74:*12*

**nine-millimeter**
26:*9, 16*

**nods** 7:*21*

**noise** 78:*24*
79:*1*

**non** 55:*17*
69:*21*

**non-operative**
63:*4*

**normal** 26:*15*
46:*3* 57:*16*
69:*16* 76:*19*
77:*6*

**normally** 47:*8*

**nos** 7:*21*

**Notary** 2:*15*
93:*1, 2, 17*

**note** 28:*15*
65:*17* 74:*2*

**noted** 32:*3*
40:*4* 45:*19*

**notes** 9:*16* 18:*1*
20:*17, 24* 43:*6*
47:*3* 51:*10*
63:*5* 67:*1*

**noticed** 8:*15*

**noxious** 48:*13*
49:*3*

**number** 36:*7*
46:*22* 61:*13*
66:*13, 14* 82:*16*
84:*20* 87:*24*

**numbers** 61:*17*
62:*6*

**numbness** 20:*19*
21:*13, 17, 22*
22:*5* 23:*1, 19, 23* 24:*1, 11, 24*
25:*3, 6* 38:*19*
55:*23*

**< O >**

**oaths** 93:*3*

**object** 56:*6*
57:*8* 85:*22*

**objection** 42:*10*

**objections** 20:*21*
21:*3, 9*

**objective** 27:*10*
53:*14, 15* 73:*4,*

*6, 10, 11* 74:*3, 7, 13, 16, 17, 20, 23*
75:*3, 16* 83:*4*

**observations**
50:*19*

**observe** 42:*22*

**observed** 47:*4*
49:*8*

**occur** 33:*15*

**occurred** 76:*15*

**October** 18:*20, 25* 76:*18*

**offer** 66:*18*

**offering** 60:*3*

**office** 14:*14*
93:*12*

**Oh** 6:*7* 12:*1*
17:*18* 49:*15*
51:*2*

**Okay** 5:*16* 6:*9, 16, 19* 7:*18* 8:*1, 9, 15, 22* 9:*7, 16, 19* 10:*5, 8, 11, 14* 11:*6, 9, 13, 18* 12:*4* 13:*1* 14:*5, 9, 19* 15:*2, 18* 16:*5, 8* 17:*2, 13, 17, 21, 25* 18:*4, 7, 10, 20* 19:*2, 12, 17* 20:*1* 21:*25* 22:*4, 8, 9* 23:*4* 24:*18* 25:*1, 5, 9, 18, 21* 26:*8, 16, 20, 24* 27:*3* 28:*12, 16, 20* 29:*12, 19* 30:*5, 8, 10, 20, 23* 31:*18, 24* 32:*3, 7, 13* 33:*5* 35:*19* 36:*21, 22*

*37:6, 10, 18*
38:*2, 12, 23*
40:*25* 41:*10*
42:*1, 17* 43:*1, 5, 17, 20* 44:*12, 13, 16, 20, 23* 45:*5, 9* 46:*8, 16*
47:*12* 48:*4, 8*
49:*4, 20* 50:*12, 18, 22* 51:*9*
53:*17* 54:*15, 21*
55:*22* 56:*16*
58:*17* 59:*15, 22*
60:*6* 61:*3, 6*
62:*11, 24* 63:*10*
65:*3, 20* 66:*20*
67:*13* 68:*10*
69:*4, 23* 70:*10, 13, 22* 71:*4, 8, 16, 23* 75:*22*
76:*3, 6, 12, 25*
77:*5, 8, 11* 79:*1*
81:*9* 84:*24*
87:*1* 88:*18, 24*
89:*6, 7, 13*
90:*16, 22, 23*
91:*11*

**once** 13:*24*
14:*6* 21:*15*
34:*14*

**ones** 19:*16*
69:*21* 87:*25*

**op** 50:*15*

**open** 62:*17*

**operate** 13:*19*
66:*8*

**operated** 36:*14*

**operating** 50:*5*

**Operative** 4:*15*
42:*19, 21* 43:*7*

49:5, 7  50:18
88:15
**operatively**
47:21  48:21
**opined**  41:16
56:19  58:7
81:15
**opines**  67:2
**opinion**  29:19,
22  47:12, 15
48:4, 5  59:3
61:14, 24  62:1
63:10, 15  64:9
65:4, 7, 16, 21
70:10  73:2
75:12, 14, 15
76:13  80:7
84:5  86:18  87:7
**Opinions**  70:16
71:25
**opposed**  25:16
**opposite**  81:19
**options**  52:24
**order**  16:23
35:13  69:13
90:14  91:6
**orders**  91:19
**orthopedic**
15:13, 15  17:2
45:6  47:4  55:18
**orthopedists**
12:19
**outcome**  47:13
94:12
**outlet**  30:12, 18
**overall**  6:1
**overcome**  65:25
**overlying**  49:23
**overpowering**
25:24

**< P >**
**p.m**  2:13  5:4
44:17  71:8, 12
91:25
**PAGE**  4:2, 9
13:6  18:10, 12
22:11  43:5
49:20  54:23
58:18  61:12, 13
62:17  67:1  89:7
**pain**  18:14, 23
19:4  22:15, 17,
18, 21, 24, 25
23:5, 6, 10, 15,
20, 22  24:1, 11,
24  25:2, 3, 6
27:24  28:4, 7, 9,
10  45:10  47:21
51:16  52:3, 22,
23  55:14  56:5,
6, 11  61:1
66:12  84:20
**painful**  51:19
**palsy**  12:1
**pan**  54:4
**paper**  11:25
**par**  46:3
**paragraph**
18:11, 20  22:12
49:21
**paragraphs**  43:6
**paresthesia**
31:25  35:20
38:20
**part**  31:19
39:10, 12, 14
82:2
**partial**  70:8

**particular**  24:8,
10  54:13  65:17
69:14  80:13
**parties**  94:8, 11
**passive**  65:13
**passively**  18:23
**patella**  80:21
**pathology**  30:17
55:20, 21  70:7
**patient**  22:12
27:8  28:25
36:10  52:9
53:24  56:2
60:8  64:18
72:5, 22, 25
73:8  75:2  77:22
**patients**  12:20
14:14  16:13, 22
68:23
**patient's**  55:14
**patterns**  11:22
**pause**  62:13
**peer**  78:21
**penetrating**  35:3
**penetration**
34:24
**people**  44:4
**percent**  16:8, 11,
12, 20  36:5
60:25  86:23
87:15, 24  89:14,
21
**percentage**
16:16  36:2
62:19  86:22
**perform**  13:13
14:24  17:2
51:21  67:6
74:15  75:1
**performed**  74:13

**performing**
65:7  90:4
**period**  14:6
33:21  59:11
**Peripheral**
11:17, 23  12:16
13:8, 11  29:1
30:17  38:8
55:21  80:9
**peripherally**
24:8
**permanent**  46:9
64:10, 13, 16, 21
65:22  66:2
86:11, 12, 13, 19,
22
**permanently**
64:25
**person**  17:6
93:5
**personal**  9:13
17:10
**personally**
19:17  27:22
28:2
**photos**  30:2
**physiatrist**  67:6
**physical**  26:20
28:14  45:19
48:2  61:18
74:3, 18, 23  83:3
**physician**  6:4,
25  27:8  36:10
**physicians**
19:13  20:11
**physician's**
47:18
**picked**  38:24
**Picture**  4:12, 13
**pinch**  25:12

pinched 48:*25*
pinching 25:*17*
pinky 31:*10, 17,*
*21, 25* 38:*20*
place 12:*24*
34:*17* 40:*16*
52:*19*
placed 48:*23*
Plaintiff 2:*5*
3:*2* 5:*11*
plan 52:*8* 74:*21*
play 79:*23*
playing 79:*19,*
*22*
please 5:*7* 6:*10*
21:*15* 28:*1*
34:*6* 58:*12*
90:*15, 21* 91:*10*
plexal 54:*5*
plexopathy
34:*21* 35:*19*
Plexus 4:*14*
11:*15, 19, 24*
12:*5, 12, 18*
13:*9, 14, 18, 20,*
*23* 14:*3, 21, 23*
15:*1, 3, 17*
16:*16, 17, 22*
27:*24* 28:*4, 7,*
*11* 32:*4* 33:*1, 4,*
*5, 11* 34:*5, 8, 14,*
*15, 18* 35:*9, 25*
36:*3, 11, 13, 14*
37:*3, 5, 11, 16*
38:*10* 40:*15*
53:*24* 54:*3, 4, 6,*
*9, 12* 55:*18*
67:*3, 8, 14, 15,*
*16, 19* 68:*2, 5,*
*18* 69:*1, 5, 13,*
*17* 72:*6, 21, 25*

73:*3, 8, 12, 17,*
*20, 21* 74:*4, 9,*
*14* 75:*8* 78:*7*
82:*20, 25* 83:*5,*
*8, 10, 24*
plus 16:*12* 32:*5*
pm 90:*11*
pocket 45:*22*
46:*6, 21*
point 26:*8, 14*
28:*15* 40:*17*
43:*8, 13* 47:*25*
48:*9* 49:*12, 25*
51:*10* 59:*24*
60:*19* 67:*2*
74:*4* 76:*22*
88:*13*
points 26:*12, 13*
pollicis 25:*14*
poor 51:*17*
position 78:*15*
positional 79:*18*
positioning
33:*20* 79:*20*
positive 24:*5, 6,*
*18, 22* 25:*5, 9,*
*18* 36:*15, 16, 17*
47:*17* 75:*19*
88:*21* 89:*17*
possibility 29:*15*
64:*22* 65:*12*
70:*17*
possible 7:*12*
29:*23* 33:*14*
34:*4, 7* 56:*8*
58:*7, 23* 70:*13*
71:*20* 83:*18*
85:*13* 86:*2, 9*
Possibly 64:*15*
post 13:*6* 47:*21*

48:*21*
posterior 38:*9*
posteriorly
35:*12* 40:*13*
postural 68:*23*
potential 80:*21*
81:*9*
potentially
58:*25* 65:*15*
79:*21* 81:*4*
85:*15* 86:*5*
Powell 3:*13*
power 47:*5*
51:*5* 84:*4*
powered 26:*6*
practice 16:*8,*
*16, 24* 88:*2*
predated 45:*11*
81:*10*
predisposing
80:*13*
preexisting
21:*21* 22:*2*
41:*17* 70:*14*
81:*5*
preferentially
82:*21*
prepare 9:*10,*
*20* 10:*5*
prepared 45:*5*
94:*3*
presence 51:*11*
52:*3*
PRESENT 3:*20*
56:*2*
presented 18:*21*
22:*12* 74:*5*
presenting 56:*11*
press 24:*22*
pressed 25:*1*

pressure 48:*22*
pretty 47:*21*
previous 60:*10*
63:*25*
previously 9:*15*
43:*23* 81:*15*
Price 4:*18, 19*
56:*19* 58:*7, 19*
60:*8* 85:*20*
Price's 56:*17*
58:*17* 61:*4, 14,*
*25* 62:*1* 85:*2, 3*
primary 78:*24*
prior 17:*14*
18:*1* 20:*4, 12,*
*19* 21:*1, 7*
26:*25* 37:*19*
40:*23* 45:*15*
50:*13* 63:*11*
80:*12* 87:*10*
probability
70:*17* 72:*2, 5*
76:*9* 80:*3* 84:*9*
probable 56:*19*
71:*21* 78:*17*
80:*11* 85:*20*
86:*2, 5, 7*
Probably 5:*24*
16:*20* 60:*8*
problem 22:*13,*
*22* 23:*2, 17, 19*
24:*16* 26:*22*
38:*17* 41:*18*
43:*15* 58:*23*
60:*10, 23* 68:*14,*
*15* 70:*7* 75:*13*
78:*3* 80:*11*
84:*12* 88:*5, 7, 9*
probleMs 55:*17*
57:*6* 58:*9*

68:*17*  80:*16*
84:*18*  88:*12*
**procedure**  48:*9,*
*12*  52:5  53:*8,*
*17, 18*  54:*13*
66:*4*
**procedures**
53:*20*
**proceeding**  52:*4,*
*6*  91:*25*  94:*4*
**PROCEEDINGS**
5:*1*  94:*6*
**produced**  11:*2*
**production**  8:*16*
**professionals**
90:*4*
**program**  14:*17*
**progression**
35:*12*
**propensity**  80:*10*
**protected**  26:*15*
**protection**  35:*17*
**protective**  26:*17*
**provide**  82:*2, 5*
**providing**  10:*19*
75:*2*
**proximal**  49:*24*
52:*12*
**proximally**
49:*23*
**Public**  2:*15*
93:*1, 17*
**pull**  25:*24*
36:*20*  41:*17*
61:*6*
**pulled**  32:*23*
**pulling**  81:*19*
**put**  36:7  42:*4,*
*13*  46:*20*  48:*19*
84:*24*

**putting**  85:*21*

**< Q >**
**qualified**  15:*2, 6*
**quantify**  36:*9*
**question**  7:*10,*
*17*  10:*20*  23:*14,*
*16, 21*  28:*1*
34:*6*  38:*12*
62:*3*  73:*14*
83:*13, 16*  84:*3*
87:*2*  88:*18*
**questions**  8:*7*
70:*24*  71:*1, 15,*
*18*  78:*10, 12*
81:*18*  84:*11*
86:*25*  90:*7*
**quick**  88:*25*
**quickly**  33:*16*
**quite**  48:*14*

**< R >**
**radial**  11:*25*
12:*1*
**radiating**  24:*9,*
*23, 24*
**radiographic**
36:*17*
**radiographs**
36:*18*
**raise**  6:*10*  57:*17*
**raised**  40:*25*
60:*21*  84:*18*
**raising**  41:*8*
57:*22, 25*  60:*20,*
*22*  84:*22*
**range**  18:*22, 23*
45:*24*  46:*1, 4,*
*10, 11, 17*  56:*5*
58:*8*  59:*1*  62:*4,*

*6*  65:*13*  85:*16*
**rare**  70:*25*
**rate**  88:*21*
89:*14, 17, 21*
**rating**  46:*21*
61:*4, 14, 19, 21*
85:*5*  86:*12*
**ratings**  46:*9, 11,*
*12*  85:*2*  86:*12,*
*13*
**reacted**  40:*19*
41:*11*
**read**  18:*3*
42:*18*  85:*11*
90:*13*
**reads**  43:*15*
**real**  88:*25*
**really**  17:*18*
31:*5*  33:*24*
36:*18*  48:*13*
54:*12*  62:*4*
80:*16*  84:*16*
**reason**  8:*6*
27:*23*  28:*2, 8,*
*10*  35:*10*  48:*2*
55:*15*  62:*10*
73:*2*  88:*4*
**reasonable**
28:*18*  43:*20*
60:*25*  70:*17*
71:*22*  72:*2, 4*
76:*9*  80:*3*  84:*8*
**reasons**  72:*8*
**Rebuttal**  4:*18*
85:*3*
**recall**  56:*21*
60:*2*  77:*23*
78:*11, 15*  83:*16*
**received**  16:*6*
17:*22*

**recipe**  51:*12*
66:*11*
**recommend**
52:*4, 5*  53:*1, 7*
66:*1, 3*
**recommendation**
52:*2*
**recommended**
65:*5*
**record**  5:*3*
7:*12, 20, 23*
15:*23*  19:*6*
44:*16, 18, 19*
71:6, *9, 10, 12*
90:*11, 24*  93:*9*
94:*5*
**recorded**  5:*5*
**recording**  94:*4*
**records**  8:*16*
9:*9, 14*  16:*9*
17:*14*  18:*1*
20:*14, 25*  39:*1*
42:*2*  45:*6*
59:*24*  60:*20*
63:*12, 19*  64:*9*
**recovered**  54:*10*
**redo**  6:*7*
**refer**  8:*9*  10:*25*
**reference**  54:*16*
**referred**  22:*21,*
*24, 25*  23:*3, 6*
**referring**  8:*11*
**reflecting**  20:*25*
**reflects**  19:*6*
20:*18*
**regarding**  11:*15*
17:*5*  28:*12*
42:*17*  44:*2*
45:*9*  51:*25*
64:*4, 12*  65:*20*
87:*14, 21*

**Regardless**
69:*23*
**re-get** 54:*6*
**region** 34:*24*
40:*1, 2* 43:*9*
49:*12* 50:*1*
57:*10*
**regularly** 88:*2*
**rehabilitate** 64:*2*
**rehabilitation**
63:*1*
**relate** 72:*15*
**related** 59:*8*
70:*11* 73:*15*
76:*7, 10* 77:*14,*
*19, 25* 80:*4, 7,*
*22* 81:*12, 16*
84:*6, 7, 12*
86:*16* 87:*6* 94:*7*
**relatedness**
80:*20*
**relates** 28:*9*
29:*20* 30:*17*
63:*15* 64:*11*
66:*19* 69:*3*
78:*4* 79:*9*
**relating** 29:*24*
**relation** 89:*18*
**relationship**
72:*14*
**relative** 94:*9*
**relatively** 67:*11*
**release** 43:*16*
53:*12, 17, 18*
77:*18*
**released** 88:*17*
**releasing** 66:*17*
**reliability** 87:*20*
**reliable** 87:*23*
90:*3*
**relieve** 50:*6*

**remain** 64:*20*
65:*1*
**remainder** 16:*24*
**remember**
12:*23* 13:*1*
14:*13* 37:*24*
42:*24* 49:*5, 9*
58:*9* 65:*5, 6*
**remove** 59:*20*
**removed** 59:*21*
**repair** 12:*2*
51:*15, 22* 52:*1,*
*4* 64:*23* 65:*8*
**repairing** 51:*10*
**repeat** 28:*1*
34:*6*
**repetition** 79:*11*
**repetitive** 33:*20*
78:*5, 14* 79:*7, 9,*
*20, 25*
**Report** 4:*15, 16,*
*17, 18, 19, 20*
10:*22* 17:*13, 21,*
*23* 22:*9, 11*
28:*16* 29:*6, 12,*
*16* 32:*3* 35:*7*
38:*23* 39:*12, 16*
41:*9, 16, 24*
42:*19, 21, 25*
43:*7, 17* 44:*22*
45:*5* 47:*3* 49:*5,*
*8, 21* 50:*3, 15,*
*19, 23* 51:*4*
54:*16, 21, 23*
58:*17, 19, 20*
60:*7* 61:*4, 12,*
*13* 66:*24* 67:*1*
85:*4* 88:*15*
**reported** 8:*12*
93:*8*

**Reporter** 2:*15*
5:*8* 6:*5, 9, 16*
7:*8* 10:*18, 21*
11:*4, 6* 30:*4*
44:*15* 45:*2*
54:*18* 61:*9*
90:*12, 16, 21, 23*
91:*2, 5, 9, 11, 16*
**reporting** 74:*1*
**reports** 8:*20*
56:*17* 87:*9*
**representative**
61:*20*
**represents** 37:*5*
**request** 7:*16*
**requested** 8:*24*
**require** 60:*1, 16*
**required** 84:*17*
**requires** 80:*17*
**research** 11:*9,*
*13*
**Reserved** 91:*24*
**responding**
58:*19, 21*
**response** 19:*5*
23:*13* 25:*2, 5, 7*
45:*5* 49:*3*
57:*16* 90:*8*
**responses** 63:*6*
**rest** 32:*22*
82:*19*
**result** 32:*4*
50:*9* 51:*17*
56:*20* 59:*12*
60:*11* 86:*19, 23*
**retrocondylar**
49:*25*
**returns** 19:*3*
**review** 9:*6, 9, 12,*
*13* 10:*19* 15:*23*
16:*10* 20:*18, 25*

21:*6* 42:*18*
45:*6, 10* 56:*16*
63:*5*
**reviewed** 9:*13,*
*14* 11:*13* 17:*14*
27:*4* 42:*25*
51:*24* 64:*9*
78:*21*
**reviewing** 58:*20*
**revving** 58:*6*
**right** 5:*2* 6:*10*
11:*11* 23:*17*
32:*7, 8* 42:*3*
44:*2* 50:*3*
71:*11* 72:*4*
77:*8* 79:*23, 24*
81:*20* 85:*11*
90:*10* 91:*18, 22*
**ring** 22:*14*
23:*19* 24:*1, 12,*
*24* 31:*17, 21*
47:*5* 51:*6*
**Ringsby** 3:*5*
**ripped** 82:*25*
**risk** 66:*5*
**road** 78:*24* 79:*1*
**ROB** 3:*11*
**rob.barlow@gar
nettlegalgroup.co
m** 3:*16*
**Robert** 5:*12*
**Rocky** 45:*6*
47:*3*
**roof** 81:*2, 5*
82:*1, 4*
**root** 12:*16* 29:*2*
**roots** 37:*15*
**rotation** 18:*14*
19:*5, 15, 16*
45:*21, 22* 46:*4,*

*13*, *19*  47:*2*
**rotations**  46:*3*
**rotator**  18:*13*, *24*, *25*  19:*7*, *13*  21:*25*  47:*9*  51:*15*, *21*  52:*1*  54:*24*, *25*  55:*4*, *9*  56:*2*, *4*  57:*6*, *18*, *19*, *20*, *22*  60:*5*, *17*  64:*4*, *23*  65:*4*, *8*  70:*7*, *14*, *20*
**Roughly**  39:*24*
**route**  35:*17*
**routine**  16:*22*
**rubric**  62:*18*
**rule**  7:*16*
**rules**  7:*5*
**run**  14:*23*  16:*15*
**rush**  91:*13*, *14*

< S >
**saw**  13:*5*  69:*10*  86:*12*  87:*9*
**saying**  7:*10*  32:*7*  35:*5*  77:*13*
**says**  23:*18*  24:*1*  43:*7*  88:*15*  89:*13*
**scapula**  35:*16*  39:*21*  40:*14*
**scapular**  39:*25*
**scar**  41:*17*
**schematic**  37:*4*
**screen**  10:*8*  89:*4*
**scroll**  11:*9*
**Second**  4:*16*  18:*10*, *11*, *12*  49:*20*

**see**  10:*11*, *16*  16:*21*  18:*15*  20:*17*  22:*9*  27:*3*  30:*8*, *24*  36:*22*  38:*19*  42:*23*  47:*8*, *10*  54:*22*  62:*14*  66:*15*  68:*19*  69:*18*  72:*24*  82:*11*  88:*2*  89:*7*, *10*, *13*
**seeing**  14:*13*  58:*9*
**seek**  64:*18*
**seeks**  64:*21*
**seen**  27:*3*, *17*  73:*16*, *19*  77:*1*  84:*4*
**sees**  47:*20*  61:*18*
**send**  9:*2*, *5*  11:*3*  90:*19*  91:*1*
**sends**  24:*9*
**sensation**  21:*7*  26:*19*
**sense**  16:*21*  57:*5*  82:*18*
**sensory**  31:*14*  62:*14*, *15*, *17*
**sent**  8:*23*
**sentence**  85:*11*, *17*, *18*  86:*3*
**sentry**  31:*16*
**series**  9:*16*
**severe**  68:*14*
**share**  10:*8*  30:*24*  49:*14*  50:*23*  89:*4*
**sharing**  19:*12*
**sharp**  34:*24*

35:*1*, *3*
**sheath**  78:*4*
**Shivers**  3:*21*  5:*6*
**shock**  21:*7*  55:*23*
**shortly**  48:*10*, *12*  50:*10*
**Shoulder**  12:*25*  21:*21*, *25*  22:*1*, *15*, *17*, *18*, *23*  23:*5*, *11*, *15*, *17*, *20*, *22*, *23*  24:*1*, *2*  32:*5*  40:*3*  45:*9*, *10*, *15*  46:*10*, *22*, *24*  51:*19*, *20*  54:*11*, *24*  56:*7*, *14*, *20*, *24*  57:*12*  58:*24*  59:*6*  60:*4*, *9*, *10*, *23*  61:*1*, *2*  62:*25*  63:*24*  64:*3*, *17*, *19*  65:*1*  84:*11*, *20*  85:*13*
**shoulder's**  32:*9*
**show**  30:*1*  36:*11*, *21*  50:*14*, *15*  58:*12*  66:*20*  67:*25*  68:*3*  69:*5*  73:*7*, *11*  75:*23*  83:*1*, *2*  87:*10*
**showed**  47:*23*
**showing**  30:*10*  69:*2*  75:*16*
**shown**  31:*6*
**shows**  37:*6*
**sic**  13:*7*  38:*4*  80:*15*

**side**  14:*15*  31:*10*, *16*, *20*, *21*  35:*17*  41:*3*  79:*23*, *24*  89:*20*
**sign**  25:*9*, *11*, *21*, *22*  90:*13*
**Signature**  91:*24*
**significant**  24:*21*  34:*1*  47:*19*, *21*  48:*20*  49:*2*  68:*15*  79:*10*
**single**  26:*14*  88:*13*
**sir**  71:*17*, *24*  72:*3*, *7*, *10*  73:*1*, *5*, *9*, *13*, *18*, *23*  74:*2*  75:*6*, *9*  76:*5*, *17*, *20*  77:*10*, *12*, *20*  78:*1*, *13*, *16*, *19*  79:*3*, *6*  80:*6*, *19*, *24*  81:*11*, *13*, *17*, *21*  82:*3*, *6*, *10*, *13*  83:*17*, *20*, *23*  84:*2*, *10*, *14*  85:*19*, *24*  86:*4*, *6*, *8*, *10*, *15*, *17*, *20*, *24*  89:*9*, *15*, *19*, *23*  90:*2*
**situation**  66:*19*  80:*11*
**six**  5:*25*  7:*3*
**size**  34:*2*
**skills**  94:*6*
**skin**  35:*4*  69:*9*
**sleep**  33:*21*
**slightly**  26:*18*, *19*  35:*11*
**sling**  48:*24*  59:*16*, *20*  60:*2*, *4*

**small** 22:*13*
23:*19* 24:*1*, *12*,
*25* 25:*25* 26:*1*
47:*5* 51:*6* 67:*11*
**Society** 12:*25*
**soft** 48:*24*
**somebody** 54:*17*
57:*20*
**Sorry** 6:*7*, *9*
10:*20*, *21* 15:*20*
23:*12* 29:*10*
40:*1* 49:*18*
51:*2* 67:*15*
68:*1*, *11* 91:*4*, *17*
**sort** 7:*21* 9:*25*
13:*16*, *17* 32:*7*
34:*2* 35:*12*
40:*11* 46:*5*
48:*24* 51:*19*
53:*21* 54:*2*, *12*
62:*13*, *18*, *21*
67:*23* 70:*6*
78:*24* 79:*22*, *23*
82:*17*, *21* 83:*25*
**sounds** 52:*13*
66:*6* 71:*4* 78:*8*
**source** 22:*16*
23:*3*, *15*, *22*
52:*22*
**space** 53:*21*
**spans** 12:*17*
**speaking** 7:*11*
**specialization**
13:*16*
**specialized**
12:*18*
**specialty** 13:*11*,
*12*
**specific** 14:*20*
89:*7*

**specifically**
14:*25* 29:*17*
39:*14*
**spectrum** 54:*12*
67:*21* 68:*9*, *10*,
*11*
**spend** 16:*9*
**spent** 16:*12*
**spillovers** 13:*25*
**spinal** 37:*6*
46:*13* 53:*22*
82:*25*
**spine** 29:*1*, *3*, *24*
30:*17* 53:*11*, *20*,
*22* 55:*17*, *20*
70:*6* 80:*9*, *21*
81:*7*
**splint** 59:*19*, *23*
**splinted** 59:*14*,
*25*
**splinting** 58:*25*
59:*7*, *12*, *18*
60:*1* 85:*15*
**spoke** 91:*16*
**spoken** 17:*8*
**squeezed** 48:*16*
**standard** 72:*1*
**stands** 62:*11*
**Starbucks** 2:*7*
5:*3*, *13* 8:*9*, *11*
17:*14* 19:*20*
20:*5*, *12*, *19*
21:*2*, *8*, *14*, *18*,
*23* 22:*6* 27:*1*
45:*12* 70:*11*, *15*
71:*16*
**started** 21:*22*
22:*5*
**state** 38:*24*
93:*2*, *12*, *18*
**stated** 18:*12*

**statement** 60:*12*
74:*11*
**STATES** 2:*1*
22:*13* 45:*10*
67:*2*
**static** 88:*8*, *9*
**statistic** 87:*16*
**steering** 79:*2*
**stepwise** 35:*12*
**stiffening** 51:*19*
**stiffness** 51:*11*
**stop** 19:*12*
30:*24*
**story** 74:*5*, *22*
**Street** 3:*14*
**strength** 18:*13*,
*17*, *18*, *24*, *25*
19:*2*, *6*, *7*, *13*
26:*5* 27:*5*
**stretch** 32:*4*, *13*
**stretched** 32:*15*
48:*15* 49:*1* 54:*9*
**stretching** 33:*3*,
*7*
**struck** 38:*25*
42:*3*
**Structure** 4:*14*
37:*3* 69:*10*, *11*
**structures** 68:*16*
72:*13*
**strumming**
79:*24*
**studies** 47:*22*,
*23* 50:*15* 67:*8*
74:*14* 77:*7*
83:*2* 87:*15*
88:*11* 89:*8*
**study** 47:*17*
67:*6* 68:*1*, *3*, *19*
69:*2*, *5*, *19* 75:*4*

77:*8*
**stuff** 14:*3*
**subjective** 27:*9*
74:*1*
**subspecialty**
13:*16*
**substantial**
34:*25* 82:*23*
83:*1*
**substantively**
11:*2*
**successfully** 78:*8*
**suddenly** 84:*1*
**suffer** 73:*3*, *21*
80:*4*
**suffered** 74:*8*
**suffering** 67:*15*,
*16*
**Suite** 3:*14*
**superior** 35:*11*
36:*15* 72:*14*
**support** 74:*18*,
*24*
**supported** 27:*10*
**supporting** 74:*7*
75:*17* 78:*22*
**supports** 53:*14*
75:*4*
**sure** 9:*1* 11:*14*
16:*19* 76:*14*
91:*16*
**surgeon** 55:*18*
**surgeries** 13:*14*
14:*24* 53:*23*
80:*12* 90:*5*
**surgery** 13:*24*
14:*1*, *14*, *25*
17:*2* 36:*12*
43:*20* 47:*13*, *16*,
*18* 48:*1*, *9*, *14*
49:*1* 50:*6*, *9*, *13*,

20 53:1 55:4,
10 66:1 74:13,
15 75:1, 19, 20
76:2 77:17
87:10
**surgical** 12:2
14:4, 15 53:8,
17, 18 74:19
**surprise** 84:19
**sutured** 48:24
**swear** 5:8 6:5
**swelling** 34:1
78:4 83:11
**sworn** 6:13
93:7
**symptom** 27:17
47:8, 10 51:6
**symptomatic**
20:4 43:24
44:8 83:16 84:1
**symptomatology**
21:7 36:17
**symptoms** 24:9
26:25 27:9, 24
28:3 29:4
45:15 55:1, 2, 5,
13, 22, 23 56:1,
8, 24 57:13 88:6
**syndrome** 26:25
28:12, 17, 21, 24
29:4, 13, 16, 20,
24 30:12, 18, 19,
20, 21 31:4
42:17 43:14, 24
47:11 52:9
53:2, 12 54:25
55:3 77:18
78:11, 18 87:6,
21 89:6, 12, 18
90:1

**synonym** 67:23

**< T >**
**T-1** 37:15 54:8
**T-12** 46:4
**tables** 62:9
**take** 7:9, 15, 18
71:1
**taken** 94:9
**takes** 64:22
**talk** 7:7 10:5
44:21 71:20
72:8 76:12
80:20 86:11
**talked** 14:20
77:22
**talking** 16:2
58:5 65:3 69:10
**talks** 89:10
**tapped** 24:10
**tapping** 24:7
**target** 82:22
**tear** 42:5 47:9
54:24 56:3, 4, 5,
9 57:18, 21, 23
60:5, 18 65:8
70:8, 14, 20
**tearing** 33:7
**tears** 56:13
**tell** 6:14 26:13
67:18
**tend** 25:14 88:9
**tendon** 78:4
**term** 53:5 67:22
**terminal** 11:24
34:13
**terms** 33:6
**test** 19:3 24:19
36:7, 8 46:19
75:18 88:8, 9
89:22 90:3

**testified** 6:15
15:19 23:13
33:10 87:5, 13
**testify** 8:4 15:3
93:7
**testimony** 15:5,
19, 20, 21, 24
16:2 50:8 93:9
**testing** 18:15
19:14 24:4
27:5 46:18
73:6, 10 74:16,
17 87:21, 23
**tests** 27:6
**tether** 48:17
**tethered** 42:12
**Thank** 6:16
11:6 18:6 31:9
36:20 50:24
88:19 91:22
**thanks** 5:19
71:5
**theoretically**
34:1
**therapeutic**
52:24, 25
**therapy** 63:5, 23
65:12, 15 66:10
**thing** 7:22 8:25
25:16 35:6 54:7
**things** 22:21
25:6 53:21
68:8, 25 71:19,
20, 21 78:6 83:1
**think** 10:25
13:5 22:22
23:11 28:6, 7,
14 29:17, 23
30:3, 18 36:21
37:24 39:19
45:1 49:17

52:3, 19 54:16,
25 55:3, 9, 11
59:7, 9, 18 60:6,
19, 20, 22 61:7,
19, 21 64:19, 25
65:10 66:1, 6,
10, 12, 17 67:15,
16, 21 68:6, 13,
21, 22 69:13
70:3, 18, 21, 22
71:1, 3 77:3, 21
79:17 80:15
84:7, 22 85:3
87:22, 24 90:18
91:14
**thoracic** 30:12,
18
**thought** 65:3
88:23
**three** 12:12, 13
18:21 25:6
79:21
**thrown** 32:23
**thumb** 15:11, 14
25:15, 17 31:16
77:21, 23, 25
78:3, 5
**thumbs** 25:12
**Thursday** 2:12
**tied** 37:10
**tight** 43:7, 12
49:25
**tightly** 48:19, 25
**Time** 2:13 5:4,
22 7:2 9:23
14:6, 12 18:12
33:21 40:20, 22
41:11 44:17
59:11 65:10
67:18 71:8, 11

Case No. 1:21-cv-03295-GPG-KAS    Document 101-17    filed 05/23/25    USDC Colorado
pg 50 of 52
Matthew R. DeJarosa, M.D.

6/6/2024
Page 22

81:*2*  87:*16*
90:*10*  91:*21*
**timeline**  76:*12*
**times**  6:*1, 22, 23*
9:*22*  15:*18*
36:*7*  55:*19*
**timing**  16:*21*
**Tinel's**  24:*5, 6, 7*
**tingling**  21:*1, 13,*
*17, 22*  22:*5*
23:*1*  24:*12, 24*
25:*4, 7*  55:*23*
**tissue**  41:*17*
48:*24*
**today**  5:*17*
7:*25*  8:*4, 7, 9,*
*17*  9:*10, 20*
10:*6*  22:*15*  91:*6*
**Today's**  5:*3*
8:*15*
**top**  18:*11*  43:*6*
49:*21*  60:*21*
69:*10*
**topic**  12:*10*
13:*17*  54:*3*
**topics**  12:*18*
**totality**  63:*3*
**touched**  26:*12*
29:*17*
**TP.one**  5:*7*
**traction**  32:*5,*
*24*  34:*25*  41:*16,*
*25*  42:*5*  53:*24*
54:*13*  81:*19, 23*
82:*2, 5, 7, 19, 20*
**training**  13:*6, 9,*
*16*  14:*21*
**trans**  90:*14*
91:*9, 10*
**TRANSCRIBER**
94:*1*

**transcript**  91:*6*
93:*12*  94:*3, 5*
**transfer**  54:*6,*
*10*  91:*8*
**transfers**  12:*19,*
*21*
**translocating**
88:*3*
**transposed**
66:*15*  88:*17*
**transposition**
48:*17*
**trauma**  34:*24*
43:*24*  58:*24*
59:*6*  60:*11*
68:*21*  69:*3*
74:*17*  83:*1, 15*
85:*14*
**traumatic**  33:*22,*
*25*  43:*14*  44:*7*
56:*12*  57:*8*
68:*4*  69:*4, 21*
**traveled**  13:*18*
**Treadwell**  4:*15*
22:*13*  24:*4*
26:*21*  42:*21*
49:*22*  87:*13*
**Treadwell's**
42:*19*  43:*7*
49:*4*  50:*3, 18*
88:*14*
**treat**  27:*8*
43:*21*  53:*1*
**treated**  78:*8*
**treating**  16:*12*
**treatment**  16:*17*
28:*17*  52:*6, 8,*
*24, 25*  53:*25*
62:*25*  63:*4, 19*
64:*19, 21*  65:*1*

**tree**  32:*21*
42:*13*
**tremendous**  66:*7*
**trial**  16:*3*
**trigger**  77:*21,*
*23, 25*  78:*3*
**triple**  86:*9*
**true**  22:*2*  32:*10*
41:*23*  69:*19*
75:*7*  77:*17*
86:*13*  93:*9*  94:*5*
**trunk**  34:*20*
35:*5, 10, 11, 13,*
*15, 18*  37:*13, 16*
54:*10, 11*  58:*22*
69:*1, 6, 14, 16*
72:*13, 15, 16, 17,*
*19, 21, 25*  82:*17,*
*22*
**truth**  6:*14, 15*
93:*7, 8*
**try**  7:*7, 25*
**trying**  7:*9*
65:*14*
**tumor**  68:*25*
**tunnel**  26:*25*
28:*4, 12, 17*
29:*3, 25*  30:*12,*
*19, 20*  31:*3*
33:*15, 19, 23, 25*
42:*17, 22*  43:*9,*
*13, 14, 16, 18, 23*
47:*11, 13*  48:*1,*
*9*  49:*12*  50:*1*
53:*12, 18*  55:*21*
65:*20, 25*  70:*21*
75:*8, 11, 12, 18,*
*21, 24*  76:*4, 7, 8,*
*21*  77:*1, 6, 14,*
*18*  78:*11, 18, 23*
80:*10*  81:*14*

83:*15*  84:*1*
87:*6, 14, 21, 24*
89:*6, 12, 18, 25*
**Twice**  6:*2*  14:*7*
**Two**  6:*23*  14:*1*
15:*18*  16:*4, 18*
26:*8, 12, 13*
37:*23*  66:*14*
68:*8*  80:*18*
**twofold**  66:*6*
**two-ish**  12:*14*
**Two-point**  26:*11*
**two-week**  14:*17*
**type**  33:*3, 7, 12*
42:*5*  45:*23*
46:*8, 17*  53:*8*
57:*21*  58:*4*
60:*17*  68:*25*
82:*14*
**types**  52:*18, 21*
53:*19*  69:*17*
**typical**  43:*15*
55:*17*  56:*11*
58:*6*  84:*22*
**typically**  38:*15,*
*19*  46:*12, 22*
47:*20*  57:*14*
62:*16*  79:*14*

**< U >**
**uh-huhs**  7:*21*
**Ulnar**  4:*13*
24:*16, 22*  25:*12,*
*19, 23*  26:*6, 22*
28:*9*  30:*11*
31:*4, 6, 10, 18,*
*20, 21*  33:*14, 18,*
*23*  34:*4, 7, 13,*
*14, 16, 19*  37:*10,*
*13, 17*  38:*13, 16*
43:*12*  44:*2, 4*

47:*24*  48:*4*, *6*
49:*8*, *22*  50:*4*, *7*,
*8*, *12*, *17*, *20*
55:*2*, *13*  58:*8*, *9*,
*22*  59:*1*, *2*, *4*, *11*,
*19*  65:21  66:*8*,
*9*, *14*, *19*  70:*8*
75:*10*, *11*, *13*
76:21  77:*3*, *18*
79:*12*, *16*  85:*16*,
*17*  88:*1*, *11*, *14*
89:*17*, *25*
**ultimately**  74:*18*
78:*6*
**umbrella**  8:*12*
39:*6*, *8*, *10*, *12*,
*15*, *17*  45:*11*
57:*9*  59:*9*
60:*25*  70:*19*
76:*7*, *10*  77:*5*,
*14*, *19*  78:*9*
80:*5*, *14*, *16*, *23*
81:*6*, *10*, *16*
84:*6*, *13*  86:*14*,
*16*, *19*, *23*
**umbrellas**  38:*25*
**unaware**  12:*19*
**uncertain**  63:*8*
**understand**
*7*:*13*  57:7  61:*24*
**understanding**
32:*1*  41:*22*
45:*14*  83:*21*
87:*20*  89:*16*
**understood**  8:*13*
40:*5*
**Unit**  3:*5*
**UNITED**  2:*1*
**unprobable**
80:*15*
**unrelated**  78:*9*

**unstable**  79:*12*
88:*1*, *14*, *16*, *17*
**untethered**
41:*18*
**Upper**  17:*1*
19:*19*  20:*11*
21:*13*, *17*  35:*10*,
*14*, *18*  51:*12*
54:*10*  62:*20*
64:*12*, *13*  69:*15*
72:*15*, *19*, *21*, *24*
76:*19*  78:7
**use**  46:*9*  54:*5*
90:*4*
**usually**  32:*16*
33:*2*, *20*  46:*4*
48:*17*  51:*18*
57:*25*  58:*1*
82:*23*
**utilized**  62:*15*

**< V >**
**vascular**  15:*16*
**vast**  30:*16*
**vehicles**  78:*25*
79:*2*
**velocity**  39:*8*
40:*9*, *12*
**version**  24:*23*
**versus**  5:*3*
14:*14*  26:*14*
**vibration**  78:*24*
79:*25*  80:*1*
**vibratory**  78:*6*,
*22*  79:*18*, *19*
**VIDEO**  2:*10*
5:*5*  91:*19*, *20*
**Videoconference**
2:*14*
**Videographer**
3:*21*  5:*2*  7:*8*

44:*17*  71:*8*, *11*
90:*10*  91:*18*, *22*
**viewing**  10:*22*
**visit**  65:*11*, *17*

**< W >**
**want**  10:*8*  11:*9*,
*14*  24:*5*  31:*5*
44:*20*  71:*20*
73:*15*  75:*10*
80:*20*  86:*11*
**wanted**  17:*25*
**Wartenberg**
25:*21*, *22*
**way**  12:*16*  38:*8*
39:*5*  40:*21*
43:*25*  59:*7*
62:*16*  64:*2*
90:*23*
**weak**  25:*13*
**weaker**  25:*24*
**weakness**  19:*18*
20:*11*  21:*13*, *17*
45:*11*  64:*4*
**weaving**  38:*10*
**weekly**  13:*11*
**weighed**  39:*6*
**weight**  58:*1*, *4*
60:*17*
**weird**  18:*4*
**well**  7:*22*  10:*25*
11:*24*, *25*  12:*9*,
*18*  16:*22*  17:*3*
23:*18*  29:*1*
42:*23*  44:*1*
47:*11*  57:*20*
63:*25*  65:*3*
82:*16*, *20*  85:*3*
**well-trained**
67:*5*
**went**  49:*11*

**we're**  7:*9*  9:*1*
33:*5*  35:*5*  43:*5*
44:*17*  60:*7*
69:*10*  71:*2*, *9*,
*12*  90:*11*
**we've**  14:*19*
44:*12*  82:*21*
**wheel**  79:*2*
**WHEREOF**
93:*11*
**wholly**  62:*22*
**wind**  38:*24*
**witness**  5:*9*  6:*6*,
*13*  15:*21*, *23*
16:*9*  19:*22*
20:*1*, *7*, *15*, *22*
21:*4*, *10*, *20*
23:*25*  27:*15*, *20*
29:*9*  34:*10*, *23*
35:*22*  36:*24*
37:*23*  38:*6*
41:*13*  42:*6*, *11*
44:*10*, *23*  45:*17*
52:*11*  53:*4*, *10*
54:*2*  56:*11*
57:*2*, *25*  58:*12*
60:*14*  61:*17*
63:*3*, *14*, *21*
64:*6*  65:*10*
68:*21*  69:*21*
70:*3*, *18*  85:*24*
87:*18*  93:*6*, *11*
**word**  86:*2*, *5*, 7
**words**  22:*3*
66:*11*  75:*1*
**work**  52:*13*, *17*
53:*13*  54:*11*
**worked**  52:*11*
**works**  89:*5*
**workup**  52:*16*
**world**  13:*20*

**TP** One

worse  29:*5*
55:*5*  59:*6*
**worsen**  57:*22*
60:*17, 23*  84:*17,*
*23*
**worsened**  84:*11*
**worsening**
56:*20, 24*  57:*6,*
*12*  61:*1*
**wound**  13:*25*
34:*23*  35:*1*
**wrap**  81:*15*
**wraps**  31:*15*
**wrist**  15:*10, 15*
**writes**  58:*19*
**written**  11:*15*
**wrong**  54:*17*
**wrote**  54:*23*

**< Y >**
**yanked**  32:*21*
**Yeah**  7:*3*  9:*5*
10:*13*  19:*23, 24*
28:*2*  44:*15*
46:*23*  49:*15, 18*
50:*18*  58:*14*
61:*24*  67:*22*
83:*3*  85:*6, 9*
90:*14, 18*  91:*14*
**year**  5:*24*  7:*3*
12:*14, 22*  13:*1,*
*10, 14*
**years**  12:*13, 14*
**Yep**  18:*8*
**yeses**  7:*21*
**yesterday**  87:*13*
**younger**  68:*24*

**< Z >**
**Zoom**  2:*14*  18:*2*